UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| LORI COOK individually,<br><br>Plaintiff,<br><br>v.<br><br>HARRISON MEDICAL CENTER, a Washington nonprofit corporation,<br><br>Defendant. | NO. 3:13-cv-05986<br><br>COMPLAINT<br><br>(JURY TRIAL DEMANDED) |

## **COMPLAINT**

1.  Plaintiff, Lori Cook, brings these causes of action against defendant HARRISON MEDICAL CENTER under 31 U.S.C. 3729, *et seq.*, the False Claims Act, for unlawfully and intentionally retaliating against Cook in violation of the anti-retaliation provisions of the False Claims Act, 31 U.S.C. 3730(h). Cook engaged in investigation and information gathering about possible Medicare fraud (a protected activity under the FCA), and defendant, with knowledge of such conduct, retaliated by wrongfully terminating Cook's employment because she engaged in such activity.

COMPLAINT - 1

**INTRODUCTION**

2. This is a civil action to recover damages in excess of $75,000 plus all applicable civil penalties and other relief from Defendant for unlawfully and intentionally retaliating against Cook in violation of the anti-retaliation provisions of the False Claims Act, 31 U.S.C. 3730(h).

**JURIDSICTION AND VENUE**

3. This Court has jurisdiction under the Federal False Claims Act, 31 U.S.C. 3732.

4. The claims in the proposed action arise from the defendant's participation in the Medicare insurance program in Bremerton, Washington, and therefore under the applicable statues and court rules, venue is proper in the Western District of Washington at Tacoma.

**PARTIES**

5. Lori Cook is a plaintiff for herself under 31 U.S.C. 3730(b)(1).

6. Defendant HARRISON MEDICAL CENTER ("Harrison") is a Washington nonprofit corporation, with its principal offices located in Bremerton, Washington.

7. Whenever reference is made in this Complaint to any representation, act, or transaction of the Defendant herein, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents, or representatives, while actively engaged in the course and scope of their employment, did authorize such acts or transactions on behalf of the Defendant. The Defendant is referred to hereafter as "Harrison."

**FACTS**

8. Lori Cook began employment at Harrison in April 2011, as the Billing Manager for Harrison Home Health, a service of Harrison. She has worked in this field for more than 35 years at a number of health care facilities in Washington and Illinois. Harrison

used McKesson Horizon Homecare Software to prepare its Medicare billings.

9. At the time she started working for Harrison, no one had been in her position for over one year, and so much of her job was trying to catch up on the backlogged Medicare billing. During these early months, she made good progress reducing the accounts receivable balance. There was a large backlog of work and untimely claims.

10. The interim director reviewed and approved the first Medicare Credit Report Cook prepared, which she submitted to the interim director on April 30, 2011. Thereafter, it was Cook's job to do all the billing and payment posting for Medicare for Harrison. Problems sometimes occur in Medicare billing because of software/claim format set-up problems or errors, new insurance changes, and details needed by specific payers, etc. When such problems arose, Cook would call the McKesson software company, whose software Harrison used to generate its requests for Medicare reimbursement. McKesson kept a record of all the questions Cook asked and information they provided in these conversations.

11. It was also Cook's job to process and organize follow-up work on all outstanding accounts, research new processes and requirements, correct accounts as per system requirements, table maintenance of software, prepare month-end reports for finance, prepare quarterly Medicare credit balance reports, perform weekend Administrator on-call duties, answer personnel questions, and write and give evaluations.

12. In July 2011, Diane Wasson became Harrison's Home Health Director. At the end of July 2011, Cook received a good three-month evaluation from Director Wasson.

13. Between July 2011 and March 2012, Cook worked closely with McKesson Software support and the Harrison 5010 electronic claim format implementation team to ensure that Medicare's required change for electronic claims was in the proper 5010 format before the date required by Medicare.

COMPLAINT - 3

14. Between July 2011 and July 2012, Director Wasson reviewed, accepted, approved, and signed five Medicare credit balance reports that Cook prepared.

15. In October and November 2012, Cook began investigating irregularities in Harrison's billing system that she believed had Medicare fraud implications. McKesson customer service representatives Jason and Tiffany answered a number of Medicare credit balance report and overpayment report questions Cook asked. Cook also asked questions about the accounts receivable reconciliation report. She verified with both of them that the credit amounts on the accounts receivable aging and the accounts receivable reconciliation reports should match. Cook gave all this information to Director Wasson.

16. On November 6, 2012, Cook learned from McKesson customer service representative Tiffany that an operation called "Gen End," which processes the revenue for Medicare charges, was to be updated for revenue only at the end of each month. Cook ran that operation by checking a box that asked "Do you want to affect revenue?" Cook, however, had been taught by Harrison to run this operation in the software every day. The manual that Harrison provided to instruct Cook and her predecessors, which was prepared by Harrison, not McKesson, as to how they were supposed to operate the McKesson software specifically provided that the Gen End operation was supposed to be run every day. After Cook's conversation with Tiffany, she double checked the instructions in Harrison's manual for the McKesson software and confirmed it called for the Gen End operation to be run daily. Cook does not possess a copy of this manual.

17. Cook, and her predecessors at Harrison, had been checking the "affect revenue" box every time they ran the Gen End, which they ran at least once a day, for many years. Given that running the program this way affected revenue every time they ran the Gen End, total revenue for the Medicare insurances would have been falsely inflated. Because the total revenue was greater than required to reimburse the hospital, the

COMPLAINT - 4

contractual allowances for the same accounts would also show incorrect results. Because both the revenue and the contractual allowances were falsely inflated, they would appear to match, and so the problem was invisible to Cook and others who reviewed the reports. At some level above Cook, however, it should have been apparent that more revenue than was justified was being collected.

18. Again, Cook directly communicated all of this information to Director Wasson and gave her a copy of Harrison's manual on how to run the McKesson software. Cook had been following this daily procedure from the outset at Harrison. Cook was now suspicious that this multiple updating of the revenue resulted in systematic upcharging of Medicare.

19. Cook's suspicion that running the Gen End operation daily resulted in upcharging was confirmed the day after Cook informed Director Wasson of this issue. On November 7, 2012, Wasson and the Human Resource representative, Karen Holland, asked Cook to attend a meeting with them. At the meeting, Holland said that Director Wasson had told her that Harrison might not have been correctly reporting all credit balances to Medicare. Director Wasson added that the total overpayment report that goes to Harrison Finance department was showing an $80,000.00 balance but the accounts receivable report credit (overpayment) listing was showing a $48,000.00 balance, and that these two balances should match, which they obviously did not. Director Wasson added that this was a serious problem and that Cook had probably committed Medicare fraud.

20. At the November 7, 2012 meeting, Director Wasson told Cook that an Internal Investigation had been ordered and that Cook would not be involved. Holland told Cook that, as of that point, she was suspended from her job. Holland asked Cook to turn in her ID badge and keys. Holland told Cook that if she were to be reinstated after the investigation, she would be paid for the days she was away from the office but that if she were to be terminated, she would not be paid for the days off.

COMPLAINT - 5

FULTON & PHILIP PLLC
601 UNION ST., SUITE 4200
SEATTLE, WASHINGTON 98101
(206) 652-3260 - FAX (206) 629-2184

21. Harrison created its manual to run the McKesson software in a way that caused anyone following its instruction to run the Gen End operation to affect revenue daily, and that was a practice that began many years ago. If so, then Medicare has been falsely upcharged for many years. Presumably, as a result of Cook reporting to Director Wasson that Harrison had been running the program incorrectly, an internal investigation by Harrison would have revealed the fact.

22. Eventually, in March 2013, as a result of Cook's investigation, she was terminated with no allowance for pay for her "suspension" period. Director Wasson confirmed Cook's reasonable belief that Harrison may have been systematically committing fraud when Cook was told by Wasson on November 7th that there was a serious problem with the Medicare reimbursements as a result of the Gen End operation being run once or more a day as opposed to once monthly. Of course, Cook ran the program that way only because Harrison instructed her to and its manual for the McKesson program instructed her to. Accordingly, Cook also believes she was fired as a scapegoat.

23. Cook also believes she was fired without explanation and denied any access to the results of the internal investigation in order to wall her off from hard information about the nature and extent of the false billing and to keep her silent. Cook's belief is well-founded in the fact that after her termination, Harrison reached out to her with an opportunity to receive compensation for her silence. She was presented with a draft settlement agreement, providing that in return for Harrison paying her $12,000.00, Cook would give Harrison a full release of all claims; Cook would promise to keep confidential any information she had about Harrison, its billing practices, policies, and procedures; and if she did these things, Harrison would not object if she applied for unemployment compensation even though the settlement called for her to "voluntarily resign."

24. Cook regards Harrison's Settlement Agreement as an attempt to buy her

silence in regard to Harrison's false Medicare reimbursement requests and as an admission that it had something very serious to hide.

## THE ACTIONABLE CONDUCT OF THE DEFENDANTS

25. For the period of more than ten years prior to March 1, 2013, defendant acted knowingly, or in reckless disregard or in deliberate ignorance of the truth in presenting or causing to be presented to the United States false claims for payment of Medicare reimbursements referenced above for payment or approval in violation of 31 U.S.C. 3729, *et seq.*, the False Claims Act.

26. When Cook's investigation exposed Harrison's fraudulent schemes, Harrison, with explicit notice of Cook's investigative efforts, retaliated by placing Cook on administrative leave and eventually terminating her employment when she refused to sign a settlement and confidentiality agreement.

## CAUSES OF ACTION

## COUNT I

## RETALIATION

27. Plaintiff realleges and incorporates by reference paragraphs 1 through 26, above, as though set forth fully herein.

28. Through investigation and fact gathering, Cook formed a good faith belief that Harrison may have been committing Medicare fraud and she reported it to her supervisors. Cook's belief was a belief that an employee in the same or similar circumstance would have also held. In retaliation for her investigative conduct, the Defendant made Cook a scapegoat for its policy of upcharging claims for Medicare reimbursement, when in fact the upcharging was the result of a deliberate policy whereby Defendant required employees to use its Medicare software in such a way that it would defraud the United States.

29. By this conduct, the Defendant retaliated against Cook and wrongfully

terminated her in violation of its own policies, Washington and federal law, and the anti-retaliation provisions of the False Claims Act, 31 U.S.C. 3730(h). As a result of Defendant's conduct, Plaintiffs have been damaged in an amount to be proven at the time of trial.

## COUNT II

### UNPAID WAGES AND WILLFULLY WITHHELD WAGES
### (RCW CHAPTERS 49.48 AND 49.52)

30. Plaintiff incorporates all prior allegations made in this Complaint. By terminating Cook wrongfully, defendant willfully and with intent withheld wages from plaintiff that it was obligated to pay. Defendant violated Washington's wage and hour laws, RCW Chapters 49.48 and 49.52. Pursuant to 49.52.70, defendant owes plaintiff double damages and is responsible for attorney fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands that judgment be entered in favor of the Plaintiff and against the Defendant as follows:

31. Plaintiff demands damages in an amount to be proven at the time of trial, including reinstatement with the same seniority status that Cook would have had but for the retaliation (or front pay in the alternative), two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the retaliation, including litigation costs and reasonable attorneys' fees, plus pre-judgment interest at the highest rate allowed by law. The Plaintiff further demands such other and further relief, as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

32. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiff demands trial by jury in this action of all issues so triable.

1  RESPECTFULLY SUBMITTED this 13th day of November, 2013.

2

3  **FULTON & PHILIP PLLC**

4  By: ___/s/ Robert Fulton_____

5  Robert Fulton, WSBA No. 29277
   rfulton@fultonphilip.com
6  601 Union St., Suite 4200
   Seattle, Washington 98101
7  Telephone:  206.652.3260
   Fax:  206.629.2184
8  Attorneys for Lori Cook

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT - 9