```
 1                   UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
 2                          AT TACOMA

 3

 4   LORI COOK individually,    )  Cause No. C13-5986BHS
                                )
 5          Plaintiff,          )
                                )  Tacoma, Washington
 6      v.                      )  March 31 and April 1, 2015
                                )
 7   HARRISON MEDICAL CENTER, a )
     Washington Non-Profit      )
 8   Corporation,               )
                                )
 9          Defendant.          )
     _____)

10

11           TRANSCRIPT OF TESTIMONY OF LORI K. COOK
             BEFORE THE HONORABLE BENJAMIN H. SETTLE
12           UNITED STATES DISTRICT JUDGE, and a jury

13   APPEARANCES:

14   For the Plaintiff:      ROBERT H. FULTON, II
                             Fulton Law PLLC
15                           601 Union Street, Suite 4200
                             Seattle, Washington  98101
16
     For the Defendant:      SEAN R. GALLAGHER
17                           MEGAN HARRY
                             Polsinelli PC
18                           1515 WYNKOOP Street, Suite 600
                             Denver, Colorado 80202
19
                             JEFFREY A. JAMES
20                           Sebris Busto James
                             14205 Southeast 36th Street, Suite 325
21                           Bellevue, Washington  98006

22   Court Reporter:         Julaine V. Ryen
                             Union Station Courthouse, Rm 3131
23                           1717 Pacific Avenue
                             Tacoma, Washington  98402
24                           (253) 882-3832

25   Proceedings recorded by mechanical stenography, transcript
     produced by reporter on computer.
```

1                          I N D E X

2

3    March 31, 2015
          (Pages 3 - 71)

4

5    April 1, 2015
          (Pages 71 - 190)

6

7

     TESTIMONY OF LORI K. COOK

8
               Direct.......................... 3
9              Direct (continuing).............. 71
               Cross........................... 104
10             Redirect........................ 184
               Recross......................... 190
11

12   EXHIBITS              Admitted

13      4                     54
        5                     28
14      6                     46
       11                     32
15     12                     78
       13                     77
16     14                     73
       19                     81
17
       A-6                    75
18

19

20

21

22

23

24

25

1                    TUESDAY, MARCH 31, 2015

2

3                    AFTERNOON SESSION

4                 *      *      *      *      *

5      (Jury present.)

6          THE COURT:  Mr. Fulton, you may call your first

7  witness.

8          MR. FULTON:  Plaintiff would like to call Lori Cook

9  to the stand.

10         THE COURT:  All right, if you would step forward

11 here.  If you will raise your right hand, the oath of witness

12 will be administered.

13             LORI K. COOK, sworn or affirmed.

14         THE COURT:  Thank you.  Please take a seat here at

15 the witness chair.

16     If you will just wait for a moment here, Mr. Fulton, while

17 Ms. Craft hands out the notepads here for the jurors.

18     All right, you may proceed.

19         MR. FULTON:  Thank you, Your Honor.

20                    DIRECT EXAMINATION

21 BY MR. FULTON:

22 Q.  Good afternoon, Lori.

23 A.  Good afternoon.

24 Q.  How are you doing?

25 A.  All right.

1  Q.  Lori, could you, for the record, just state your full name

2  again?

3  A.  Lori Kelene Cook.

4  Q.  Lori, how long have you lived in the State of Washington?

5  A.  About 57-and-a-half years.

6  Q.  And where were you born?

7  A.  Tacoma, Washington.

8  Q.  And what high school did you go to?

9  A.  Lincoln High School in Tacoma.

10  Q.  After you got done with high school, what did you do?

11  A.  I started attending college at Tacoma Community College,

12  and I was there just about five months and my husband and I

13  moved out of the state.  He had discharged from the Army.

14  We went to Western Massachusetts and we lived there about

15  six months.  I had our first child.  I was not working there.

16  And we returned to Tacoma, Washington.

17  It was not until the next year, in '76, that I began

18  working at St. Joseph Hospital in Tacoma.  While there, I

19  worked there for three years and I was the Medicare biller.  I

20  had improved processes for them so we were able to get cash in

21  approximately one week earlier than they had been, and I was

22  congratulated there by the CEO, Dan Russell.

23  From there, because of economic reasons and the change in

24  gas prices, I worked at Good Samaritan Hospital in Puyallup

25  for 17 years.  I was what we call the float biller because I

1   learned all the insurance companies and how to process them,

2   along with patient account services, patient balances.  And I

3   was there for 17 years.

4       While I was there, I earned my Bachelor's of Arts degree

5   from Pacific Lutheran University.

6   Q.  Lori, let me catch up with you.

7   A.  Okay.

8   Q.  What year did you go back to school?

9   A.  From '98 [sic] to 1990 I went to Pierce College and earned

10  my AA degree, and then I transferred to PLU in '92 to '95.  In

11  1995 I graduated.

12  Q.  And your degree you graduated with in 1995?

13  A.  A Bachelor's of Business Administration.

14  Q.  Okay.  And what was your goal?  What did you desire to do

15  with your degree?

16  A.  I moved up in the supervisory manager roles.

17  Q.  So the reason you went to get your BA was for management?

18  A.  Yes.

19  Q.  Okay.  Now, if you could go back to, you said you worked

20  for 17 years for what, what facility?

21  A.  Good Samaritan Hospital in Puyallup, Washington.

22  Q.  And what was your title at that facility?

23  A.  I was the float biller.  So on any given day I would fill

24  in for two or three people who may be ill or on vacation.

25  Q.  And as a float biller, your responsibilities in terms of

1  billing, what did that include?

2  A.  Can you repeat the question, please?

3  Q.  Yes.  As a float biller, what were your billing

4  responsibilities?

5  A.  Well, we did verified and audited claims that went out.

6  We processed the payments, answered any questions that the

7  insurances or the patients had, process denial.  For a while

8  we did coding for the emergency room physicians.

9  Q.  And did you change your work title during that 17 years

10  that you were with that agency?

11  A.  For a while I focused on Washington Medicaid, but the

12  majority of the time I was a float.

13  Q.  And so you were there for 17 years?

14  A.  Yes.

15  Q.  Why did you leave there?

16  A.  I received an opportunity to be the billing -- the

17  business office manager at Clearview Nursing Home in Tacoma,

18  Washington.

19  Q.  And approximately what year was that?

20  A.  1997.

21  Q.  So in 1997, the title you took at that facility again?

22  A.  Business office manager.

23  Q.  So you were a business office manager.  How many

24  individuals were you managing?

25  A.  Two.

1  Q.  And could you tell the jury what your responsibilities

2  were at that location?

3  A.  I had payroll responsibilities.  I had accounts receivable

4  responsibilities.  I was over the supply area, the accounts

5  payable area.  I also did administrative work for human

6  resources and kept people -- employment records.  And I also

7  administered our benefits and gave the information about

8  benefits to new employees at employee orientation.

9  Q.  How long did you stay in that position?

10  A.  Approximately two years.

11  Q.  And during that time, did you receive any accolades or any

12  good evaluations?

13  A.  Yes.  I had good evaluations.

14  Q.  So after two years, you decided to leave.

15  A.  Yes.

16  Q.  Why did you decide to leave?

17  A.  I found a job that was in Port Orchard.  It was closer to

18  our home, and again I was the business office manager at

19  Ridgemont Terrace Nursing Home.

20  Q.  And let's just back up a little bit because I don't want

21  to have Richard feel left out.  How long have you been

22  married?

23  A.  Forty years.

24  Q.  And to the same person?

25  A.  The same person.  I actually married him twice.

1   Q.   Tell me a little bit about that.

2   A.   I don't know.  We'd been married about five years and he

3   just proposed again.  I said okay.  I think it was because he

4   had met up with a -- the minister from the post church that we

5   were married -- who originally married us, and so we just took

6   the day off and went and were married again.

7   Q.   All right.  And do you have any children?

8   A.   Yes.  We have three grown children.

9   Q.   Are you happy that they are grown?

10  A.   Yes.

11  Q.   All right.  And do your children live in this area?

12  A.   We have one daughter that lives here.  She and her husband

13  have two dogs.  And my older daughter lives in Illinois, and

14  our son lives in Texas.

15  Q.   Okay.

16  A.   The older girl and the son, they each have three children.

17  Q.   So going back to your last employment.  Why did you decide

18  to leave that employment?

19  A.   The job was misrepresented.  I was there just a few weeks,

20  maybe ten.  It was very antiquated, and I just knew that was

21  not the right job for me.  I could not deal with -- you know,

22  it just seemed like everything I was trying to do there was

23  out of my control.  So I let them know that I needed to

24  resign.

25  Q.   Okay.  And so where did you go after that?

1   A.  I went to Swedish Physician Division.

2   Q.  In what year, approximately?

3   A.  2000.

4   Q.  2000.  Okay.  And what was the title at that -- what was

5   your title at that position?

6   A.  For a few months I was an insurance rep 2.  It's a large

7   physician group there, and so I was doing insurance follow-up.

8   Then opportunity came open to be an employee educator and

9   application trainer.  I applied for that and I received that

10  position, which I kept for five years.

11  Q.  And so after those five years, you left Swedish?

12  A.  Yes.  I learned about the supervisor position at Swedish

13  Home Care, and I was accepted for that.

14  Q.  Okay.  So you went to Swedish home care approximately what

15  date?

16  A.  2005.

17  Q.  Okay.  And when you -- who was your supervisor at Swedish

18  Home Care?

19  A.  John Miotke.

20  Q.  And what was John Miotke's title?

21  A.  Director of finance.

22  Q.  And how long did you -- was John Miotke your direct

23  supervisor?

24  A.  Yes.

25  Q.  And you worked with John for how many years?

1    A.   Three.

2    Q.   And what was your work responsibilities?

3    A.   I came in, I did evaluation of the billing team.  I had a

4    team of eight people.  We were billing for several types of

5    services:  regular home health, hospice, and infusion

6    services.  So I oversaw what they did.  I mentored them.  I

7    updated our computer system, whatever tables and insurance

8    changes happened.  And I did month-end processing, and the

9    financial and statistics for all three of those lines of

10   businesses.  Also did regular supervisor things.  Checked

11   people's attendance, gave them counseling.  Of course,

12   mentored them and taught them new things.  Reviewed their

13   aging work on old accounts.  Any problem accounts that they

14   had, they would bring it to me.  And then I gave them

15   evaluations and interviewed for new employees.

16   Q.   Okay.  And so how many individuals were you supervising at

17   Swedish Home Health?

18   A.   Eight.

19   Q.   And the year you left Swedish Home Care was what year?

20   A.   2009.

21   Q.   2009.  What is a SCIC?

22   A.   SCIC.

23   Q.   Oh.  See, I don't even know.

24   A.   It's an acronym, S-C-I-C.  It means sudden change in

25   condition.

1   Q.   Okay.  And so briefly, explain what that is.

2   A.   Okay.  We're talking about patients who are having

3   services in their home.  And if -- at the time when the SCIC

4   process was active, to describe what was happening with a

5   patient and to pay the agencies properly, there was a process

6   that Medicare put in called sudden change in condition.

7        In my work, it would mean coding the claim a certain way

8   to match up to Medicare, so Medicare would have all the

9   correct information about the patient.

10  Q.   Okay.  And so SCIC -- is that right?

11  A.   Yes.

12  Q.   I said it right.  Okay.  So the SCIC process, how long was

13  this in play?

14  A.   It ended December 31, 2007.

15  Q.   Did something take its place?

16  A.   Refined PPS, which is Medicare prospective payment system.

17  It's comprised of two types of formulas, that all the clinical

18  information about a patient is transmitted to Medicare, and

19  Medicare puts it -- the condition itself is given what they

20  call a HIPPS code, health insurance perspective payment system

21  code.  And the final payment that Medicare pays, they will

22  call it a HHRG.  They will base it on a HHRG score, which is a

23  home health related group.

24       They -- Medicare expanded on that system with more codes,

25  so as the codes would follow the patient, if they had to be

1  updated, there would be a code that specifically matched their

2  condition.  And therefore, it was a new process that

3  clinicians and people in the billing had to follow.

4  Q.  Okay.  So -- but in 2007 --

5  A.  Yeah.

6  Q.  December 2007, the SCIC process went away?

7  A.  Correct.

8  Q.  During your time at Swedish Home Health, John Miotke was

9  your supervisor; correct?

10  A.  Until 2008.

11  Q.  2008.  So during your time there, did John provide you

12  with evaluations of how you were doing?

13  A.  Yes.

14  Q.  Okay.  And what were those evaluations?

15  A.  They were good passing evaluations.

16  Q.  What software system were you using at Swedish Home Care?

17  A.  It was McKesson Horizon Home Care.

18  Q.  And was that your first time using McKesson software?

19  A.  Yes.

20  Q.  Before McKesson, what software did you use?

21  A.  At Swedish Physicians Division, we had a software called

22  Misys.  Before that, I would say -- I don't have an

23  off-the-shelf name for every software.  In fact, going back to

24  Good Samaritan Hospital, we still have -- had a big mainframe

25  computer encompassing a room and actual programmers who

1  programmed the software to use with it.

2      So everything was, I guess, just known by IT, but at

3  people's work stations, we each didn't have a PC.  We had what

4  they called a dummy terminal, and from the mainframe,

5  information would be sent out to the dummy terminals.

6  Q.  So when you were working at Swedish Home Care, did you

7  have problems with the McKesson software?

8  A.  It was very cumbersome.

9  Q.  But were you able to do your job using the McKesson

10  software?

11  A.  Right.  I did not have anybody question the work there.

12  Q.  Okay.  So after your time at Swedish Home Health, where

13  did you go?

14  A.  Well, Swedish Home Health merged with, I think they called

15  it Snohomish Visiting Nurse Service.  That's in Mountlake

16  Terrace, and because of that, they eliminated the job that I

17  had.

18      We always don't get to see our grandchildren nearly

19  enough, so I said, okay I will just look everywhere for a job

20  because I do need to work, and I found a job in Illinois, and

21  I was accepted at Ingalls Home Care in Harvey, Illinois.

22  Q.  What job -- what was your job title?

23  A.  I was a billing supervisor.

24  Q.  Okay.  And how many people were you supervising?

25  A.  Five.

1  Q.  And your job duties, were they roughly the same as your

2  job duties at Swedish Home Health?

3  A.  Yes.

4  Q.  What software did you use at the Illinois job?

5  A.  It was Homecare Homebase.

6  Q.  Did you have an understanding why McKesson software wasn't

7  used, or was McKesson software used at one time at the

8  Illinois job site?

9  A.  Yes.  During my interview, the management there said,

10  well, we know you have not used Homecare Homebase anymore, but

11  you will learn it and you will be fine.  They said we used to

12  have that McKesson, and we just scrapped it.  It -- it did not

13  work for us.  It -- it was not a good software.

14  Q.  Okay.  So how long did you stay in Illinois?

15  A.  A year and a half.

16  Q.  Okay.  And then why did you leave Illinois?

17  A.  I don't know if anybody has moved across the country

18  before, but it is a big project and many things enter in with

19  you leaving a place, getting settled in a new one, and so

20  forth.

21      I moved to Illinois ahead of my husband, and within a

22  couple of months, he was hit by someone.  He was on his

23  motorcycle, and from that day forward, he has not worked.  Our

24  plan was if he took a partial retirement from his union here,

25  he could again work in a new state and continue adding to his

1   retirement.

2       So he has not worked, and finances were getting harder and

3   harder for us in Illinois.  Trying to actually find a house

4   was going to be hard because taxes on us, an easy estimate

5   would be two or three times what they are on the properties

6   here in Washington.  So that was going against us.  And they

7   only offered HMO insurance, where he wasn't able to -- we

8   weren't able to choose amongst all the doctors in the area,

9   and the people giving him care were not -- it just was not

10  happening very well and he was not able to walk for months.

11  So I said, well, I will just start looking everywhere again

12  and see what I find, and I found the position at Harrison.  It

13  was like within a day or two of them receiving my application,

14  they kept calling and calling and calling our house to set up

15  interviews and so forth.  I checked what type of insurance it

16  was.  It seemed like it would be better, we wouldn't be locked

17  into an HMO, and we knew -- we had kept our house, rented our

18  house out, but the people were not taking care of our house,

19  so it all happened in a good time that we could move back to

20  our house.

21      So we came back.  He was able to get some care that helped

22  him somewhat but still he has not been able to work.  And at

23  least we knew that for our budget, we could keep our house

24  with the amount of tax and so forth we would owe on it.

25  Q.  So you made a decision to come back to Washington?

1    A.   Yes.

2    Q.   And what year was that?

3    A.   2011.

4    Q.   Okay.  So have you -- before we get to your Harrison job.

5    In your whole working career, have you ever been out of work,

6    outside --

7    A.   No.

8    Q.   -- of your own choice not to work?

9    A.   Right.  Only the months that I chose to be, yeah.

10   Q.   Have you ever been disciplined at your work?

11   A.   No.

12   Q.   So you've never been -- obviously, you've never been

13   terminated from a position before?

14   A.   No.

15   Q.   When you got to Harrison -- when did you start?

16   A.   April 2011.

17   Q.   Okay.  And who interviewed you for the position?

18   A.   I had a group of managers from patient financial services,

19   finance, and the interim director at Harrison Home Health, Pat

20   Dodge.  That was one interview.  Then the next interview I

21   went to was with Patty Cockrell.  She's the chief operating

22   officer for the hospital.  Then I had a third interview with

23   the leadership of the Harrison Home Health, which was their

24   interim director, Pat Dodge, and four other managers.

25   Q.   In your other positions that you applied for, did you go

1  through that many series of interviews before you got the

2  position?

3  A.  Can you repeat that?  I couldn't hear you.

4  Q.  Sorry.  In the other jobs that you interviewed for, did

5  you go through that many rounds of interviews?

6  A.  No.

7  Q.  Why so many rounds of interview, do you think, when you

8  went to Harrison?

9  A.  I don't know.  I was going from one building to another

10  building to a third building.

11  Q.  But in the end, obviously, they hired you; right?

12  A.  Yes, they did.

13  Q.  Now, when you started, your immediate supervisor -- who

14  was your immediate supervisor?

15  A.  It was Pat Dodge.

16  Q.  Was Diane Wasson at Harrison at that time?

17  A.  No.

18  Q.  Okay.  And when you started at Harrison, what training did

19  you receive?

20  A.  I had regular orientation that all employees would go to.

21  I had orientation for the manager level.  And then I had a

22  department orientation, which was a checklist of items that I

23  had to check off with Pat Dodge about various specific

24  department things.

25      Next, the person that was doing their billing before I

1    came, she was a payroll billing clerk.  Her name is Sam, and

2    she gave me a manual and said this is what I was given to --

3    given from John, meaning John Miotke because he had preceded

4    me --

5              MR. GALLAGHER:  Objection.  Hearsay.

6              THE COURT:  Overruled.

7    A.   And she gave me a manual to follow with Harrison's

8    specific details of how to process GenEnd daily: the first

9    claims, which are called RAPs, to Medicare; final claims to

10   Medicare; and commercial claims.  I had a little bit of

11   training from a payroll manager on how to process payroll for

12   my staff.  And I also had training from Stacy, who is in

13   finance, about month-end finance reporting, and for that she

14   also gave me a separate manual that my predecessor had wrote

15   which stated to finish up certain steps in the charge entry

16   process, check with Sam how to do GenEnd, and then proceed

17   with all the reports that you interpret and enter information

18   from them on to your monthly financial statement and do your

19   statistics.

20   Q.   Okay.

21   A.   She also talked about I should check and balance each

22   month the receipts deposit information we would get from

23   patient financial services.  That's the business office of the

24   hospital.  They get actual checks or remittances, and we don't

25   receive any cash or payments directly in home health.  So I

1  would have to take what they sent, match it with what we

2  deposited, and verify that it all balanced.

3          MR. FULTON:  An easel?

4      Permission to approach the witness, Your Honor.

5          THE COURT:  You may.

6  BY MR. FULTON:

7  Q.  Lori, I'm going to place this here.  Can you see that?

8  A.  Somewhat.  Okay.

9  Q.  How is that?

10 A.  Good for me but I don't know if it's good for the whole

11 room.

12 Q.  Well, we will do our best.

13 A.  Okay.

14 Q.  How's that?  Can you see it?

15 A.  Yes.

16 Q.  So let me go back through your testimony here.  When you

17 came to Harrison, you were trained by two people regarding

18 manual -- or billing procedures; is that correct?

19 A.  Yes.

20 Q.  Okay.  And those two people were who?

21 A.  Sam for the billing.

22 Q.  Okay.

23 A.  And Stacy for month-end processes.

24 Q.  Okay.  Now, did Sam and Stacy, were they in the same

25 building?

1   A.   No.

2   Q.   Okay.  So those two billing procedure manuals that you

3   received, explain again the content in the daily billing

4   manual.

5   A.   The daily billing manual told you what to process as far

6   as GenEnd because it needed to be done every day.  Told you

7   like parameters.  Mostly this has to do with dates, how --

8   what date range do you want for your first claims, the RAPs,

9   and what date range do you want for your final claim, the

10  second claim you have to send to Medicare.

11       Medicare processes -- or looks at home health patients as

12  60 day episodes.  The patient will get continuous care for 60

13  days.  In the beginning they allow an agency to bill for

14  request for anticipated payment where they will get 50 or 60

15  percent of their money up front.  Then Medicare requires a

16  final claim at the end of the 60-day service where they will

17  then adjust, according to the HHRG code assigned to the

18  patient, and they will like true up with agencies.  They will

19  either send you a debit or a credit.

20       Medicare is good for the patients in the fact that

21  Medicare leaves no balance to the patient on their home health

22  services.  And I want to state that all the things I say are

23  as they were in 2012.  Some regulations may have changed.  I

24  try to keep up, but not doing it every day, they might have

25  changed something, I don't know.

1      So we had the RAP information, the final claim

2 information, and then another section for commercial claims.

3      Commercial carriers are Blue Cross, Aetna, Cigna, any auto

4 insurance.  There's about 40 of them, and they each may

5 require different things.  So their claims are called -- are

6 based on fee for service, visit by visit, so it's a different

7 grouping.

8      Did you ask me to do book 2?

9 Q.  I asked you to do the daily.

10 A.  Yeah.

11 Q.  Okay.  And so the daily was provided by Sam; correct?

12 A.  Yes.

13 Q.  And then there was another section, and that was a monthly

14 section; is that right?

15          MR. GALLAGHER:  Objection.  Leading.

16          THE COURT:  Well, it was leading.

17          MR. FULTON:  Sorry, Your Honor.

18 BY MR. FULTON:

19 Q.  Did you receive a second manual from Stacy?

20 A.  Yes, I did.

21 Q.  Okay.  And that manual covered what area?  What was the

22 scope of that manual?

23 A.  Okay.  Told you preliminary work you had to do.  You had

24 to check where the system was as far as services to be

25 entered.  There was a double check, which was check with Sam.

1  Then there was a special GenEnd process where at the end of

2  the month where first you had to run a report about it.  For

3  the beginning of the episode was a specific question, and then

4  you run it again calling it the end of the episode.  From

5  there on, it was a set of reports that we needed the

6  information for to interpret on to a financial statement

7  required by the finance office and also to produce statistics.

8  Q.  Other than those manuals, did you receive any other

9  materials or any other procedural manuals?

10  A.  No.

11  Q.  Did Pat Dodge provide you with any training?

12  A.  No.

13  Q.  Did McKesson provide any training to you?

14  A.  No.  As I told Harrison at my interview, I have not ever

15  been formally trained by McKesson.  The only other piece was

16  Pat Dodge made sure that I had access to what McKesson calls

17  their information center, and you can look at that by

18  yourself, and a lot of times their support office will refer

19  you to that.

20  Q.  All right.  So you received this training.  Did you then

21  start using those manuals to do your billing?

22  A.  Yes.

23  Q.  Within the first month, did you hear from Pat Dodge or any

24  of your supervisors that things looked amiss because of the

25  procedures you were using?

1    A.  No.

2          MR. GALLAGHER:  Objection.  Leading.

3          THE COURT:  Overruled.

4    A.  No.

5    BY MR. FULTON:

6    Q.  What was your focus during your first -- your first month

7    or your first days at Harrison?  Were you assigned a specific

8    task?

9    A.  First they had me read their office procedures and

10   policies, which I did.  And then they, you know, gave me my

11   access codes and so forth.  Pat asked me, you know, do I feel

12   comfortable just starting back in through McKesson?  Softwares

13   that are off the self often provide you -- a good example

14   would be Windows.  They provide you with updates now and then,

15   and sometimes a whole different version, you know.  Windows 7,

16   Windows 8.  So my time in that -- during my time in Illinois,

17   I may have missed some of those.  But she said if you have any

18   questions, let me know.  Does any of this, as you look through

19   the screens, does any of it look familiar and so forth?  And I

20   said yes.

21          And as I always do when I start everywhere, I sit with

22   each of my subordinates and have them describe their job, what

23   references they have, manuals and so forth, and how their

24   functions fit in with the whole office.  So I had done that

25   with my two subordinates.  And, you know, then I spoke with

1  Pat Dodge every day and we, you know, touched basis, what's

2  going on.  And I said, are you ready for me to start on the

3  aging?  And she said, oh, sure.  And so aging is -- I'm just

4  going to say a company.  It could be a hospital, a doctor's

5  office, a nursing home, any medical facility -- where they

6  keep a listing of what has not been paid yet, and there may be

7  things on there that are overpaid and they categorize it.

8  They say, there are all our new charges, and then what -- and

9  what's 30 days old, 60 days old, 90 days old, and so forth.

10       MR. GALLAGHER:  Your Honor, objection.  I don't think

11  the witness is responding to a question at this point.  I

12  think she is simply --

13       THE COURT:  It is open-ended.

14       MR. GALLAGHER:  Yeah.

15  BY MR. FULTON:

16  Q.  Lori, you started talking about your immediate task.

17  A.  Uh-huh.

18  Q.  Were you ever assigned a certain task around aging reports

19  or aging accounts?

20  A.  Right.  I started working on the oldest accounts.  There

21  had been no one in my position for over ten months, and our

22  main filing filing limit is one year with Medicare, you have

23  to have your claims and whatever corrections in to Medicare.

24  Medicare has to process before that 365 days.  So I had to

25  start immediately finding and resolving what was the oldest so

1  we would not lose the money.

2  Q.  And by way of comparison, what was the amount of the aging

3  account compared to other places you had worked at?  Was it --

4  could you give us a figure as to what amount of payments that

5  were unpaid?

6  A.  I believe it was around one million, one hundred thousand.

7  And I can't really compare it to other places because

8  mathematically I have really not worked it out according to

9  the difference in their sizes.

10  Q.  Roughly in a month -- or let's go a year.  In a year,

11  what's the average billing amount in terms of Medicare

12  payments that go through, that went through Harrison?

13  A.  At Harrison we would receive about 400,000 a month.

14  Q.  And that's just Medicare?

15  A.  Yes.

16  Q.  Were you also in charge of other accounts, other types of

17  payments?

18  A.  There may be 50,000 to 100 in other insurances.

19  Q.  So in a year, over four million?

20  A.  Yes.

21  Q.  So you assumed the task of working on the aging accounts;

22  is that right?

23  A.  Yes.

24  Q.  And how did you do?  Did you make progress on those?

25  A.  Yes, we did.  We dropped about 500,000 just of old

1  accounts.  The numbers we were just saying were just average

2  every month accounts.  But the 500,000 would be specifically

3  old accounts that they would have lost had we not put in place

4  a mechanism to collect them.

5  Q.  So did you receive any evaluations -- or let me ask it

6  this way:  When you started at Harrison, were you on a

7  probationary period?

8  A.  Yes.

9  Q.  How long was that probationary period?

10  A.  Ninety days.

11  Q.  And at the end of that 90 days, did you receive an

12  evaluation?

13  A.  Yes.

14  Q.  Backing up a little bit.  When did Diane Wasson become

15  your supervisor at Harrison?

16  A.  I would guess about July the 6th, 2011.

17  Q.  Okay.  So you started in April?

18  A.  Yes.

19  Q.  And then in July Diane became your supervisor?

20  A.  Yes.

21  Q.  Did you have any meetings with Diane when she became your

22  supervisor?

23  A.  Yes.  She had a meeting with all the office staff

24  collectively, and then she met with each of us managers and

25  supervisors individually.

1   Q.  Okay.  And in the meeting with Diane, did she provide you

2   or talk about any particular training procedures or any type

3   of training that you -- she wanted to give you or provide you?

4   A.  She talked about the conditions of participation from

5   Medicare, that if we as supervisors or managers had not

6   encountered those before or used them, we would be doing that.

7   And I was telling her about McKesson and it being probably so

8   cumbersome, hopefully we would keep up with all of our

9   updates, and that from what I had experienced in the first two

10  months -- two months, I suggest we have more McKesson

11  training.

12  Q.  Okay.  So you suggested to Diane that you needed more

13  McKesson training?

14  A.  Yes.

15  Q.  And what was Diane's response?

16  A.  She said we would look into that and keep that on our

17  radar.

18  Q.  Okay.  Did Diane ever follow through with that and provide

19  any more McKesson training?

20  A.  Not while I was there.

21  Q.  Okay.

22          MR. FULTON:  Permission to approach the witness.

23  BY MR. FULTON:

24  Q.  Lori, I'm handing to you what has been marked as

25  Plaintiff's Exhibit No. 5.  Will you take a look at that and

1  familiarize yourself with that?

2  A.  All right.

3  Q.  What is that document?

4  A.  It was my first evaluation given to me by Diane Wasson.

5  Q.  What's the date on that?  On the bottom.

6  A.  7/27/2011.

7  Q.  Did you review that evaluation and sign off on it?

8  A.  Yes.

9  Q.  Is that your signature on the bottom of that document?

10  A.  Yes.

11         MR. FULTON:  Permission to approach the witness, Your

12  Honor.

13         THE COURT:  You may.  Did you provide Gretchen with a

14  set of these exhibits?

15         MR. FULTON:  Yes, I did.

16     Plaintiffs move to admit Plaintiff's Exhibit No. 5 into

17  evidence.

18         MR. GALLAGHER:  No objection.

19         THE COURT:  Exhibit 5 is admitted and may be

20  published.

21     (Exhibit 5 admitted.)

22         THE COURT:  This might be a good time to take our

23  midafternoon break for 15 minutes.  I remind you, of course,

24  not to discuss the case among yourselves or with anyone else.

25         THE CLERK:  All rise.

1      (Jury excused; 2:30 p.m.)

2           THE CLERK:  Let me just say something about

3  objections and leading question objections.  I have a rather

4  liberal approach to leading questions if they are foundational

5  and they don't really involve a matter that's in contest.  I'm

6  not likely to sustain an objection just to keep the case

7  moving along.  It, of course, is not always easy for me to

8  tell whether it's a contested matter or not.  So I will try

9  and pay close attention to that.  But normally I sort of give

10  that heads up before we get started, so now you have a better

11  understanding.

12           MR. GALLAGHER:  Thank you.

13           MR. FULTON:  Thank you, Your Honor.

14      (Recess.)

15      (Jury not present.)

16           THE COURT:  Mr. Fulton, you may have picked up on the

17  fact that with a set of exhibits with Gretchen, she can

18  provide that to the witness, and the witness can refer to

19  that.  And of course you're using the ELMO for showing a copy

20  on the ELMO.

21           MR. FULTON:  Okay.

22           THE COURT:  You don't need to approach the witness

23  for the exhibits.

24           THE CLERK:  Do you want Ms. Cook to resume the stand?

25           THE COURT:  Yes, thank you.

1      Do we have a witness?

2          MR. FULTON:  Oh.  Yes, I should get her.

3          THE CLERK:  Please rise for the jury.

4      (Jury present; 2:50 p.m.)

5          THE COURT:  Ms. Cook, if you would just step forward

6   and resume the witness chair, please.

7      All right, everyone may be seated.

8      You may proceed, Mr. Fulton.

9          MR. FULTON:  Thank you, Your Honor.

10  BY MR. FULTON:

11  Q.  Good afternoon again, Lori.

12  A.  Hello.

13  Q.  When we left off, I was going to ask you to read the first

14  line of the comments on the evaluation that you received from

15  Diane Wasson.

16  A.  Okay.  "Lori's experiential knowledge has been very

17  evident during her first 90 days!"

18  Q.  You can read the whole paragraph.

19  A.  Okay.  "She's identified a number of system and processes

20  issues which has precluded accurate and timely billing;

21  researched and corrected many of those issues consequently

22  reducing the aged accounts receivable by tense of thousands.

23  She is self-motivated and task focused, taking initiative to

24  contact vendors and payers, speaking as an informed consumer,

25  to resolve issues and further outcomes for the agency and

1  takes resolutions/new information to other staff with vested

2  interest."

3  Q.  Okay.  I'm going to ask you a few questions about that.

4  It says that you identified a number of system and processes

5  issues.  Can you recall what issues that you identified?

6  A.  Yes.  Early on I had found out they were billing Regence

7  Medicare Advantage incorrectly.  They were billing it as fee

8  for service and it should be PPS because of the Medicare

9  replacement product.  So I updated the system and reprocessed

10  the claims and received payment.

11      There was also some problems that were occurring in the

12  Veterans Administration billing, and again, a lot of that was

13  due to authorization and information, but I went through that

14  and that was very backlogged, which I cleared up.

15  Q.  Could you also read the second paragraph.

16  A.  I'm sorry, with my hearing loss it's hard to understand

17  someone chewing on their glasses.

18  Q.  Touché.  Could you read the second paragraph as well?

19  A.  All right.  "While she was tasked exclusively to focus on

20  aged AR during her first 90 days, Lori has worked closely with

21  staff to identify process roadblocks to be addressed for

22  efficiency improvement.  However, her colleagues report she is

23  always responsive and willing to engage when asked for input

24  and assistance with issues other than collections.  This

25  reviewer has found Lori to be most willing to stretch outside

1    the billing/collections environment to learn more about the

2    clinical functions of the agency and contribute to peer

3    projects necessary to the management and compliance readiness

4    of the agency."

5    Q.   Okay.  Thank you.

6         Lori, in the booklet in front of you, could I have you

7    turn to Exhibit No. 11?

8    A.   Okay.

9    Q.   And could you tell me what that exhibit is?

10   A.   This is my position offering letter from Harrison Medical

11   Center.

12   Q.   And when did you receive this?

13   A.   March 10th, 2011.

14            MR. FULTON:  Plaintiffs move to admit Exhibit No. 11.

15            MR. GALLAGHER:  No objection.

16            THE COURT:  All right.  11 is admitted, and it may be

17   published.

18        (Exhibit 11 admitted.)

19   BY MR. FULTON:

20   Q.   Okay, Lori.  According to this letter, when did you

21   begin -- what was your start date?

22   A.   April 18th, 2011.

23   Q.   Okay.  And what was your title?

24   A.   Billing manager for home health.

25   Q.   And at that time, were you overseeing other employees?

1  A.  Two.

2  Q.  And also, what was your starting salary?

3  A.  Seventy-five thousand dollars a year.

4  Q.  Lori, could you turn to Exhibit No. 17?

5  A.  Okay, I'm on 17.

6  Q.  And when did you prepare this document?

7  A.  November 2012.

8  Q.  What was the reason for preparing this document?

9  A.  I had such a life-changing event, I wanted to make sure I

10  remembered everything that happened from when I began working

11  until November, and then I kept ongoing notes in real time.

12  Q.  So you kept these entries contemporaneous with the events?

13  A.  Yes.  After November 2012.

14  Q.  And after reviewing these, or this document, does this

15  help refresh your memory as to what events occurred?

16  A.  Yes, it does.

17      MR. FULTON:  Plaintiffs move to admit this as a

18  recorded recollection, not to be published, but only to be

19  read.

20      MR. GALLAGHER:  Would it come in as an exhibit or is

21  it only to read?

22      MR. FULTON:  It wouldn't be published if it would be

23  only read to the jury.

24      MR. GALLAGHER:  Your Honor, I would object to that.

25  I'm not sure of the practical effect of publication.  But we

1  also object because it's hearsay, Your Honor.  It's based on

2  hearsay.  It is not a recollection recorded.  The testimony

3  was it was created after the events as a summary that she

4  prepared.

5          THE COURT:  I don't think a foundation has been made

6  for the hearsay exception, because it's a document.

7          MR. FULTON:  Your Honor, Lori testified that she

8  prepared this, in essence, as a diary as these events

9  occurred.  She has testified that this is the document that

10  she prepared, and she has testified that this was kept in the

11  course of -- I'm sorry, was kept contemporaneous with the time

12  of the events.

13          THE COURT:  I didn't hear her indicate that she could

14  not recall what's contained here.

15  BY MR. FULTON:

16  Q.  Lori --

17          MR. FULTON:  Well, the question to her was whether or

18  not the document would help her recall these events.

19  BY MR. FULTON:

20  Q.  So the follow-up question would be, without this document,

21  would you be able to recall all of these events as listed

22  here?

23  A.  Possibly the event but not the date of the event.

24          MR. GALLAGHER:  Your Honor, we would object under

25  803.  This is not -- I mean, it's possible that the document

1    could be used to refresh her recollection, but that's not a

2    separate exception to the hearsay rule.  It's still hearsay.

3    It would need one of the other exceptions.

4         THE COURT:  This is being offered for recorded

5    recollection, which is a record that is a matter on which the

6    witness once knew about but now cannot recall well enough to

7    testify accurately; it was made or adopted by the witness when

8    the matter was fresh in the witness's memory; and accurately

9    reflects the witness's knowledge.  If admitted, the record may

10   be read into evidence but may be received as an exhibit only

11   if offered by an adverse party.

12        I believe the foundation has been laid, but is it your

13   intention to read this entire document?

14        MR. FULTON:  No, it's not, Your Honor.

15        THE COURT:  I will let you proceed in areas, and she

16   can make reference to this if she cannot recall the specific

17   answer to your question.

18        MR. FULTON:  Thank you, Your Honor.

19   BY MR. FULTON:

20   Q.  Lori, on 4/18/11, can you recall what happened on that

21   date?

22        Before you -- Lori.  Lori.

23   A.  That's when I began at Harrison.

24   Q.  Okay.

25        MR. GALLAGHER:  Your Honor -- well, I object.  My --

1  it looks like the witness is looking at the document in answer

2  to that question.  My understanding is she should be asked

3  whether she can recall what happened.  If she can't, then it

4  might be permissible for her to review a document that would

5  refresh her recollection.

6          THE COURT:  I think that's the proper procedure, on

7  the one hand.  On the other hand, I don't want to get this

8  extended out and drawn out.  We all understand from her

9  testimony that the details of the dates and the events, she

10  needs to have her memory refreshed from this docket.  So we

11  will proceed, and you will ask her about an event, and if she

12  says she needs to refer to it, she can refer to her notes

13  taken on this Exhibit 17.

14          MR. FULTON:  Your Honor, because of her hearing loss,

15  I want to --

16  By MR. FULTON:

17  Q.  Did you understand what the judge said, Lori?

18  A.  No.

19  Q.  Okay.

20  A.  I'm sorry.

21  Q.  That's all right.

22          THE COURT:  All right.  What I'm saying is, Mr.

23  Fulton can ask you questions concerning events that you have

24  recorded on this document 17.

25          THE WITNESS:  Yes.

1          THE COURT:  And if you need to refer to the document

2    to fresh your memory, you may do that.

3          THE WITNESS:  Okay.

4    BY MR. FULTON:

5    Q.  All right.  So, Lori, you need to listen to my question

6    first before you refer to this document.

7    A.  I will.

8    Q.  When you started at Harrison, were you in charge of

9    preparing monthly reports?

10   A.  I believe I started preparing the month -- the reports the

11   second month I was there.

12   Q.  What was the first monthly report you prepared?

13   A.  Stacy and finance did it.

14   Q.  What was the name of that report?

15   A.  The month that I did it would have been May 2011.

16   Q.  Okay.  And what was the name of the report?

17   A.  With Stacy I did the home health financial statistics and

18   financial reporting.

19   Q.  Did you ever do a Medicare credit report?

20   A.  Yes.  The first month I was there.  April is the first

21   month after the end of first quarter for 2011, so I prepared

22   the Medicare credit report.  Every quarter Medicare requires

23   agencies to tell them what final claims process have been

24   overpaid and how the agency is going to repay Medicare.

25   Q.  And that's called a credit report?

1    A.   Yes.   Medicare credit report.

2            MR. FULTON:   Permission to approach the easel.

3            THE COURT:   You may.

4    BY MR. FULTON:

5    Q.   Can you see that?

6    A.   Yes, I can see that.

7    Q.   Lori, what do you see on the easel there?

8    A.   I see a detailed page of a Medicare credit balance report.

9    Q.   And is that the report format that you used when you

10   prepared the credit report for Harrison?

11   A.   It's the second page of the report that you would put the

12   details of any true credits you had after a final claim of a

13   60-day episode.

14   Q.   Okay.   And after you prepared that, the credit report, did

15   Pat Dodge have to approve that report?

16   A.   Yes.

17   Q.   And did Pat Dodge approve that report?

18   A.   Yes.

19   Q.   When you prepare a monthly credit report, do you often

20   show credit balances on that report?

21   A.   No.   Credits are -- true refunds that need to go back to

22   Medicare are rare.   Since 2005, I had one, and it was not at

23   Harrison.

24   Q.   So is your testimony that the whole time that you were at

25   Harrison, did you have a credit report that actually had a

1  credit on it?

2  A.  No.

3  Q.  And again, why wouldn't a credit report have a credit

4  balance on it?

5  A.  As I said, Medicare pays on a 60-day episode.  There's a

6  first payment, and at that time I would say until the person

7  was -- completed their episode in 60 days, they were in the

8  mid of their episode, the middle of it.  The first payment may

9  leave the account as a credit or a debit, and when the final

10 claim comes, then Medicare makes the actual payment based on

11 our contract with them and their formulas, which will true up

12 the account.

13         MR. FULTON:  Permission to approach, Your Honor.

14         THE COURT:  You may.

15 BY MR. FULTON:

16 Q.  On this report, there's a column that has "Discharge

17 Date."

18 A.  Yes.

19 Q.  What's the significance of this discharge date?

20 A.  In home health, it would be the date of the end of the

21 episode.

22 Q.  Could you define for us, what is a LUPA?

23 A.  A LUPA is an episode with four or fewer visits, and it's

24 called a low utilization payment adjustment.

25 Q.  How does a LUPA correspond with a monthly credit report,

1   if at all?

2   A.   As I have found, many LUPAs will have a credit after the

3   first payment, after the RAP payment, and that mid episode.

4   So if you saw that at the end of your quarter, you do not need

5   to report it because the episode had not been discharged.

6   It's just mid episode.  Medicare only wants to see true

7   credits.

8   Q.   So if you don't have a discharge date, you can't put that

9   on the credit report?

10  A.   Right.  There's no reason to.

11  Q.   Okay.  Now, you said another term.  While we're here, we

12  might as well have a little lesson.  What is a RAP?

13  A.   A request for anticipated payment.

14  Q.   And so in an abbreviated manner, when you are preparing

15  reports or looking through documents, how does this RAP come

16  into play?

17  A.   It's the first billing that Medicare allows an agency to

18  send in.  It shows the person -- the patient's HIPP, and based

19  on that, Medicare is going to make a payment of 50 percent or

20  60 percent.

21  Q.   Okay.  And when they make the payment of 50 or 60 percent,

22  where is the remaining 40 or 50?

23  A.   You have to finish out the episode, and the Medicare will

24  true up with the agency.

25  Q.   Okay.  When you say "true up," again, what does that mean?

1  A.  As I said before, Medicare pays on formulas, so they're

2  not going to look at your bill, and even though you itemize

3  all your services, if your services were a thousand dollars,

4  because of the patient's medical criteria that you enter on

5  the claim, it might fall under one of the formulas or the

6  HHRGs that pay $800.  So what Medicare is going to do, once

7  they receive final claim, they are going to retract the

8  payment that they made first and pay you only the payment

9  based on the final claim.  So whether mid episode your account

10  was a credit or a debit, after you bill Medicare the final

11  bill and they pay, the account will go to zero.

12  Q.  I think you just explained to us that -- the next term I

13  wanted you to explain was a final claim.  When do you have a

14  final claim?

15  A.  You have it at the end of the 60-day episode.

16  Q.  And we will do one more term down here.  And the next term

17  down there I believe is PECOS.

18  A.  All right.

19  Q.  And what does PECOS stand for?

20  A.  It's the -- it was a new enrollment system that Medicare

21  has put in for all providers, and it's a provider enrollment

22  chain and -- what do they say?  The physicians' ownership

23  system.

24  Q.  Okay.

25  A.  A long acronym that doesn't really describe what they're

1  doing with it.

2  Q.  So is PECOS something that you had to monitor and oversee?

3  A.  Yes.

4  Q.  Okay.  Where would you indicate the status of your PECOS

5  claims?

6  A.  I cannot remember the exact formula locater, but what you

7  had to do was verify in home health that the referring doctor

8  was signed up and eligible in PECOS, and that -- then they

9  would be given an identifier number and you would put that on

10 your claim next to the referring physician's name.

11 Q.  Did you have any problems or issues implementing PECOS at

12 Harrison?

13 A.  It was just cumbersome.  We did have a few doctors at the

14 VA clinic that had not enrolled in PECOS, and they also did

15 not sign a special waiver.  If they didn't want to enroll,

16 they could have a waiver.  But they had to do that with the

17 PECOS system.

18 Q.  Were you ever counseled or talked to by Diane Wasson about

19 PECOS?

20 A.  No.  She asked me to just keep monitoring it.  PECOS was

21 something that Medicare kept delaying and delaying and

22 delaying, but every few months we wanted to check -- you know,

23 we would find a point in time that we checked every physician

24 in our system and find out if they are or are not, and then

25 watch all the new physicians.  And you wanted to make sure,

1  absolutely, you audit all the claims that you send out so that

2  you wouldn't get a rejection.  Medicare started issuing

3  rejections of your billing if the doctor wasn't enrolled in

4  PECOS.

5  Q.  So let's go back to the monthly credit report.

6  A.  All right.

7  Q.  You filled out the monthly credit report with Pat Dodge;

8  correct?

9  A.  Yes.

10  Q.  And the monthly credit report -- or, I'm sorry, the credit

11  report was done on a quarterly basis; is that right?

12  A.  Quarterly.

13  Q.  So your next report was due when?

14  A.  In July.  July 31st.

15  Q.  At that time, was Pat Dodge your supervisor or Diane

16  Wasson?

17  A.  Diane Wasson.

18  Q.  So when you turned in your quarterly report in July, did

19  you turn it in to Diane Wasson?

20  A.  Yes.

21  Q.  And did Diane Wasson review that report?

22  A.  Yes.

23  Q.  And did she approve that report?

24  A.  Yes.

25  Q.  For the remainder of your tenure at Harrison, did you

1  submit quarterly credit reports to Diane Wasson?

2  A.  Yes.

3  Q.  At any time did Diane Wasson -- I should say, did Diane

4  Wasson review all those reports?

5  A.  Yes.

6  Q.  Did she ever deny any of those reports?

7  A.  Yes.

8  Q.  Okay.  Which one, or when did she deny a report?

9  A.  In October of 2012, she denied the report for quarter

10  ending 9/30/2012.

11  Q.  Okay.  So all previous reports were reviewed and approved

12  by Diane Wasson?

13  A.  Yes.

14  Q.  Why was the report in October not approved?

15  A.  Her warning was she wasn't sure that the accounts I was

16  showing her having credits were not true credits.  They were

17  all LUPAs, and she just said until I can prove that they are

18  not credits, she was not going to sign it.

19  Q.  So was it your understanding that Diane Wasson believed

20  LUPAs should have been on the credit report?

21  A.  Well, she didn't say specifically.  She didn't -- you

22  know, I had told her I reviewed all the instructions for the

23  Medicare credit report again and we do not have to put those

24  on.

25  Q.  And again, if you don't have a discharge date, do you put

1  that on the credit report?

2  A.  No.

3       MR. FULTON:  Permission to approach.

4  BY MR. FULTON:

5  Q.  When was your next review?

6  A.  June of 2012.

7  Q.  And who did that review?

8  A.  Diane Wasson.

9  Q.  If I could have you turn to Plaintiff's Exhibit No. 6.

10  Would you take a look at that exhibit, Lori.  What is that

11  exhibit?

12  A.  It's my yearly review from 2012.

13  Q.  Okay.  And what's the date on that review?

14  A.  June 6th, 2012.

15  Q.  And is that your signature on the bottom of the review?

16  A.  Yes.

17  Q.  And you've seen this document and you've reviewed this

18  document and signed it on June 6th, 2012?

19  A.  Yes.

20  Q.  Okay.

21       MR. FULTON:  Plaintiffs move to admit Exhibit No. 6

22  into evidence.

23       MR. GALLAGHER:  No objection.

24       THE COURT:  Exhibit 6 is admitted and may be

25  published.

1     (Exhibit 6 admitted.)

2  BY MR. FULTON:

3  Q.  Lori, could you read the section "Leader's Overall

4  Comments," and read the highlighted areas?

5  A.  Okay.  The first highlighted says, "Lori joined the

6  organization and inherited an aged AR that had not been

7  adequately attended for several months; process errors have

8  continued to contribute to a growing accounts receivable.

9  There appears to be several inefficient inputs into the

10  billing/accounts receivable and Lori will need to explore and

11  identify those processes and put corrections in place before

12  momentum can be gained in reducing the outstanding AR,

13  reducing the turnaround time to release claims, and minimize

14  the number of rejections to initial submissions due to

15  incomplete or errored claims."

16     The second section says --

17  Q.  Lori, hold on.  Let me ask you a question about that.

18  A.  Okay.

19  Q.  So the first sentence says you inherited aged AR.  Is that

20  what you were talking about when you first started at

21  Harrison, the aged AR?

22  A.  Yes.

23  Q.  And AR, again, is accounts receivable?

24  A.  Yes.

25  Q.  And the next sentence says "process errors have continued

1  to contribute to a growing accounts receivable."  Can you

2  explain that?

3  A.  I don't know actually of any errors.  I know that we had a

4  new Medicare requirement that came in May of 2011 having to do

5  with 13th and 19th visits on physical therapy, occupational

6  therapy, speech visits, and that was a big impact both on the

7  clinician and on the billing side which had to be monitored

8  constantly and carefully.

9      There were an account or two also where the people had

10  been on service for years, so we might be talking ten episodes

11  or so.  But the system -- the information input as to events

12  were not processing correctly through the system.

13  Q.  Okay.  So did you have a plan in place to work on that

14  issue?

15  A.  Oh, yes.  I worked on problem accounts routinely, and as

16  far as the rehab accounts, I had a report that I ran for them

17  every day to see possible -- trying to make sure the correct

18  clinician went to see the patient on the 13th and the 19th

19  visit.  What Medicare was trying to do is to balance out the

20  number of times a patient was treated and evaluated by an

21  actual therapist and not a therapist assistant.  So I would

22  give a report every day to the scheduler so they could then in

23  turn look at the schedule and make sure if the plan we had is

24  going to match the Medicare regulation.

25      I also contacted clinicians in the field that -- if I had

1  a question or asked them, you know, watch -- get with your

2  team members and watch the service.  Also had gave a copy of

3  the report and worked closely with the rehab clinician

4  supervisor to do the same thing, because what Medicare would

5  do is if the correct service or clinician did not help the

6  patient on a certain -- at a certain visit, then you would

7  lose visits.  You might have to lose one, two, or three

8  visits.  It varied.  We would have to just absorb the cost and

9  remove them from the bills.

10 Q.  So that plan was always -- was that an always ongoing plan

11 that you were working on this issue?

12 A.  Right.  And then I had a spreadsheet of anything that we

13 did have to lose, and I would have to adjust those services

14 off.  I had a spreadsheet that tracked that.

15 Q.  The second paragraph, could you read that highlighted

16 section, the second highlighted section?

17 A.  All right.  "In addition to the billing/AR challenge Lori

18 has been on-point to transition to new regulatory required

19 billing tools for sending claims and receiving electronic

20 payments.  The organizational knowledge of the McKesson system

21 has been limited and not readily available from our IT

22 department" -- that's the computer department -- "and required

23 a great deal of contact with the vendor and liaison with our

24 IT department, and trial-and-error to test multiple attempts.

25 She has persevered and has successfully tested and prepared to

1 comply with the new requirements by the required date."

2 Q.  So could you explain what you had to do to successfully

3 achieve this result?

4 A.  Okay.  The change there was an electronic transmission

5 format that Medicare and then other insurances changed to.

6 Medicare's final date that you had to have it was March of

7 2012.

8      The prior version was called 4010, and the second version

9 that we were transferring to was called 5010.  So first I had

10 to learn about those transitions and what requirements we had

11 to make with vendors and other companies or staff that we

12 worked with.  The hospital itself had a group from the

13 physician offices, the hospital offices, and myself, and we

14 would each weekly state what next step or where we were in the

15 process.

16      The computer department, the IT department, would receive

17 new claim formats from our software vendor, McKesson.  They

18 would install it on our servers.  They would then ask me to

19 test it.  So in a test mode we would be able to pick a claim

20 and send them to Medicare.

21      It -- the claim formats changed many, many times, and even

22 after the deadline, it wasn't until like the end of September

23 2012 that I finally got to send in live a Medicare secondary

24 claim form to Medicare in the 5010 format.  So it's a tedious

25 step-by-step process.

1  Q.  Would you take a look at the next page of the exhibit and

2  read that highlighted section, please.

3  A.  Okay.  Read the top highlighted?

4  Q.  Yes.

5  A.  These are comments I made on evaluation.  I say that "I

6  have uncovered billing problems and had to correct claim

7  formats, transitioned to the Medicare Rehab Thresholds billing

8  process, and did much testing to put Harrison Home Health into

9  5010 production.  The Medicare secondary payer claim formats

10  for Horizon Homecare have not worked well and I will be

11  reviewing all these claims again to process with the 5010 MSP

12  from Horizon Homecare.  Since Horizon Homecare had to make the

13  Medicare secondary payer formats compliant for 5010 I am

14  hoping that they will work without errors.  We also have

15  processes to improve when insurances change from commercial to

16  Medicare secondary payer and Medicare secondary payer to

17  Medicare.  And, processes to improve with Face to Face.  I

18  have put these out with our home health management team and we

19  will improve on these with Lean 6 Sigma or with thorough

20  process review."

21  Q.  Okay.  So what you describe, or what you just stated

22  there, that -- how long were you working on this process,

23  trying to improve it?

24  A.  Well, the thresholds, about a year at that time.  It was

25  newly implemented and we kept monitoring it.

1    The 5010 started about October 2011, and for regular

2  claims was successful by March of 2012.  The only hanging up

3  ones were those where other insurances were primary over

4  Medicare, so the Medicare secondary format for the 5010.

5    The unfortunate thing about that was, I want to say about

6  three years prior, Medicare took away your right -- or your

7  ableness to send a claim with all the primary insurance

8  information to them by paper, or even to directly enter it by

9  typing it into the Medicare system.  You had to do it through

10  an electronic data transmission.

11  Q.  Okay.  Could you read the last highlighted section,

12  please?

13  A.  "It is difficult to progress quickly and keep a positive

14  momentum when one must fix and correct so much each day to

15  keep our billing processes in place.  Today is an example as

16  three or four of our team, plus clinicians, and IT have to do

17  extra work on a recent found problem of presently 20 episodes

18  not processing into our billing system due to what has been

19  explained by McKesson and IT as an issue with Java software

20  not transmitting data correctly to Horizon Homecare and

21  assigning Oasis Matching Keys/Case Mix Index to the episodes."

22  Q.  So how often did you have to call McKesson to deal with

23  issues like you just read about?

24  A.  An average of twice a week.

25  Q.  Why did you have to call them twice a week?

1    A.   It may have been something you did not encounter before.

2    If you tried to look it up on the info center, they -- you

3    will come up with a page of, I don't know, 20 to 100 choices

4    of what might be the problem if you -- and so it's better to

5    talk with someone at McKesson, tell them what you see or what

6    you don't see or what's processing and describe it to them,

7    and then if they want to refer you to the info center, they

8    will give you a specific info center knowledge base number to

9    go to.

10        Now, a lot of those things are what they call workarounds.

11   Say there was -- let's say there's a year and you have 40

12   updates that go on, or -- each one may have bugs in it when

13   they send it to you.  They might send patches and you get more

14   and more information programmed into your computer system, but

15   they -- McKesson also tries to tally away, oh, we know there's

16   this bug, so you have to do something in the alternative.  So

17   they tell to you do that.

18   Q.   And that's what they call a workaround?

19   A.   That's a workaround.

20   Q.   Okay.  Was Diane's review of this evaluation required in

21   order for you to get a salary increase?

22   A.   Yes.

23   Q.   Was there any other requirements?

24   A.   The hospital had goals that they wanted departments to

25   meet that were based on everyone in their department, and then

1    there was -- I think there's just one that's based for the

2    whole medical center, the hospital, physicians, and the home

3    health.

4            THE CLERK:  I shut it off until it's admitted.  Is it

5    admitted?

6            MR. FULTON:  It's the same exhibit.  I'm sorry.  It's

7    the first page of Plaintiff's Exhibit 6.

8    BY MR. FULTON:

9    Q.  Lori, you just explained group goals that needed to be --

10   you had to meet certain group goals.

11   A.  Right.

12   Q.  And does this page represent those group goals?

13   A.  Yes.

14   Q.  Okay.  So is it your understanding that based on this

15   evaluation your group met those goals?

16   A.  Yes.

17   Q.  Lori, would you turn to Plaintiff's Exhibit No. 4.

18   A.  Okay.  I'm on 4.

19   Q.  And could you review that exhibit.

20   A.  Yes.

21   Q.  What is that exhibit?

22   A.  It's the letter that I received from the president and CEO

23   announcing that I had received the pay increase.

24   Q.  And this letter was addressed to you?

25   A.  Yes.

1          MR. FULTON:  Plaintiffs move to admit Plaintiff's

2    Exhibit No. 4 into evidence.

3          MR. GALLAGHER:  No objection.

4          THE COURT:  4 is admitted.  It may be published.

5      (Exhibit 4 admitted.)

6    BY MR. FULTON:

7    Q.  Lori, could you read those highlighted sections, please?

8    A.  Okay.  "On behalf of myself, the Board of Directors and

9    the entire Executive Team of Harrison Medical Center, we want

10   to thank you for your contributions to our organization during

11   the course of the last fiscal year.  Your service and efforts

12   continue to move us forward and are very much appreciated."

13   Q.  You can go on and read the second highlighted area.

14   A.  Okay.  The second is:  "On June 1, 2012, you will receive

15   a salary increase of 2.5 percent, which will increase your

16   rate of pay to $36.95 per hour.  This increase will be

17   reflected on your June 22 paycheck.  This conveys, at least in

18   part, our gratitude for your daily work and its contribution

19   to our success as an organization."

20   Q.  Thank you.  Lori, the date on that letter was June 22nd?

21   A.  Yes, of 2012.

22   Q.  Okay.  So how long had you been at Harrison at the time of

23   this increase, pay increase?

24   A.  One year and two months.

25   Q.  Okay.  And you had been supervised by Diane Wasson for how

1  long?

2  A.  One year.  Nearly a year.

3  Q.  Okay.  During the time that you were supervised by Diane

4  Wasson, did you have regular meetings that you would get

5  together and talk about potential issues or problems that were

6  going on?

7  A.  Yes.  She scheduled with all the managers and supervisors

8  regular meetings.  At first they started out like once a week,

9  and at times some would have to be postponed so they might be

10 once every other week.  But probably a minimum of two times a

11 month.

12 Q.  And was this a meeting where there was a give and take

13 between you and Diane Wasson?

14 A.  Right.  It was just informal, bring what current projects

15 you are working on.  If you have any questions or if there's

16 new -- new things we have to put in place, we will work on it

17 together and, you know, catch up with each other.

18 Q.  At any time during those meetings were you admonished or

19 was there any corrective actions given to you?

20 A.  No.

21 Q.  Did Diane, or Ms. Wasson, ever tell you that you needed to

22 do a certain task and if you didn't do that, you would be --

23 receive a corrective action?

24 A.  No.

25 Q.  You have testified that in October -- October was the

1  first time that Ms. Wasson did not accept the credit report,

2  quarterly credit report; is that correct?

3  A.  Yes.

4  Q.  Did you have any discussions with Stacy Geiger in the

5  finance department in October?

6  A.  The only discussion I remember was -- I don't think I had

7  a discussion with her in October, but she did send out an

8  email stating that in approximately a week she was going to be

9  leaving Harrison.

10  Q.  Okay.  Could you refer to Plaintiff's Exhibit No. 17?

11  A.  Okay.  You know, I might be -- I might have the wrong

12  month on that because Stacy left at the beginning of October.

13  Yeah.  Which page?

14  Q.  Page number 4.

15  A.  I'm on 4.

16  Q.  Yes.  I think it's entry number 29.

17  A.  Yes.

18  Q.  Does that refresh your memory as to what occurred

19  regarding Stacy Geiger?

20  A.  Right.  Okay.  So about a week -- the last week of

21  September, Stacy sent out the email and said, "I will be here

22  about another week.  I will introduce you all to the person

23  taking my place next week and that will be the person you send

24  your month-end reporting in to from then on."  So in October,

25  the first week, I went and talked to Stacy and met the person

1    replacing her, Jakob.  Final reports are due in for the

2    previous month to them on the 2nd.  So Stacy was there working

3    with Jakob, telling him the specifics of the month-end

4    reporting.

5    Q.  And did you have a separate meeting with Jakob?

6    A.  No.  Jakob did ask me in the middle of October, a couple

7    weeks after Stacy went, he asked me to re -- to produce for

8    him one of the reports processed routinely in month end, which

9    is called the McKesson overpayment report.

10             MR. FULTON:  Permission to approach.

11             THE COURT:  You may.

12   BY MR. FULTON:

13   Q.  Can you see that?

14   A.  Yes.

15   Q.  All right.  I thought this would be a good time to talk

16   about these reports a little bit.  So let's go back to that

17   question.  You had a meeting with Jakob.  What was Jakob's

18   last name, can you recall?

19   A.  Stickly.

20   Q.  Okay.  So you had a meeting with Mr. Stickly.  And what

21   was the -- what was the content of the meeting?

22   A.  He asked me to produce a 30 -- only a 30-day state span

23   for an overpayment report.  In our monthly end reporting we do

24   the McKesson overpayment report from the inception of the

25   software at Harrison, which I believe is January 1st, 1980, to

1    present.  So Jakob wanted me to run the same type of report

2    but only for September 1 to September 30th.  I gave him that

3    and asked him if he has any questions or any comments, please

4    let me know.

5    Q.  Okay.  And did he have any questions or comments?

6    A.  No.  I never talked to Jakob again.

7    Q.  And explain to us, what is that McKesson overpayment

8    report?  How is that generated?

9    A.  It's basically an already set up forumulative report in

10   the McKesson system.  So when you request to print one, you

11   basically are just putting in the dates you want it to start

12   and the dates you want it to end.

13   Q.  Okay.

14          MR. FULTON:  Permission to approach, Your Honor.

15          THE COURT:  You may.

16   BY MR. FULTON:

17   Q.  Could you explain what a listing of credit and debit

18   adjustments are?

19   A.  All right.  The -- I have trouble with this question,

20   because the McKesson over -- overpayment report.  McKesson --

21   I finally learned from McKesson that it's not about true

22   overpayments but the series of adjustments.  Now, adjustments

23   could be something you receive as you receive payments from

24   Medicare, or any insurance, and it could be a debit or a

25   credit.  You can receive adjustments if you put in adjustments

1    into the system as a debit, if you send out a refund.  So the

2    balance on your accounts receivable is a credit.  When you pay

3    the money back to whom it's owed, you debit the account, and

4    then that puts the account to zero.  But I've not had an

5    explanation of where the debits and credits or what type of

6    adjustments make up the McKesson overpayment report.

7    Q.   So do you know where the data originates from?

8    A.   No.

9    Q.   Did McKesson ever tell you where the data originates from?

10   A.   No.  And I had learned what I learned from them like

11   November the 6th, also.

12   Q.   Now, is the McKesson overpayment report part of a

13   month-end process?

14   A.   Yes.

15   Q.   So you do -- you prepare those reports every month?

16   A.   Yes.

17   Q.   So for the -- up until October of 2012, were you ever

18   questioned about McKesson's overpayment report?

19   A.   No.

20   Q.   And where does the overpayment report go to?  Where is it

21   sent?

22   A.   Finance.

23   Q.   Is it also sent to Diane Wasson?

24   A.   Yes.

25   Q.   So Diane Wasson received the McKesson overpayment report

1  every single month that you worked with her; is that correct?

2  A.  Right.  She actually receives all the reports because we

3  put them in a special file on the home health share drive.

4  Q.  Now, when you talked to McKesson, is the McKesson

5  overpayment report tied to another report, or should it be

6  tied to another report?

7  A.  No.

8  Q.  Okay.  Were you ever told that the McKesson overpayment

9  report should be tied to another report?

10  A.  I was asked by Diane Wasson why our overpayment report

11  total does not match the credit column on the McKesson monthly

12  accounts receivable reconciliation report.

13  Q.  The MARR?

14  A.  Yes.  So I think from the acronym we are going to call it

15  the MARR.

16  Q.  Okay.  So you were told that the final figure should not

17  match the credit balance of the MARR.

18  A.  That's what McKesson said.

19  Q.  Okay.  But Diane Wasson told you to find an answer for

20  that?

21  A.  Right.  Yes.

22  Q.  So we just shortened it to MARR, but what exactly is in

23  the MARR report?

24  A.  All right.  That is an overview of your month by column.

25  You start out with the accounts receivable balance from the

1  previous month.  You have your new charges, adjustments,

2  payments, refund, and your new accounts receivable balance is

3  the ending number.

4  Q.  Okay.  So when did you learn that the credit balance on

5  the MARR report should match the McKesson overpayment report?

6  When did you learn that?

7  A.  November 6, 2012.

8  Q.  Okay.  And how did you learn that?

9  A.  Doing research to find the problem that Diane Wasson asked

10  me to find.

11  Q.  Okay.  So tell me what you did to -- what was your

12  research?  What did your research encompass?

13  A.  First, I reran the report to make sure no typographical

14  error or date error had occurred and I came up with the same

15  answers and I let Diane know that.

16      And then I went back and called the McKesson support

17  department and let them know what question I was being asked

18  and asked them if they have any information about this.  And

19  then they gave me the definition, you know, and stated that

20  the McKesson over-reporting monthly report and the credit

21  total on the MARR do not match.  They are not intended to

22  match, they are not going to match.

23      And so I went back, let Diane Wasson know that, and I

24  explained it to her in the very same words that McKesson told

25  me.  She says, "Well, I don't know the answer, and finances is

1  asking us this question.  Keep working on it."

2      Okay.  So I called McKesson support again, and I learned

3  from Tiffany there, as we brainstormed, I said, please, you

4  know, help me out.  What -- what ties to all of this with --

5  what could make them different?  And where does the

6  information come from?  And she says, okay, let's start at the

7  beginning.  Every day do you do your generation end report?

8  For short we call it GenEnd.  It pulls all the financial

9  information about an episode together to produce the claim.

10  So I said, all right, we do that every day.  And she says, do

11  you do an update mode?  I said yes.  She said, do you do it

12  for adjustments or for adjustments and revenue?  And I said,

13  well, I do it every day, as the instruction manual I was given

14  here at Harrison says, and that says affect adjustments and

15  the revenue daily.  It's my daily manual.  She goes, no, we

16  suggest it be done just at the beginning and end of month.

17  And I go, well, yes, before we begin our end-of-month process

18  we have a separate, different criteria we put on the GenEnd

19  report.  She said, just hold on a minute.

20      So I grab my book off the shelf, flip to the page because

21  McKesson, I consider that an off-the-shelf program.  You buy a

22  shell of it.  No, you don't have the programmers on your site

23  who wrote it.  When each company gets a program like that,

24  they -- they have people who work with the software company

25  and with the computer people and some finance people and they

1  decide how they want that company -- how that company wants to
2  do their process.
3          MR. GALLAGHER:  Your Honor, objection.  I don't know
4  that there's a posed question right now.  We're again in the
5  middle of just a long narrative.
6          THE COURT:  We want to avoid long narratives on the
7  one hand.  On the other hand, sometimes answers just require
8  longer explanations.
9      So ask another question.
10         MR. FULTON:  Okay.
11  BY MR. FULTON:
12  Q.  Lori, after hearing the explanation from McKesson support,
13  you said you reviewed your manual again?
14  A.  Yes.
15  Q.  Okay.  After you reviewed your manual again, did you --
16  did you talk to McKesson again?
17  A.  I just let her know what I saw in my manual, and we -- you
18  know, I said, "I probably will have to get back with you on
19  this and I may need you to work with me more on it."
20  Q.  Did you have any discussions with McKesson about what
21  pressing -- incorrectly pressing that GenEnd process would do
22  to your payments, or impact the payments and the postings?
23  A.  I did.  That was the one last question I did ask her, and
24  she said she did not know and she in turn would do some
25  research and get back with us.

Q.   Okay.  When you heard that you had been for over a year,
year and a half now -- is that right?

A.   Yes.

Q.   That you had been processing payments incorrectly for a
year and a half, what did you think?

A.   I don't know of any incorrect payments, but GenEnd process
we had been doing incorrectly.  And because we were affecting
revenue, you must do the process even multiple times in a day,
depending on how many final claim batches you have in the
corrections.

     So I'm going, okay, I'm affecting the revenue more times
than I should.  I don't see anything wrong on my actual
claims, but I could -- something could be happening that I
don't see in the electronic format.  I could be -- we could be
overcharging Medicare.  I thought, okay, this is a compliance
issue, and I take it to Diane Wasson.  Anyway, it was my first
step of research to help answer the question, but I gave it to
her, and I said, "This manual you gave me specifically says to
do it this way.  I have been doing it.  Now McKesson tells me
it's wrong.  It looks like it could be a big problem."

     And she says, "Okay," and she took my manual, and she
says -- because it was the end of the day, she said, "We will
work on it again tomorrow."

Q.   So when you first brought your manual to Diane and
explained to her what had happened, was she alarmed?

1  A.  Yes, she looked alarmed.  She didn't -- she just said, "We

2  will work on it tomorrow."

3  Q.  Okay.  So what day was that, to the best of your memory?

4  A.  That was election day, so it was a Tuesday.  Tuesday, the

5  6th of November, 2012.

6  Q.  How can you remember that date so well?

7  A.  Because the next day I was suspended.

8  Q.  Okay.  Did you have any further conversations with Diane

9  before you were suspended?

10  A.  No.

11  Q.  Okay.

12        MR. FULTON:  Permission to approach.

13  BY MR. FULTON:

14  Q.  So explain again, what actually did you hand to Diane?

15  A.  It would be book 1, part one.  I call it the daily billing

16  manual.

17  Q.  Okay.  And again, that's the manual, and what's -- that's

18  just for daily billing; is that correct?

19  A.  Yes.

20  Q.  Okay.  And you physically handed that manual to Diane?

21  A.  I did.

22  Q.  Okay.  What happened on November 7th?

23  A.  When I arrived to work -- excuse me -- when I arrived I

24  had an email from Diane, and she asked me for a total aging

25  report that was current and a Medicare aging report that would

1   be listed out by individual patient.  Then there was the

2   morning office meeting, which is about 15 minutes.  I had the

3   reports done, I take them to Diane, and all she did was take

4   them and say, "I will get back with you, but don't work on

5   anything we worked on yesterday."

6       So I went back to my desk because everything I do is

7   prioritized.  It's prioritized by daily, weekly, monthly,

8   quarterly, yearly, and even by time of day.

9       The office we send our Medicare claims to is in the east,

10  so my claims have to be accepted by one o'clock or they are

11  not for the current day.  If I'm working with McKesson,

12  they're in the central time zone, so I'm losing hours there.

13  So you always want to fill in and multitask all day long.

14      So I went and I was having a conversation with my

15  part-time billing person, Sam, because she was going on

16  vacation the next day and I was going to be doing some of her

17  work, so we were doing our course -- you know, conversation:

18  Where are you with this?  Where are you with that?  And what

19  do you want me to do while you're gone?  Diane comes up to us

20  and asks me to go to a meeting with her.

21  Q.  Okay.  Who was involved in this meeting?

22  A.  The meeting was with Karen Holland, Diane Wasson, and

23  myself.

24  Q.  And what was discussed in that meeting?

25  A.  Diane had said, "We've been working on some things.  I

don't think you've described them adequately.  We're finding
that there are big problems everywhere.  They're very serious.
I believe they are fraudulent, and we have been there working
on the Medicare credit report and then there's the issue of
overpayment and the credit column."  Exactly, you know,
which -- you know, I would take all of that into account and
say those are the problems.  And Karen Holland is asking, do
you -- you know, "Are you aware of what she's talking about,
this work you've been trying to do?"  And I said, "Well, yes,
we've been trying to do that work."  And I said we've been --
you know, I say again, "We've been working on these Medicare
accounts and it's not right."  And I said, "Well, you're
telling me then Medicare fraud is happening," and so that
really scared me because the one thing you never want to hear
is Medicare fraud.  You don't want to be questioned.

So I asked if the police were going to be coming?  Should
I expect them, you know.  Am I going to walk out of the room
and see them, because my thought was, something so serious,
even, I thought, before someone starts mentioning that, you
would see auditors or you would see -- I don't know -- federal
people or someone from Medicare.  And they just snickered.
And then Karen Holland went on to say I was going to be
suspended.  And Diane mentioned, "You don't have to talk to
anyone above us because everybody knows.  I've had to report
that to everybody."  And I thought, well, now that's kind of

1   unusual, too, because I would have thought a compliance

2   officer or Diane's boss or someone would be questioning me

3   also.  But they just said, "Oh, we just want you to go home.

4   There's going to be an internal investigation."

5        And I go -- again, I come back to the police.  "When I go

6   home in a few hours, are they going to come and get me or

7   what?"  I thought, I don't want to be arrested.

8        And so they said, "No, we just want you to go home.  We

9   will call you when we are done or when we have questions for

10  you."  And then they said, "You are going to have to turn in

11  your keys and your badges."  It was just humiliating.  It was

12  like -- I guess people describe something like that as deer in

13  the headlights.  I work every day, every day, and then in one

14  second this is happening and I have never been in trouble at

15  school or on -- at work before.  Not even someone complaining

16  that I'm not doing something like they like.

17       So I say, "Well, if you" -- and they have no documents.

18  They have nothing.  You would think they would have -- I'm a

19  supervisor.  If I even counseled someone, I have to write up

20  several documents, and one goes in their personnel file, and

21  they -- they didn't have anything.  They didn't have anything

22  that says we're putting you on suspension or any details.

23       So I say, "This is very humiliating.  Please don't take

24  those things from me in front of the other people."  So Karen

25  escorted me to my desk.  We locked it up.  I got my purse, and

1    I said, "I have some shredding here."  Financial documents or

2    documents that I have patients' names on it or proprietary

3    information for your company are confidential.  And we have a

4    shredding bin.  It's secured, it's locked.  So I said, "We

5    have to stop and do that."  I did want to say one thing to

6    Sam, and I went over to Sam.  I let her know, "I have to

7    leave.  If you have any questions, please see Diane."  We went

8    to the shredding bin, and we went back to the room.

9        And they just sit there like I'm going to hand over my --

10   my identity and everything to them.  I said, "Well, are you

11   going to give me a receipt?"  And they are like looking at

12   each other, like what is she talking about, you know, as if

13   these things are important to her.  And I said, "You don't

14   have any documents here that's saying why I'm not going to be

15   on my job.  You're going to at least give me something to show

16   you took these things from me."

17       And so Karen goes to her desk and she comes out, she

18   goes -- and she writes on the back of her business card, and

19   she scribbles, "We got the two badges from Lori and five

20   keys."  And she hands it to me, and I go, "Well, at least I

21   have this."  And then she escorts me out of the building, and

22   their requirement was, if you are a manager, you punch in but

23   you never punch out, and so I was glad at least I have the

24   little business card that says what time I left.  And the

25   importance of that is that knowing I wasn't going to be back

1  soon or I had no control of my -- my documents and my

2  credentials as far as passwords and things into Medicare and

3  other systems, anybody with my notebook, you know, my

4  information is there somewhere with my ID on it.  You can't

5  memorize all of that.  And so I wanted at least something that

6  said when I had left.  I didn't get to punch out.  So at least

7  she had wrote on there what time it was, also.

8      And I drove home.  I suppose I shouldn't have, but I did.

9  And as bad as I felt and as much as -- as much as I was

10  shaking, I got home.  I should have called somebody, but I

11  didn't want to call my husband because I didn't want him to

12  worry about me on my way home.  So I got home, and when I

13  first spoke with him later he said I looked like a ghost.

14      (Counsel hands witness a Kleenex.)

15  A.  Thank you.

16  Q.  Do you need a minute?

17  A.  (Nods head.)

18      THE COURT:  We will take our recess for the day.

19  We're close to the 4:30 time.

20      I want you to have a peaceful and good evening and come

21  back tomorrow.  It will be 9:00 o'clock.  Please do not

22  discuss the case or do any research on your own.  There will

23  be a slight deviation again tomorrow on the calendar.  That

24  is, we will go until 11:30 in the morning and start up again

25  at 1:00.  So we're moving again the lunch hour up a half hour.

1    THE CLERK:  All rise.

2    THE COURT:  See you tomorrow.

3    (Jury excused; 4:25 p.m.)

4                    *    *    *    *    *

5           (Remainder of the day not ordered.)

6                 *    *    *    *    *

7

8                WEDNESDAY, APRIL 1, 2015

9

10               MORNING SESSION

11   (Jury not present; 9:00 a.m.)

12                *    *    *    *    *

13          (Proceedings not ordered.)

14               *    *    *    *    *

15   MR. FULTON:  Plaintiffs would like to call Lori Cook

16   back to the stand.

17   THE COURT:  All right.

18               LORI COOK, resumed stand.

19   THE COURT:  I will simply remind you that you are

20   still under oath.

21            DIRECT EXAMINATION (Continuing)

22   BY MR. FULTON:

23   Q.  Good morning, Ms. Cook.

24   A.  Good morning.

25   Q.  How are you doing?

1    A.   Holding in here.

2    Q.   Okay.  We're going to resume talking about the days after

3    you came to Ms. Wasson with your information and the billing

4    manual.

5    A.   All right.

6    Q.   Yesterday you testified that November 7th, you had a

7    meeting with Diane Wasson and Karen Holland; is that correct?

8    A.   Correct.

9    Q.   After that meeting, what was the next time you had any

10   conversations with either Diane Wasson or Karen Holland?

11   A.   About one week later Karen called my home one morning and

12   was talking about setting up another meeting, and then she

13   sent an email or two in between.

14   Q.   Okay.  So you had no -- were there any further sensitive

15   conversations you had with either Diane Wasson or Karen

16   Holland?

17   A.   No.

18   Q.   So how did they leave the meeting then on November 7th?

19   A.   I should go home and wait.

20   Q.   Would you turn to Plaintiff's Exhibit No. 14.

21   A.   Yes.

22   Q.   And could you tell the jury what that is?

23   A.   It was -- it is a letter where I state my decision not to

24   resign.

25   Q.   And what is the date of the letter?

1   A.   November 27, 2012.

2   Q.   And this letter was written by you?

3   A.   Yes.

4   Q.   And that's your signature?

5   A.   Yes.

6        MR. FULTON:  Plaintiffs move to enter Exhibit 14 into

7   evidence.

8        MR. GALLAGHER:  No objection, Your Honor.

9        THE COURT:  All right.  14 is admitted and may be

10  published.

11    (Exhibit 14 admitted.)

12  BY MR. FULTON:

13  Q.   Would you please explain why you wrote this letter, Lori?

14  A.   At the meeting where I was asked to resign or there would

15  be consequences, and I asked Karen Holland what the

16  consequences were, and she said, "Well, you would be

17  terminated."  And I said, "That's a big decision.  May I have

18  a day or two to think about it?"  And I said, "I will respond

19  to you in writing."  So then I made my decision, drafted the

20  letter, and sent the letter to them.

21  Q.   Okay.  Could you read that highlighted section.

22  A.   "During this process you have refused to honor my requests

23  for a written reason why I was suspended to include criminal

24  acts, no written reason for the severance offer above,

25  refusing to send me in advance the questions to be discussed

1  at the November 26, '12, meeting, refusing to allow me to have

2  a neutral witness at the 11/26 meeting, and foremost because I

3  have done nothing wrong I am declining your offer to resign as

4  the billing manager of Harrison Home Health."

5  Q.  Now, I have taken this letter.  You wrote some letters

6  before that, didn't you?  Did you write a few letters before

7  this?  Before 1/27, did you send other letters to Harrison?

8  A.  No.  Before November 27, I had not sent any other letters.

9  I may have responded with a date and a time on an email to

10 Karen when I could attend a meeting.

11 Q.  Okay.  So before 11/27, Harrison had given you an

12 ultimatum, either resign or be terminated?

13 A.  Yes.

14 Q.  Can you recall approximately when that was?

15 A.  November 26, 2012.

16 Q.  November 26.  And how was that -- did they present that to

17 you in writing or through a conversation?  How was it

18 presented to you?

19 A.  Through conversation.

20 Q.  And conversation with whom?

21 A.  Karen Holland and Diane Wasson.

22 Q.  Okay.  So were you in a meeting sitting in front of them?

23 A.  Yes.

24 Q.  And at that meeting, they informed you that you can either

25 resign or be terminated?

1   A.   Yes.

2   Q.   Okay.  Lori, can you refer to -- actually, it's

3   Defendant's Exhibit No. A-6, and I don't know if you have a

4   copy of defendant's exhibits.

5   A.   All right, I have it.

6   Q.   Okay.  Can you -- do you recognize this exhibit?

7   A.   Yes.

8   Q.   And is this an email that was sent to you?

9   A.   Yes.

10   Q.   And what's the date this email was sent to you?

11   A.   11/28/2012.

12          MR. FULTON:  Plaintiffs move to have Exhibit A-6

13   admitted.

14          MR. GALLAGHER:  No objection.

15          THE COURT:  All right, A-6 is admitted.

16     (Exhibit A-6 admitted.)

17          THE COURT:  It may be published.

18   BY MR. FULTON:

19   Q.   Okay, Lori, can you explain this email to the jury?

20   A.   Okay.  On the -- when I had left the last meeting with

21   Karen and Diane, I said that I would respond to them within a

22   day or so with my decision.  My husband and I were having

23   trouble at our home at that time.  On the Sunday before, our

24   well had been broken, all the well pipes and so forth, so we

25   were working with -- well, installers, the health department,

1    and so forth, trying to put in place getting a new well.  So I

2    had left her a message and told her, "I am sending my

3    decision.  You will get it in writing."  And so she writes --

4    she calls me back, leaves me a voicemail, and this email, too,

5    saying she had left a couple of messages, you know, and she's

6    awaiting my letter, and she says that she's awaiting my letter

7    so she can respond to Washington Unemployment, which I'm not

8    really -- I don't know why she would have to do that.  She

9    would be able to answer the questions that Washington

10   Unemployment would give to an employer, why have you suspended

11   this person, what day, and so forth.  But she's asking me to

12   send to her at least the letter that I'm sending to her ahead

13   of time so she can respond.  And then she reminds me there's

14   just a small window of opportunity for their offer, and just

15   for me -- you know, she's waiting for my contact.

16   Q.  Okay.  So you had already sent Exhibit No. 4 -- I'm sorry,

17   Exhibit No. 14, which we first -- what we just published a

18   minute ago, you had already sent that letter before you read

19   this email?

20   A.  Yes.

21   Q.  Okay.  Would you now turn to Plaintiff's Exhibit No. 13.

22   A.  Okay, I'm on 13.

23   Q.  Okay.  And what is that?

24   A.  It is a copy of a December 7th, 2012, letter that I

25   received from the human resource executive director.

1  Q.  Okay.

2       MR. FULTON:  Plaintiffs move to admit Plaintiff's

3  Exhibit No. 13 into evidence.

4       MR. GALLAGHER:  No objection, Your Honor.

5       THE COURT:  13 is admitted and may be published.

6    (Exhibit 13 admitted.)

7  BY MR. FULTON:

8  Q.  Lori, is this the letter that is in response to the letter

9  you sent on November 27th?

10 A.  Yes.

11 Q.  Okay.  And so what was Harrison's response?

12 A.  She's saying in light of my decision not to resign,

13 Harrison will continue the forensic investigation into billing

14 irregularities.  Any prior offer are null.  "Depending on the

15 outcome of the investigation, we may decide to reinstate your

16 employment, with or without back pay, or take other action,

17 including ending your employment for cause."  And then she

18 says the reason you were suspended is multiple billing

19 irregularities.  She also asked me for my continued

20 cooperation in the investigation and states that I may be

21 called in for meetings with third-party investigators and I

22 would be paid for that time.  I am currently -- continue to be

23 suspended without pay until further notice.  And if I have any

24 questions, I may call her.

25 Q.  Okay.  So as of the date of this letter, Harrison had not

1  done an independent third-party investigation; is that your

2  understanding?

3  A.  I don't know.  It does appear that way from the letter.

4  Q.  Were you ever provided with any information about an

5  independent third-party investigation?

6  A.  No.

7  Q.  Could I have you turn to Plaintiff's Exhibit No. 12?

8  A.  I'm on 12.

9  Q.  What is that exhibit?

10 A.  It's a letter that I sent certified to Harrison Home

11 Health January 29, 2013.

12 Q.  This is a letter that you sent?

13 A.  Yes.

14      MR. FULTON:  Plaintiffs move to have Plaintiff's

15 Exhibit No. 12 admitted into evidence.

16      MR. GALLAGHER:  No objection.

17      THE COURT:  12 is admitted and may be published.

18    (Exhibit 12 admitted.)

19 BY MR. FULTON:

20 Q.  Lori, what's the date you sent this letter?

21 A.  January 29, 2013.

22 Q.  So how long has this been since your suspension?

23 A.  Two months, two-and-a-half months.

24 Q.  Could you read the highlighted portion of that letter,

25 please?

1    A.   Okay.  "On 11/6-11/7/2012 I found and verified with

2    McKesson Software Support that the Harrison Home Health

3    instruction manual given to me to follow when I began at

4    Harrison stating to run the GenEnd report to update revenue

5    daily is wrong.  McKesson Support stated that the GenEnd

6    report to update revenue should be ran only once per month

7    just before processing the month-end reports.  I immediately

8    gave this information to Diane Wasson to help with the report

9    and account review we were working on together.  Has this

10   information been helpful?"

11   Q.   Did you receive a response to this letter?

12   A.   No.

13   Q.   Okay.

14          MR. FULTON:  Permission to approach the witness.

15          THE COURT:  You may.

16          MR. FULTON:  Thank you.

17      You can't see.

18   BY MR. FULTON:

19   Q.   Now, the letter you just read, you referenced the manual

20   that you gave Diane Wasson; is that correct?

21   A.   Correct.

22   Q.   Okay.  Now, which manual did you give Diane Wasson?

23   A.   The book 1, the one that would be on the left.

24   Q.   Okay.  Again, that book 1 is comprised of what?

25   A.   Daily instructions for running GenEnd and processing your

1  claims.

2  Q.  Okay.  And book 2 refers to what processing?

3  A.  The month-end process.

4  Q.  Okay.  Two different set of duties?

5  A.  Yes.

6  Q.  Okay.  I will now have you turn to Plaintiff's Exhibit No.

7  19.

8  A.  Okay.  I'm on 19.

9  Q.  Okay.  Now, can you describe what 19 is?  Or what is

10  Exhibit No. 19?

11  A.  I'm not sure what it was originally called, but at my

12  deposition it's some document that the defendants brought.

13  Q.  Okay.  The first time you saw this document was at your

14  deposition?

15  A.  Yes.

16  Q.  And at your deposition, did defendant tell you that this

17  was the document that Diane Wasson received from you?

18  A.  Yes.  I think they asked me, "Did you give this to Diane

19  Wasson?"

20  Q.  Okay.  So defendants were alleging that this was the

21  document that you gave Diane Wasson?

22  A.  Yes.

23  Q.  Okay.  And at your deposition, what did you say?

24  A.  Can I look further into it?

25     There's multiple pages, and they are all -- the numbers

1   are changing all over.

2   Q.  Hold on.  I will walk you through it so they will be short

3   questions.

4   A.  Okay.

5   Q.  First question, did you tell defendants that this was the

6   document that you presented to Diane Wasson?

7   A.  I said it was not the document I produced.

8   Q.  You said it was not.  Okay.

9       MR. FULTON:  Plaintiffs move to introduce Exhibit No.

10  19 into evidence.

11      MR. GALLAGHER:  No objection.

12      THE COURT:  19 is admitted and may be published.

13     (Exhibit 19 admitted.)

14  BY MR. FULTON:

15  Q.  This will make it easier for us.

16      THE COURT:  For the record, when you speak about a

17  document within 19, if you would state the Bates number.

18      MR. FULTON:  Yes, Your Honor.

19  BY MR. FULTON:

20  Q.  This is actually numbered as Plaintiff's Exhibit No. 19,

21  and it's number 4.

22  A.  Okay.

23  Q.  Lori, could you explain what this screen shot is?

24  A.  Yes.  It's a McKesson screen where services are listed.

25  The services generate from clinician reports and laptops, is

1   sent to the billing section, and we call this enter services.

2   Q.   Okay.   So this screen shot, would you find this screen

3   shot in your daily section of your manual or would you find

4   this in your monthly section of your manual?

5   A.   Month end.

6   Q.   So had you seen this particular section before?

7   A.   In my month-end manual.

8   Q.   Okay.   Now, did you provide your month-end manual to Diane

9   Wasson?

10   A.   No.

11   Q.   But you don't disagree that that is from your month-end

12   manual?

13   A.   Correct.

14   Q.   Now, earlier you testified that John Miotke prepared and

15   created the manuals that you use.

16   A.   That's what I was told.

17   Q.   Okay.   Is there anything on the manual that you use that

18   indicates who the author was?

19   A.   Yes.   Starting at the top left, you read the title enter

20   service-selective batch, and then you draw your eyes down

21   about four lines, it states batches created by, and JMiotke

22   comes up because he was the person creating it and the system

23   pulls it from his identification in the system.

24   Q.   Okay.   Are there any dates on when the Windows batches

25   were pulled?   Can you indicate -- does the document indicate

1  when the approximate time this batch would have been pulled?

2  A.  July 2010.

3  Q.  And the manuals that you had, were there a series of

4  screen shots like this pulled from -- during -- pulled by John

5  Miotke?

6  A.  Yes.

7  Q.  Okay.  Now, describe what the daily manual looked like.

8  Was it similar to this monthly manual?

9  A.  Yes.  Where it would have the screen shot, and then some

10  typed instructions, and sometimes people may write on the

11  pages.  I remember John had a couple of notes in there.

12  Q.  Okay.  Would you take a look at Bate stamp number 6.

13  A.  Okay.

14  Q.  Of Plaintiff's Exhibit No. 19.

15  A.  Okay, I'm on it.

16  Q.  Okay.

17          THE COURT:  When we refer to the Bates number, we

18  refer to the bottom right-hand corner.  Mr. Fulton is

19  referring to the last digit that is shown on the number.  If

20  you would push that up so the jury will understand.  You also

21  see it's a little difficult to read the number.  It's been

22  changed there, but that reflects -- the last three digits are

23  146, not 145.

24          MR. FULTON:  Thank you.

25  BY MR. FULTON:

1   Q.  Lori, who was Sam Hubbard?

2   A.  Sam Hubbard was the person below me who did payroll.  She

3   did enter service and she did some commercial billing.

4   Q.  Okay.  Now, when you came to Harrison, was Sam Hubbard

5   already an employee?

6   A.  She was.

7   Q.  Do you know what Sam Hubbard's role was when John Miotke

8   was at Harrison?

9   A.  She had the same role as she had under me.

10  Q.  Okay.  And so did you have any discussions with Sam

11  Hubbard about the -- both, either the daily or the monthly

12  manuals?

13  A.  I only had discussions with Sam about the daily manual.

14  She -- the daily manual she introduced to me because after

15  John left, she was processing whatever billings she could.  So

16  she had some instructions on how to do the daily GenEnd RAP

17  first claims, and she sent out some final claims.  She did not

18  have any training or experience beyond that.

19  Q.  Okay.  So these training manuals were helping Sam Hubbard

20  do her job?

21  A.  Yes.

22  Q.  I would have you refer to Plaintiff's Exhibit No. 19, Bate

23  stamp number 7.

24  A.  Okay.

25  Q.  The next page.  Do you recall that writing where it says

1    "month end," "month end"?  Was that in any manual you saw

2    while at Harrison?

3    A.  No.

4    Q.  Again, this manual that we're looking at now is for

5    month-end billing; is that correct?

6    A.  Yes.

7    Q.  I will now have you turn to Bate stamp 9, Plaintiff's

8    Exhibit 19.

9            MR. GALLAGHER:  Could I have counsel also refer to

10   the Bate stamp number on the lower right-hand corner of the

11   exhibit?  We don't have a Bates number on the copy that I've

12   got.

13           MR. FULTON:  You don't?

14           MR. GALLAGHER:  No.  We do have the Bate stamp

15   numbers in the lower bottom starting HMC.  That would allow us

16   to track.

17           MR. FULTON:  This is also indicated as HMC000148.

18           THE COURT:  Mr. Gallagher, do you have the amended

19   Bates number down there with the red superimposed?

20           MR. GALLAGHER:  We have it in black and white, but it

21   looks like something might have been stamped over it.

22           THE COURT:  It is difficult to read.  They are in

23   sequence, however.  It might be good for you at the break to

24   handwrite in at the bottom just simply the number that you are

25   referring to in that last digit of that Bates number so it can

1    be consistent for the jury's understanding.

2            MR. FULTON:  I will, Your Honor.  Thank you.

3    BY MR. FULTON:

4    Q.  Lori, could you identify what this page refers to?

5    A.  It's a student guide from McKesson.

6    Q.  And how do you know it's a student guide?

7    A.  It's typed on the bottom of the page.

8    Q.  So you're referring to the bottom where it says "Horizon

9    Homecare... Student Guide"?

10   A.  Yes.

11   Q.  Have you ever seen this document?

12   A.  No.

13   Q.  I'm sorry.

14   A.  Sorry.  I thought you were finished.

15   Q.  I'm sorry, I did too.  Have you ever seen this document

16   presented to you in a manual at Harrison?

17   A.  No.

18   Q.  Could you read to the jury what that writing is on the

19   side.

20   A.  "This packet provided by Lori Cook, indicating this

21   material was provided software vendor in response to," I can't

22   read the next word, "question."

23   Q.  Okay.

24   A.  "...how to procedures for billing."

25   Q.  Okay.  So do you believe that handwriting is the

1   handwriting of Diane Wasson?

2   A.  It is possible.

3   Q.  The key question is, is that the packet you provided to

4   Harrison?

5   A.  No.

6   Q.  Is that student home guide the guide that John Miotke

7   prepared for you?

8           MR. GALLAGHER:  Objection.  Foundational.

9           THE COURT:  If you want to ask some foundational

10  questions as to how she might know.

11          MR. FULTON:  Okay.

12  BY MR. FULTON:

13  Q.  Lori, I'm going to ask you some more questions about this

14  document.

15  A.  Okay.

16  Q.  Do you see any indication on that document that it was

17  prepared by John Miotke?

18  A.  No.

19  Q.  Okay.  And the monthly packet that you received was

20  prepared by John Miotke; is that correct?

21  A.  Yes.

22  Q.  And it was -- is it your testimony that the daily packet

23  was nearly just as similar as the monthly packet?

24  A.  Yes, but different topic.

25  Q.  But in terms of screen shots pulled by John Miotke

1   indicating McKesson software screen shots?

2   A.  Yes.

3        MR. FULTON:  This is Bate stamp number HMC000153, and

4   this is the plaintiff's Bate stamp number 14.

5   A.  Can you repeat the number, please?

6   BY MR. FULTON:

7   Q.  19.  I'm sorry, it's 14.  Plaintiff's Exhibit No. 19, page

8   14.  Bate stamp 14.

9   A.  Will you scroll up to the bottom?  I'm not getting a

10  matching to those numbers.

11      Okay, now I have it.

12  Q.  My fault.

13  A.  Well, I'm going kind of cross eyed reading these numbers

14  here.

15  Q.  Okay.  All right.

16      Yesterday you explained what the SCIC was.

17  A.  Yes.

18  Q.  Would you explain again what that is?

19  A.  Sudden change in condition.

20  Q.  Okay.  And you also testified that the SCIC was

21  discontinued.

22  A.  Yes.

23  Q.  In what year was it discontinued?

24  A.  At the end of 2007.

25  Q.  End of 2007.  Based just in reference to SCIC alone, what

1   does that tell you when this student home guide was published

2   or created?

3   A.   A long time ago.

4   Q.   To cover 2007?

5   A.   Right.

6        MR. FULTON:   This is Bate stamp HMC000156, and it's

7   plaintiff's 17.

8   BY MR. FULTON:

9   Q.   Lori, could you take a look at the highlighted dates in

10  the episode beginning period at the top of that document?

11  A.   It appears that's something from 2005.

12  Q.   Through what year?

13  A.   2006.

14  Q.   Okay.  Based on your review of that document, the SCIC,

15  the date of the screen shots, in your opinion, when was that

16  document created?

17  A.   2005.

18  Q.   At any time that you worked at Harrison, were you provided

19  with the student home care manual covering the period of

20  between 2005-2007?

21  A.   No.

22  Q.   Lori, I want to go back to the weeks and the months after

23  you were on suspension and then ultimately terminated.  What

24  was the date that you were finally told that you were

25  terminated?

1  A.  3/14/2013.

2  Q.  Okay.  You've testified that, I believe, on 11/26 you were

3  given a choice to resign or be terminated.

4  A.  Yes.

5  Q.  Did you later have any meetings with Harrison regarding

6  trying to provide you with compensation even though they had

7  told you that you were going to be terminated on 11/26?

8  A.  I had a meeting of such about a month after I was

9  terminated.

10  Q.  Okay.  Could you tell me what that meeting was?

11  A.  Again, it was with Karen Holland and Diane Wasson.

12  Q.  And what was the general conversation or discussion at

13  that meeting?

14  A.  They gave me a document, asked me to read it over, and if

15  I had any questions, I could ask them.  They said it was just

16  some compensation they wanted to give me for the time that I

17  had been out.  Basically it was my vacation pay that I had

18  accrued and a little bit more money.  And then just, you know,

19  making -- asking me not to ever talk about this or how my --

20  none of my family to talk about it to anyone.  And also there

21  was a paragraph about I have the right to seek an attorney.

22  Q.  So Harrison provided you with a document that you were

23  supposed to review, and you had an opportunity to review that

24  with attorneys or whoever else you wanted to?

25  A.  Right.  I don't remember how many days I had --

1   Q.   Okay.

2   A.   -- to do that.

3   Q.   And approximately when were you presented with that

4   document?

5   A.   April 12th sticks in my mind.

6   Q.   Okay.

7   A.   I don't recall if that's exactly right.

8            MR. FULTON:  Plaintiffs move to admit into evidence

9   Exhibit No. 16.

10           MR. GALLAGHER:  Your Honor, I guess I object based on

11  relevancy grounds.  I don't know why a release covered under

12  Rule 408 would be offered as an exhibit in this case.

13           THE COURT:  We will take our morning recess.  As you

14  recall, we are going to break for the noon hour at 11:30, so

15  we will take a 15-minute recess now.

16           THE CLERK:  All rise.

17      (Jury excused; 10:09 a.m.)

18           THE COURT:  You may step down.

19      I thought this particular objection needed to be dealt

20  with outside the presence of the jury.  If you could explain

21  your theory of relevance now.  I was concerned about this

22  document when I saw it listed because it appears to be some

23  sort of offer of settlement, but you haven't raised that

24  objection.

25           MR. GALLAGHER:  Well, Your Honor, I have under Rule

1    408.  I think this document would be covered under Rule 408.

2         THE COURT:  I didn't hear you say it.  I heard you

3    say relevance.

4         MR. GALLAGHER:  I said relevance and 408.  I think

5    it's irrelevant because it's an offer under 408.

6         THE COURT:  All right.

7         MR. FULTON:  Obviously, relevance I disagree with,

8    but 408, I have no -- I don't have an argument against the

9    408, other than at the time she was not represented by

10   counsel, nor did she believe that this was an offer of

11   settlement.  To her this was an offer to be quiet and to

12   conceal any information she had about the fraud, or the

13   indications of fraud at Harrison.  So...

14        THE COURT:  In what way would those take that out of

15   408?

16        MR. FULTON:  Other than a layman's perspective.  She

17   didn't understand that this was under 408.

18        THE COURT:  You don't have to be represented by

19   counsel, do you?

20        MR. FULTON:  No, you don't, Your Honor.

21        THE COURT:  All right.  So the Court will sustain the

22   objection on that basis.

23      I wanted to also, with respect to Exhibit 19, you are

24   going to change the Bates numbers so that they're easy to

25   read.  You can either put a 19-1, 19-2.  That might be the

1    preferred way.

2        I also was concerned that some of the screen shots

3    contained what might be considered HIPAA information, and yet

4    it seems to me the documents need to go to the jury, they've

5    been admitted.  But I'm suggesting that the last name of the

6    patients be redacted so just the first names appear.

7        What's the parties' reaction to that.

8            MR. GALLAGHER:  Your Honor, I wouldn't have any

9    objection to that.

10           MR. FULTON:  I wouldn't object to that.

11           THE COURT:  All right, that's what we will do.

12       If there's nothing else, we take about a 15-minute recess.

13           MR. FULTON:  Thank you, Your Honor.

14       (Recessed at 10:10 a.m.)

15       (Jury not present.)

16           THE CLERK:  All rise.

17           THE COURT:  Ms. Cook, if you would resume the stand.

18       I'm a little bit concerned about the pace of the case.  I

19   believe this Court has made a commitment to a juror that this

20   was going to be completed by Friday.  Of course that entails

21   deliberation.  So how much more time do you have with this

22   witness?

23           MR. FULTON:  I have, I would say, about 30 minutes.

24           THE COURT:  Can you pick up the pace just a little

25   bit?

1           MR. FULTON:  I can.  This was the most -- trying to

2   get through these, and following with the Bate stamping, but

3   we will move through quickly.

4           THE COURT:  Thank you.  Bring in the jury.

5           THE CLERK:  Please rise for the jury.

6       (Jury present; 10:30 a.m.)

7           THE COURT:  Please be seated.

8       The objection is sustained.  You may proceed.

9   BY MR. FULTON:

10  Q.  Lori, I'm going to go back to Exhibit No. 19, the very

11  first page.

12  A.  All right.

13  Q.  It says -- could you read the first two lines?

14  A.  "These are training documents that Lori provided, at my

15  request, that she felt evidenced she had been trained

16  incorrectly.  However, on review of the materials, I find:"

17  Q.  Okay.  So, number one, did you provide these documents at

18  Diane Wasson's request?

19  A.  No.

20  Q.  You came to Diane Wasson with these documents; is that

21  correct?

22  A.  No.

23  Q.  What documents did you come to Diane Wasson with?

24  A.  I came to her with a daily billing manual written by

25  Harrison.

1  Q.  Are either one of these alleged documents the documents

2  that you provided Diane Wasson?

3  A.  No.

4  Q.  Okay.  Lori, after you decided not to agree to the

5  document that Harrison provided you, what did you do?

6  A.  I sought out counsel and -- to explain my situation.

7  Q.  Okay.

8  A.  And listened to suggestions.

9  Q.  Okay.  So did you have a meeting with Diane Wasson where

10 she ever explained to you the results of an audit?

11 A.  No.

12 Q.  Did she ever talk to you about the McKesson audit?

13 A.  They just said a couple of sentences about McKesson audit

14 on the day they terminated me.

15 Q.  Okay.  Did she talk to you about the results of that

16 audit?  Did she say anything about did they find fraud?  Did

17 she say anything about that?

18 A.  Well, they said they didn't find fraud, and I believe it

19 was just described as the person doing that job was not

20 adequate for it, for the job.

21 Q.  Okay.  I believe you -- if you flip over to Exhibit No.

22 17.

23 A.  Okay, I'm on 17.

24 Q.  On page 10, does this document refresh your memory on

25 whether or not you had conversations with Diane Wasson

1  regarding the McKesson audit?

2  A.  Yes.

3  Q.  Okay.  And from what you recorded previously, what were

4  those discussions?  What was that?

5  A.  That no fraud or ill intent was done by the employee and

6  that Harrison Home Health software was only 70 percent that

7  would be available from the software vendor.

8  Q.  So Diane Wasson informed you that there was no fraud

9  theft?

10  A.  Correct.

11  Q.  Did you believe her?

12  A.  No.

13  Q.  Why not?

14  A.  Because she did not give me any documents, she didn't

15  share any report with me, and so I had nothing in writing to

16  show, to -- for me to try to formulate the proof on.

17  Q.  Okay.  Why were you so concerned about making sure fraud

18  hadn't been committed?

19  A.  Because when I apply for jobs, most of the applications

20  will ask you if you have ever been disqualified from working

21  or providing care or billing to Medicare or any other

22  government insurance.

23  Q.  So what was your plan to try to find out whether or not

24  fraud had been committed?

25  A.  I had heard about the *qui tam*, and in that manner we could

1    get someone to research the Medicare records, and if the

2    Medicare records actually showed no fraud, then I could be

3    assured I could always tell a future employer that I was --

4    what would be the word?  Not found guilty of fraud.

5    Q.   So your purpose in filing a *qui tam* -- what was your

6    purpose in filing a *qui tam*?

7    A.   To clear my name and my work history, that I had committed

8    no Medicare fraud.

9    Q.   Upon leaving, did you have an opportunity to look at your

10   employment file?

11   A.   I looked at it before I left, yes.

12   Q.   Okay.  And in that employment file, did you find all your

13   evaluations in that employment file?

14   A.   No, I did not.

15   Q.   What evaluation was left out of your employment file?

16   A.   My 90-day prelim -- or probationary report.

17   Q.   And that's the 90-day evaluation that we showed the jury

18   yesterday?

19   A.   Yes.  The 90-day evaluation.

20   Q.   The evaluation that was done by Diane Wasson?

21   A.   Yes.

22   Q.   And that was left out of your employment file?

23   A.   Right.  It was not there.

24   Q.   Lori, did you have a series of conversations with Diane

25   Wasson regarding a plan on working on the aging reports?

1   A.   I did.  As we talked about yesterday, we would have weekly

2   or biweekly meetings talking about current events, current

3   situations.  Remember, back in November of 2011, she asked me

4   to change my focus from all the oldest accounts, and she said

5   we are going to focus on some newer accounts.  So she would

6   assign a date range she wanted me to focus on.

7   Q.   Did you continue to work on those accounts with Diane?

8   Did you continue to work on those accounts with Diane?

9   A.   Not the old ones, only those she asked me to work on.

10  Q.   Okay.  What happened with the old ones?

11  A.   They become untimely.

12  Q.   Okay.

13  A.   And then you lose your payment for them.

14  Q.   Okay.  After you were finally terminated, what steps did

15  you take to try to find new employment?

16  A.   Well, from the time -- even the time when I was suspended,

17  I did job search.  I looked for jobs that were at my level,

18  and that -- and in any type of company, my degree is just in

19  business administration.  So I know administrative tasks for

20  all types of companies.  I would have at least three jobs I

21  would apply for every week.  Even unemployment requires that

22  you do that.  I went to the employment office and they give

23  you things like let's make sure your resume is up to date.

24  Different information about what's new on the Internet, where

25  to find jobs.  They say don't go out driving around for jobs

1  because most people want you just to apply on line, and I did

2  find that out when I went in person to some companies.  They

3  wouldn't even accept my paper.

4      I updated my Microsoft Windows -- Microsoft Office skills

5  because when I went to college Microsoft Office did not exist.

6  And the hardest part of my job search has been the fact that

7  Harrison now has merged with Franciscan and Catholic Health

8  Initiatives, so from -- I believe it starts in the north on

9  Kitsap -- on the peninsula at Sequim.  You've got Sequim,

10  Bremerton, Gig Harbor, Tacoma, Lakewood, Federal Way,

11  Enumclaw, and then Highline and Burien.  Those main -- those

12  hospital systems are all linked together, and even in -- it's

13  really disheartening and embarrassing that for the good job I

14  did at St. Joseph Hospital, when I put my application in

15  there, even just on suspension, I don't even get a phone call.

16  There were several good, nice positions in the business office

17  that I could do, and even those didn't answer me.

18      So I just keep applying, keep applying, keep applying

19  every week.  And then trying to stay current and stay focused

20  on some tasks to do every day.  My husband has suggested, you

21  know, you could go to school, and I go, I think I should go to

22  school because I'm kind of -- as far as the knowledge and the

23  skill level for jobs, I'm either overqualified for beginning

24  jobs or under qualified for jobs just beyond mine because they

25  will ask you for a master's.  So I'm in a master's program

1  with Western Governors University.

2  Q.  Approximately how many resumes have you sent out or

3  applications?

4  A.  Four hundred and forty.

5  Q.  Do you keep a running total?

6  A.  Yes.  It might be 443.

7  Q.  Okay.  And out of all those, have you had any responses?

8  A.  Between phone interviews and in person, I believe about

9  ten.

10  Q.  And you're currently not employed?

11  A.  Correct.

12  Q.  Lori, I know yesterday it was hard to talk about the day

13  in which you were suspended, but I want to ask you some

14  questions just about your -- how you are doing mentally with

15  this.  Have you had to consult with any doctors regarding any

16  of your emotional issues --

17  A.  Yes.

18  Q.  -- around this?

19  A.  Yes.

20  Q.  Could you tell the jury about that?

21  A.  I have had -- I described how I feel and how I cannot

22  sleep, and my doctor has prescribed some antidepressant for

23  me.  And that has helped somewhat, but sometimes I just feel

24  in despair and cry.  And when I have trouble sleeping, I spoke

25  with her about that, and she was saying that, well, that's

1   just kind of anxiety.  And sometimes I feel myself just

2   staring in the daytime even.  It's just like I go, oh, come

3   on, stay on track, you know, wake up.  But every morning I

4   wake up and I have to say what -- what are you going to do

5   today?  What is your purpose?  And motivate myself to keep

6   going.  I mean, I had two part-time jobs when I was in high

7   school and basically I've worked every day since I was --

8   until I was suspended, and I'm used to getting up, having some

9   type of commute, going to work, working on the toughest things

10  first, getting those out of the way.  And even though I don't

11  pick a group of friends at work, I don't gossip at work, I

12  don't do anything rude to anyone, I'm respectful to everyone,

13  it still gives you a sense of belonging somewhere.  And so

14  that's where I am.  So now I keep studying and hoping that

15  someone will say, she's not giving up.  We're going to ask her

16  to come to work.

17      And I know it has affected my husband and my family in a

18  negative way, too.  I know that for my -- just my medical

19  conditions, about five years I've had diabetes 2, and that was

20  always under real good control, but now my doctors have had to

21  double my medication.  And I've had high blood pressure since

22  I was like 25, but that's always been under control with

23  medication.

24      But I feel like I've lost an opportunity to even like go

25  to the Y and stay in a good exercise routine.  And I don't

1  want to visit anywhere.  I don't call my kids.  What am I

2  going to tell them?  Oh, yeah, I go to the computer and I look

3  for new jobs.  And what's really -- makes you feel bad is when

4  you know you applied for a job three weeks ago, and then you

5  see the job posted again so it's like the people have gone

6  through a whole hundred or so whatever applications they

7  received, but they didn't even call you.  And when you call

8  back to try to say, well, why, or inquire, you are getting

9  no -- no answer.  They are all so busy.  And the human

10  resource offices are somewhat automated, so you just can't

11  even get a conversation going with someone to get your foot in

12  the door.

13  Q.  You don't need to go into detail, but how has this

14  impacted you and your husband, your relationship?

15  A.  We are not able to go visit with our children just because

16  they live far away.  Our daughter from Tacoma comes over, and

17  she and our grand dogs come over, and that's nice.  They say

18  we're -- the conversation about this incident has happened

19  every day.  It might happen the moment we wake up, it might

20  happen right before we go to bed.  If I feel really tired,

21  sometimes my husband doesn't, sometimes he gets up in the

22  middle of the night.  It's just really hard, just on -- I

23  guess the physical connection.  I just try to have

24  conversations, and there's really nothing new to talk about.

25  Q.  Lori, the question -- before I ask that question.  Have

1  you, in your opinion, exhausted your employment opportunities

2  within this region?

3  A.  Yes, because of the number of employers I have applied to.

4  Sometimes I may see -- like today I might see a job or two at

5  one company, and then, you know, in a few weeks they might

6  have another job I qualify for, a fully different job, and I

7  will apply but I still do not get selected.

8  Q.  Have you thought about leaving the state?

9  A.  I have.  We're not financially able to do that, and I

10  don't want to do it until I clear up everything I can about

11  this incident because I don't want to go further and further

12  and further away and to more and more companies just to

13  continue to get rejected.

14  Q.  Lori, before you gave the manual to Diane, why didn't you

15  just make a copy of it to keep one for yourself to have as

16  proof?

17  A.  It's not mine to do that with.  It's the property of the

18  company.

19  Q.  I have just a few more questions for you, Lori.  Going

20  back to when you were asked to investigate both the monthly

21  credit report and the McKesson overpayment report issues, did

22  you believe that they had fraud potential?

23  A.  Yes, I believed they would have fraud potential.

24  Q.  And why?

25  A.  We send the Medicare credit report directly to Medicare.

1    It's about a company disclosing to Medicare.  And Diane made

2    the overpayment report matching to the MARR problem sound

3    serious, and it, too, would link to Medicare revenue somehow.

4    Q.  Okay.

5    A.  And when I discovered that affecting the revenue was

6    something we should have done once a month rather than every

7    day as the manual instructed me to do, I definitely knew

8    something could be wrong in the system and on our claims that

9    I did not have access to.

10   Q.  Did you have the ability to determine once and for all

11   whether or not fraud had been committed?

12   A.  No.

13   Q.  Did you need to have an outside source or someone else to

14   confirm that fraud wasn't committed?

15   A.  Yes.  And that was -- I would say it's from Medicare, but

16   it was through Ms. Swem when she did her investigation.

17            MR. FULTON:  Lori, those are all the questions I have

18   for you at this time.

19            THE WITNESS:  Thank you.

20                         CROSS-EXAMINATION

21   BY MR. GALLAGHER:

22   Q.  Good morning, Ms. Cook.

23   A.  Good morning.

24   Q.  You have water in front of you, right?

25   A.  Yes.

1  Q.  And I guess Kleenex, in case you need them?

2  A.  Yes.

3  Q.  Why don't you take the exhibit books and just set them

4  aside.  We're not going to look at exhibits for a little

5  while.

6      Ma'am, you understand that Harrison Medical Center is a

7  not-for-profit company; right?

8  A.  Yes.

9  Q.  Some companies are for profit, and some are not for

10  profit; right?

11  A.  Right.

12  Q.  For-profit companies are in it to make money for their

13  shareholders; aren't they?

14  A.  Yes.

15  Q.  But not-for-profit companies don't have shareholders, do

16  they?

17  A.  Correct.

18  Q.  So they aren't trying to maximize shareholder profit, are

19  they?

20  A.  No.

21  Q.  In fact, they are about providing good health care for the

22  citizens in a particular community; wouldn't you agree?

23  A.  Yes.

24  Q.  And you understand that health care companies are not

25  required to participate in the Medicare program; right?

1   A.   Right.

2   Q.   There are some doctors, for example, that don't take

3   Medicare; right?

4   A.   Correct.

5   Q.   And there may be some hospitals out there that don't take

6   Medicare; isn't that true?

7   A.   I suppose it could be true, yeah.

8   Q.   But you've worked for hospitals that have always taken

9   Medicare; correct?

10  A.   Yes.

11  Q.   Because that's one of your areas of expertise is Medicare

12  billing?

13  A.   Yes.

14  Q.   So a doctor or a hospital could say, no thanks, I don't

15  want to participate in the Medicare system, couldn't they?

16  A.   Yes.

17  Q.   But if that doctor or that hospital decides that they want

18  to participate in the Medicare system, the government attaches

19  some strings, don't they?

20  A.   Yes.

21  Q.   One of the strings is you have to follow the Medicare

22  billing procedures; right?

23  A.   Yes.

24  Q.   And you know as well as anybody about how complicated

25  those can be, don't you?

1  A.  Yes.

2  Q.  And another of the strings is that hospitals that take

3  Medicare have an obligation to provide medical services to

4  people who can't pay for those medical services; right?

5  A.  Yes.

6  Q.  They can't deny basic coverage just because somebody

7  cannot pay; isn't that true?

8  A.  Right.

9  Q.  In fact, they often provide services for free to the poor;

10  correct?

11  A.  Can you repeat that?  I didn't hear you.

12  Q.  Sure.  In fact, they often provide services for free to

13  the poor; correct?

14  A.  Yes.

15  Q.  And so one of the things that makes this system work is

16  that in return for providing care to people who can't pay,

17  Medicare has a billing process that allows those hospitals and

18  those health care agencies to obtain regular payment for the

19  services that they do provide pursuant to Medicare; right?

20  A.  Yes.

21  Q.  So you understand that it's important for a hospital to

22  promptly process its Medicare billing; don't you?

23  A.  Yes.

24  Q.  Now, we've talked at some length in this case about

25  Harrison Medical Center and Harrison Home Health, haven't we?

1   A.   Yes.

2   Q.   Harrison Home Health is basically a division of Harrison

3   Medical Center; is that right?

4   A.   Yes.

5   Q.   And you first applied at Harrison Medical Center in 2011,

6   didn't you?

7   A.   Yes, through Harrison Home Health.

8   Q.   Harrison Home Health.   Okay.   When you applied, you

9   attached a resume to that application?

10  A.   Yes.

11  Q.   And the resume listed all of your job skills?

12  A.   Yes.

13  Q.   And I believe you testified you went through a fairly

14  rigorous interview process when you first interviewed at

15  Harrison; correct?

16  A.   Yes.

17  Q.   There were, I think, three rounds of interviews; isn't

18  that right?

19  A.   Yes.

20  Q.   And the position that you applied for was a medical

21  billing manager position; right?

22  A.   Yes.

23  Q.   So this was a management position?

24  A.   Yes.

25  Q.   And you ultimately started at Harrison in April of 2011;

1  correct?

2  A.  Yes.

3  Q.  So at the time that you first interviewed at Harrison, you

4  told them that you had more than 37 years of experience in the

5  Medicare billing field; right?

6  A.  Yes.

7  Q.  And you understood that Harrison was looking for somebody

8  who had that kind of Medicare billing experience; didn't you?

9  A.  Yes.

10 Q.  They were looking for somebody who could hit the ground

11 running, weren't they?

12 A.  Yes.

13 Q.  They were not looking for somebody that they had to train

14 on the job?

15 A.  Yes.

16 Q.  And you felt that you were qualified for that job; right?

17 A.  I did, and I was explicit that I had not ever been trained

18 by McKesson on McKesson software.

19 Q.  But you had used McKesson software?

20 A.  I had used it.

21 Q.  And you felt comfortable using McKesson software; didn't

22 you?

23 A.  I did.

24 Q.  And you knew how to contact McKesson helpline; right?

25 A.  Yes.

1  Q.  And you knew that there were materials available online

2  that you could look at if you had questions about how the

3  software worked; correct?

4  A.  Yes.

5  Q.  You had also used other kinds of Medicare billing

6  software; correct?

7  A.  Yes.

8  Q.  What other kinds of Medicare billing software had you

9  used?

10  A.  I cannot remember the names of them.  Homecare HomeBase

11  for home health, but when I worked at physician or hospitals,

12  so forth, before -- how do I want to say it?  When electronic

13  billing first started, I was at Good Samaritan Hospital, and I

14  was the first person asked to do that.  We did it first with

15  Medicaid, and then we brought on Medicare.  Those claims were

16  going directly to the insurance company.  If -- I don't even

17  think there was another electronic interchange company in

18  there.  It was just modem direct to the insurance.

19      Since then, when I worked at a hospital or -- I mean a

20  physician group or at a nursing home, they had a mechanism for

21  transmitting the claims, but I don't remember the names of all

22  those --

23  Q.  Okay.

24  A.  -- different softwares.

25  Q.  And is it fair to say that there were -- different

1  companies had different pieces of software that they used to

2  basically do the same thing with regard to Medicare billing?

3  A.  Yes.

4  Q.  So the McKesson software might be different from another

5  company's software, but it basically accomplishes the same

6  task; right?

7  A.  Yes.

8  Q.  And since you had 37 years of experience with Medicare

9  billing, you understood what that task was that needed to be

10 accomplished, didn't you?

11 A.  Yes.

12 Q.  You knew how the Medicare billing system worked, didn't

13 you?

14 A.  Yes.

15 Q.  And even though you might not know how a particular piece

16 of software is operated, you knew what it was supposed to do,

17 didn't you?

18 A.  Yes.

19 Q.  So when you applied for the job at Harrison, you explained

20 to them that you started in the medical billing field at St.

21 Joseph Hospital, St. Joe's, in Tacoma; correct?

22 A.  Yes.

23 Q.  And that you were there for 17 years; isn't that right?

24 A.  No.

25 Q.  Oh, I'm sorry.  Oh, that's Good Samaritan.  I'm sorry.

1  You were at St. Joe's for three years; right?

2  A.  Yes.

3  Q.  Okay.  And then you moved to Good Samaritan.

4  A.  Yes.

5  Q.  Okay.  In Puyallup; right?

6  A.  Yes.

7  Q.  And you were a float biller; right?

8  A.  Yes.

9  Q.  And as a float biller, I take it you would -- you would

10  sort of fill in for people if they were out that day?

11  A.  Correct.

12  Q.  They might be on vacation or sick or something, you would

13  sit at their desk and do their job; correct?

14  A.  Yes.

15  Q.  And so you were sort of the jack-of-all-trades in that

16  group; right?

17  A.  Yes.

18  Q.  You had to know more than a little bit; you had to know a

19  lot about everybody's job, didn't you?

20  A.  Yes.

21  Q.  And then as you were interviewing at Harrison, you also

22  told them that you had been a business office manager at

23  Clearview Manor in Tacoma; right?

24  A.  Yes.

25  Q.  And there you handled insurance billing and patient

1  billing; right?

2  A.  Yes.

3  Q.  And you were there for two years; right?

4  A.  Yes.

5  Q.  And you told them about your next job, then, at Ridgemont

6  Terrance in Port Orchard; right?

7  A.  Yes.

8  Q.  There you were a business office manager as well; correct?

9  A.  Right.

10  Q.  But you only stayed at that job for ten or twelve weeks

11  because it turned out to be something other than what they had

12  promised you; right?

13  A.  Yes.

14  Q.  So then you moved to Swedish, the physician division at

15  Swedish; correct?

16  A.  Yes.

17  Q.  Is that in Seattle?

18  A.  Yes.

19  Q.  Okay.  And you moved to Swedish in about 2000; right?

20  A.  Yes.

21  Q.  And stayed there about five years?

22  A.  Yes.

23  Q.  And there you were an application trainer; is that right?

24  A.  Yes.

25  Q.  And your responsibilities included training on the

1  software that Swedish used for Medicare billing; right?

2  A.  No.  I will explain.  They have the central business

3  office where I was based out of and they had all the clinics.

4  People at the business office either did payment posting,

5  insurance follow-up.  Some did refunds, some did like high

6  level denials, and some were customer service.  There was just

7  one person who actually took the information that the clinics

8  had input as their services and compiled the batches to be

9  sent to Medicare.

10  Q.  Okay.  What was it that you did?

11  A.  I trained many people in the payment posting, and then

12  insurance follow-up and registration and taking copays, and so

13  forth, with the staff at the clinics.

14  Q.  And your title when you were at Swedish Home Care was

15  billing supervisor; correct?

16  A.  Yes.

17  Q.  That was a management position?

18  A.  I would say mid management.

19  Q.  You were --

20  A.  Because they had some people that were managers and some

21  people that were directors, so supervisor level.

22  Q.  Okay.  Is supervisor the same as a manager level?

23  A.  I don't know the definition each company put on it.

24  Q.  Okay.  At that company, was it the same as a manager

25  level?

1    A.   No.

2    Q.   Okay.  And you left Swedish after about five years; right?

3    A.   Yes.

4    Q.   And that's when you moved to Illinois for family reasons;

5    right?

6    A.   Yes.

7    Q.   And when you were in Illinois, you worked at Ingalls Home

8    Health Care in Harvey, Illinois; right?

9    A.   Yes.

10   Q.   There you managed a staff of five; right?

11   A.   Yes.

12   Q.   And your responsibilities there included Medicare billing,

13   didn't it?

14   A.   I did oversee it, yes.

15   Q.   So your responsibilities included overseeing the Medicare

16   billing?

17   A.   Right.  And reviewing the Medicare credit report and

18   whatever table maintenance changes we had, insurance changes,

19   and the month-end reporting.

20   Q.   So your responsibilities included making sure that the

21   people that worked for you were doing the Medicare billing;

22   right?

23   A.   Correct.

24   Q.   And that's something that you told the people at Harrison

25   about when you were interviewing there; right?

1  A.  Yes.

2  Q.  And you thought that actually made you look more qualified

3  for that position; right?

4  A.  Yes.

5  Q.  Did you think you were qualified for the position at

6  Harrison?

7  A.  Yes.

8  Q.  Did you think that it was a step up in terms of

9  responsibilities for you to become a manager?

10  A.  No, because the duties were lateral.

11  Q.  You had been doing that stuff before?

12  A.  Right.

13  Q.  So you thought you could move over to Harrison and hit the

14  ground running; correct?

15  A.  Right.  They had a different name for the position.

16  Q.  Okay.  But it was -- they were job functions that you had

17  previously done; right?

18  A.  Correct.

19  Q.  So when you joined Harrison, you knew that they used the

20  McKesson software to do their Medicare billing; correct?

21  A.  Yes.

22  Q.  And that's known as McKesson Horizon Home Care software;

23  right?

24  A.  Yes.

25  Q.  And you had used McKesson Horizon Home Care software

1   before; correct?

2   A.   Yes.

3   Q.   And where was that?

4   A.   At Swedish Home Care.

5   Q.   And you worked at Swedish with Mr. Miotke; correct?

6   A.   Yes.

7   Q.   And was he at -- he had come to but left Harrison by the

8   time you joined Harrison; isn't that right?

9   A.   Yes.

10  Q.   Okay.  So when you interviewed at Harrison, had you had

11  any training by McKesson Corporation on their software?

12  A.   No.

13  Q.   So all the training you received was training by your

14  employer; correct?

15  A.   Yes.

16  Q.   Had you ever called McKesson helpline before?

17  A.   Yes.

18  Q.   Okay.  So you had talked to McKesson helpline people;

19  correct?

20  A.   Yes.

21  Q.   Had you ever accessed the online information that was

22  available on the McKesson website before?

23  A.   Yes.

24  Q.   So you knew where to go if you had a question about the

25  McKesson software; correct?

A.   Yes.

Q.   And you understood Medicare's rules about Medicare billing; right?

A.   Yes.

Q.   So you felt that your experience with McKesson software made you qualified for this job you applied for at Harrison; isn't that true?

A.   Along with my other experience and education.

Q.   Right.  It was a total package; it wasn't just the software experience, but it was 37 years of experience in Medicare billing; right?

A.   Yes.

Q.   At the time you interviewed at Harrison, you understood that they had had this position opened for quite a while; right?

A.   They just mentioned they needed someone.  I figured maybe someone left three months ago or so.

Q.   So you had no idea how long that position had been open at the time that you got it?

A.   Correct.

Q.   At any time did you ever learn how long that position had been open?

A.   After I started doing my accounts receivable work.

Q.   And what did you learn?

A.   Actually I thought someone hadn't been there for about 14

1    months.

2    Q.  And that's because when you started, you had a pile,

3    basically, of accounts receivable work that had been piling up

4    because nobody had been doing it; right?

5    A.  Correct.

6    Q.  And that was job one for you, wasn't it?

7    A.  Yes.

8    Q.  To start diving into those accounts receivable; isn't that

9    true?

10   A.  Yes.

11   Q.  And part of the reason is because at some point, if you

12   don't process the accounts receivable quickly enough, you lose

13   the ability to send it to Medicare; right?

14   A.  Correct.

15   Q.  And when we talk about an account receivable, we are

16   talking about money that the hospital can obtain from Medicare

17   if you just send in the right paperwork and ask to be paid;

18   correct?

19   A.  Correct.

20   Q.  So the first few months that you were doing your job at

21   Harrison, that was really the focus of your job, right,

22   digging through that accounts receivable pile?

23   A.  Correct.

24   Q.  Now, when you started at Harrison, you were hired as the

25   medical billing manager; correct?

1  A.  Yes.

2  Q.  That's a member of the management team at Harrison; isn't

3  it?

4  A.  Yes.

5  Q.  And you supervised two people, Sam Hubbard and Jeff

6  Inwood; correct?

7  A.  And Jeff Underwood.

8  Q.  Underwood, okay.  I apologize.  And at the time that you

9  started at Harrison, you were given policy and procedural

10  manuals that were created by both Harrison itself and by

11  McKesson; right?

12  A.  I just was given the Harrison procedures, and whatever was

13  McKesson would be online.

14  Q.  Okay.  So you didn't have a hard copy of the McKesson

15  procedures, that was available online?

16  A.  Right.

17  Q.  So the Harrison procedures, it's been called a manual, I

18  think, by your counsel and in your testimony; right?  Did you

19  think of it as a manual?

20  A.  Repeat that question, please.

21  Q.  Sure.  The materials that you had that were prepared by

22  Harrison -- I just want to make sure we are using the right

23  term -- you've referred to that as a manual, haven't you?

24  A.  Right.  I received two notebook manuals that were written

25  by Harrison people about the daily processes and then the

1   month-end processes.

2   Q.  Okay.  And you sort of anticipated my next question.  Were

3   these a pile of papers that had been stapled together, or what

4   did that manual look like?

5   A.  A light notebook, in a green binder.

6   Q.  How thick was the notebook?

7   A.  Oh, I would say each were about 30 pages.

8   Q.  Okay.  Can I have you look at the exhibit that's been --

9   the demonstrative exhibit that's been put up there, the

10  exhibit that is sitting on the easel.

11  A.  Yes.

12  Q.  That's a graphic that your lawyer created for this trial;

13  correct?

14  A.  No.

15  Q.  Okay.  Did you make that?

16  A.  I made that.

17  Q.  Did you really?

18  A.  I did.

19  Q.  Okay.

20  A.  He blew it -- he had it changed to that format.

21  Q.  Okay.  So the two books that we see sitting on the -- or

22  at the top of that chart --

23  A.  Yes.

24  Q.  Those look like they are bound books; right?

25  A.  Yes.  I couldn't find a notebook picture.

1   Q.   Okay.  That's fine.  So if you had been able to find a

2   picture of a notebook with 30 sheets of paper in it, that

3   would have been a more accurate representation of the teaching

4   manual?

5   A.   Right.  And I will apologize, if need be.  They are

6   different sizes, they are different widths, and my two books

7   were exactly the same size each.

8   Q.   Okay, good.  I just wanted to -- I didn't want to create a

9   misimpression that perhaps these were bound volumes like you

10  would buy in a book store or something.

11  A.   Correct.

12  Q.   And I believe your testimony was that Sam Hubbard showed

13  you how to use the Harrison manual, the billing manual;

14  correct?

15  A.   The daily manual, yes.

16  Q.   And that billing manual had some screen prints from the

17  McKesson software program; right?

18  A.   Yes.

19  Q.   And by screen prints, we're talking about someone had

20  basically copied an image from a computer screen and then

21  printed it out on three-hole paper and put it in the notebook;

22  right?

23  A.   Yes.

24  Q.   So it was basically a picture of what your computer screen

25  looked like; correct?

A.   Yes.

Q.   And Pat Dodge at the time was your manager, wasn't she?

A.   Yes.

Q.   And she showed you how to use the McKesson program?

A.   Well, she gave me my passwords and just made sure everything logged on correctly for me when I first started using it.  And she asked me a few questions of what I remember and so forth, and then she, you know, just said, well, look around, see what you can do with it, what you can find, and then she gave me an aging that they had, and then I don't remember how old it was.  And the first thing I probably would do is prepare myself a new aging so it would be current.

Q.   What's an aging?

A.   Accounts receivable listing of the outstanding accounts.

Q.   So that would be a piece of paper that showed you how much was outstanding and needed to be collected from Medicare?

A.   You could order it just for Medicare, you could order it for any insurance, you could order it by total, by patient name.  There are many choices.

Q.   Okay.  And you have the opportunity -- if you had questions about how the McKesson software worked, you had the opportunity or the capability of calling McKesson and asking them questions; correct?

A.   Yes.

Q.   But you didn't call McKesson and ask them a single

1  question about their software until November 6th of 2012, did

2  you?

3  A.  No, that's not correct.  I asked them many questions.

4  Q.  Ma'am, do you recall having your deposition taken in this

5  case?

6  A.  Yes.

7  Q.  And Ms. Harry asked you questions under oath in your

8  deposition; correct?

9  A.  Yes.  Possibly your question is not definitive enough.

10  Q.  Well, I guess we will see.  Could we have --

11          MR. GALLAGHER:  Your Honor, may I approach?

12          THE COURT:  Yes.

13          MR. GALLAGHER:  How do you prefer we handle --

14          THE COURT:  Ask it be published after the foundation

15  has been laid as to the date and place of where this took

16  place.

17          MR. GALLAGHER:  Okay.  May I approach and hand it to

18  her?

19          THE COURT:  Yes.

20  BY MR. GALLAGHER:

21  Q.  So, Ms. Cook, your deposition was taken in Bellevue,

22  Washington, on November 6th, 2014; correct?

23  A.  Yes.

24  Q.  So two years to the date from the November 6, 2012,

25  meeting; right?

1   A.   Yes.

2   Q.   And you swore to tell the truth in that deposition;

3   correct?

4   A.   Yes.

5   Q.   There was a court reporter there to transcribe --

6   A.   Yes.

7   Q.   -- your answer -- I'm sorry, ma'am, you have to wait until

8   I finish asking my question before you answer.

9        So there was a court reporter there that transcribed

10  your -- Ms. Harry's questions and your answers; correct?

11  A.   Yes.

12  Q.   And then you had an opportunity later to review the

13  deposition and make any corrections if there were typos or if

14  it was transcribed incorrectly; right?

15  A.   Yes.

16  Q.   Okay.  Let me ask you to turn to page 20 of the

17  deposition.

18  A.   Yes.

19  Q.   At line 11, you were asked the question:

20       "You testified that if you had a question you would have

21  asked someone.  But did you ever actually do that?"

22       Do you see where I'm referring to?

23  A.   I see that.

24  Q.   Would you read to the jury the answer that you gave that

25  begins on line 13?

1   A.  It says:  "I did not ask any question about that until

2   November 6th, 2012."  So we have to go back and see what

3   "that" is.

4   Q.  Okay.  So is it your testimony that you never asked any

5   questions about the GenEnd report until November of 2012?

6   A.  Correct.

7   Q.  How often did you call McKesson with questions?

8   A.  At least twice a week.

9   Q.  But nothing with the GenEnd report appeared incorrect to

10  you until November 6th of 2012; correct?

11  A.  Correct.

12  Q.  Let's talk first -- you can set the deposition aside for a

13  second.

14      I want to talk about Medicare.  Medicare is administered

15  by the Department of Health and Human Services; isn't it?

16  A.  Yes.

17  Q.  And there's a division of the Department of Health and

18  Human Services called CMS; correct?

19  A.  Yes.

20  Q.  What is CMS?

21  A.  Centers for Medicare and Medicaid.

22  Q.  What is it that CMS does?

23  A.  They oversee all the guidelines for the program.  They

24  have on their website information about the different types of

25  providers.  There might be -- I think there's a column for

1    providers to look up things.  There's a section that might be

2    of interest to just Medicare beneficiaries or Medicaid

3    beneficiaries.  There's a whole wealth of different topics.

4    Q.  I want to focus in on the process that relates to the

5    GenEnd report, and I want to try to explain to the jury how --

6    both you and I explain to the jury what that reconciliation

7    process is so they understand what we're talking about.

8         So is it fair to say that the way Medicare works is that

9    care providers, such as Harrison Home Health, are paid a

10   predetermined amount of money for a particular service?

11   A.  Yes.

12   Q.  And in this case we've talked a lot about this 60-day

13   episode of care period.  That's a unit of payment Medicare

14   uses, isn't it?

15   A.  I would say it's a unit of service.

16   Q.  Okay.

17   A.  Time period of service.

18   Q.  Okay.  It's a unit of service, but ultimately that health

19   care provider gets paid for providing those services; correct?

20   A.  Correct.

21   Q.  But Medicare doesn't require the provider to wait till the

22   end of that 60-day period to get paid, does it?

23   A.  No, if certain conditions exist.

24   Q.  So if certain conditions exist, Medicare allows that

25   provider to receive an interim payment before the expiration

1  of that 60 days; right?

2  A.  Yes.

3  Q.  So in our situation that we've talked about in this case,

4  Harrison Home Health wouldn't have to wait 60 days to get paid

5  for treating the patient; they can get a portion of what they

6  are going to earn in the middle of that 60-day period; right?

7  A.  Correct.

8  Q.  And I think you testified it was between 50 and 60 percent

9  of ultimately the total they would be paid; correct?

10  A.  Yes.

11  Q.  And the reason for that is to help companies like Harrison

12  with cash flow; right?

13  A.  Yes.

14  Q.  So that they don't have to go 60 days before they get paid

15  for treating a patient; they can get something in the door

16  sometime during that 60-day period to help with their

17  expenses; right?

18  A.  Correct.

19  Q.  But the way the system is set up, ultimately Harrison

20  would compare notes with Medicaid -- Medicare, and sometimes

21  more money would be paid at the end of that 60-day period, and

22  sometimes less money would be paid in order to make sure that

23  at the end of that 60-day period Harrison got exactly what it

24  was entitled to; right?

25  A.  Can you repeat that question?

1  Q.  That was a horrible question.

2  A.  Well, you are speaking so fast, too.

3  Q.  Okay.  Let me slow it down.

4      At the end of that 60-day period, Harrison and Medicare

5  would essentially compare notes and make sure that Harrison

6  got paid exactly what it was owed but not more than it was

7  owed or not less than it was owed; correct?

8  A.  Correct.

9  Q.  And that's the reconciliation process; right?

10  A.  Right.

11  Q.  And when you run the GenEnd report either on a daily basis

12  or a monthly basis, that affects the amount of money that

13  Medicare may pay during that 60-day period; right?  Not at the

14  end of the 60-day period.

15  A.  GenEnd was never described to me in that manner.

16  Q.  Okay.  But you're an expert in Medicare billing, aren't

17  you?

18  A.  Yes, but the GenEnd process is a McKesson process.

19  Q.  Right.  But the Medicare billing process is the same

20  whether you are using McKesson software or other company

21  software; isn't it?

22  A.  No.  The other softwares that I have used for home health

23  billing, that was not a GenEnd process.

24  Q.  Right.  But the Medicare rules that they use to pay

25  service providers are the same whether the service provider

1  uses McKesson software or uses some other piece of software,

2  aren't they?

3  A.  Right.  But GenEnd is not something Medicare talks about

4  when they are talking about processing claims.

5  Q.  Right, ma'am, but you are a manager in the Medicare

6  billing department; correct?

7  A.  Yes.

8  Q.  You're in charge of overseeing the Medicare billing at

9  Harrison Home Health regardless of what software package it

10  uses; correct?

11  A.  Yes.

12  Q.  So wasn't it your responsibility to know if the software

13  that your company was using actually accomplished what you

14  knew was supposed to be submitted to Medicare?

15  A.  Yes.  And all the information I saw, all the HHRGs or the

16  HIPPs had their correct amounts associated with them.

17  Q.  But you ultimately learned from the individuals at

18  McKesson that you had been running the software incorrectly,

19  didn't you?

20  A.  The day before I was suspended.

21  Q.  Yeah.  And then if you were the manager of the Medicare

22  billing department at Harrison, how come you didn't discover

23  that the day after you started at Harrison?

24  A.  Because it was not evident.

25           THE COURT:  We're going to take our noon recess again

1    early.  I ask you then to return at 1:00.  Please do not

2    discuss the case among yourselves or anyone else.

3              THE CLERK:  All rise.

4        (Jury excused; 11:28 a.m.)

5              THE COURT:  You may step down.

6        (Recessed.)

7                        AFTERNOON SESSION

8        (Jury not present.)

9              THE COURT:  Ms. Cook, if you would like to resume the

10   witness chair, please.

11             THE CLERK:  Please rise for the jury.

12       (Jury present; 1:00 p.m.)

13             THE COURT:  Everyone please be seated.

14       You may proceed.

15             MR. GALLAGHER:  Thank you, Your Honor.

16   BY MR. GALLAGHER:

17   Q.  Ms. Cook, before our lunch break we were talking about the

18   Medicare system and 60-day episode of care concept.  I want to

19   pick up at that point.

20       You had testified that Medicare allows providers to

21   request and receive an interim payment before the expiration

22   of this 60-day period; correct?

23   A.  Yes.

24   Q.  And that helps the providers with their cash flow; right?

25   A.  Yes.

1  Q.  So once an initial consultation is done by the doctors and

2  nurses, they gather information, and then Medicare permits the

3  provider to submit a form telling Medicare what the provider

4  anticipates the patient's care will entail; correct?

5  A.  Yes.

6  Q.  What's that form called, or that submission called?

7  A.  You're talking about the billing submission?

8  Q.  Yes.

9  A.  Okay.  That's a request for anticipated payment, or RAP.

10  Q.  That's the RAP; the RAP is request for --

11  A.  Yes.

12  Q.  So the nurses then make an estimate of what needs to be

13  done in the next 60 days, and someone takes that estimate and

14  compares it to the Medicare's fee schedule to determine how

15  much money should be paid by Medicare; correct?

16  A.  I believe that's how that processing would work.

17  Q.  And then the RAP, the request for anticipated payment, is

18  submitted; right?

19  A.  Yes.

20  Q.  And this could be sent within a week or two of the time

21  that the patient comes into the facility; right?

22  A.  Yes.

23  Q.  And after a facility like Harrison submits this request

24  for anticipated payment, it receives what's called a

25  provisional interim payment from Medicare; correct?

1  A.  I've not heard the word "provisional" before, but it is an

2  interim payment.

3  Q.  Okay.  So it's called an interim payment, is that what you

4  would refer to it as?

5  A.  Right.

6  Q.  And you said that's usually 50 to 60 percent of what the

7  total payment would be; right?

8  A.  Yes.

9  Q.  So during that 60-day episode, some patients might

10  actually require more care than is anticipated; isn't that

11  true?

12  A.  Yes.

13  Q.  And other patients might require less pay; correct?

14  A.  Yes.

15  Q.  So at any one time it's not unusual for a particular

16  patient's account to show a credit balance or a deficiency

17  based on all these factors; correct?

18  A.  Yes.

19  Q.  But at the end of that 60-day period, the provider, in

20  this case Harrison, and Medicare compare the estimated charges

21  with the actual charges and, I believe, as you said in your

22  direct examination, true up the account; correct?

23  A.  Yes, after the final claim.

24  Q.  And by truing up the account, you're referring to a

25  process where essentially Medicare and provider either pay

1  additional -- Medicare will either pay additional fees or

2  perhaps the provider may return some fees in order to make

3  sure that the provider only gets what it's entitled to;

4  correct?

5  A.  No.

6  Q.  Okay.  How did I get that wrong?

7  A.  Medicare will take back or recoup the RAP payment and make

8  just the payment that they have calculated per the HHRG and

9  make that new payment to the provider.

10  Q.  So they actually take back -- they made a RAP payment.

11  They actually take it back, and then they just pay the

12  provider exactly what they are entitled to; correct?

13  A.  Right.  So on your remittance, when you are paid for a

14  final claim, you have both a take back and a new payment on

15  the same remittance.

16  Q.  And your concern about the way that the GenEnd program

17  worked, the difference between running it on a daily basis

18  versus a monthly basis, is that that RAP payment might have

19  been higher than it otherwise should have been; is that

20  correct?

21  A.  No.

22  Q.  Okay.  But your concern was that the RAP payment was not

23  correctly calculated; isn't that true?

24  A.  No.

25  Q.  Okay.  What was your concern?

1   A.   My concern was that within the -- within the McKesson

2   system that something was being reported like the total

3   revenue of that account or multiple accounts were being

4   reported to Medicare.  We were talking about -- yesterday

5   about electronic claim formats.  Whether you were on the 4010

6   version until the time you needed to change to 5010 or you

7   were just on 5010, there are detailed -- more details allowed

8   on those electronic claims than what I would see on my paper

9   claim when I go to audit it.  And I -- not having seen it

10  before, I cannot give you an explanation, but that extra

11  revenue that was being reported by us, recorded somehow to

12  Medicare.  I don't know.  Maybe it would go into finance, into

13  the cost report or something.

14  Q.   So you don't have an understanding as to how it was

15  actually reported to Medicare; correct?

16  A.   What?  What was reported?

17  Q.   Well, you said the extra revenue.  You don't have an

18  understanding as to how that extra revenue was actually

19  reported?

20  A.   Right.  I don't have an example.

21  Q.   Now, as the billing manager, you were responsible for

22  overseeing Harrison's accounts receivable with regard to

23  Medicare; isn't that true?

24  A.   Yes.

25  Q.   And by accounts receivable, we are talking about the money

1   that Medicare owed Harrison, that Harrison appropriately

2   billed for; correct?

3   A.  Yes.

4   Q.  Now, I want to focus on events leading up to this

5   November 6, 2012, meeting.  It's your testimony that the

6   first time that you really focused on the GenEnd issue,

7   whether GenEnd should be run on a daily basis or monthly

8   basis, was at this November 6, 2012, meeting; correct?

9   A.  It was in that -- on that day, at the end of the day,

10  after I learned new information from McKesson and gave my

11  billing manual to Diane Wasson.

12  Q.  Okay.  And prior to that meeting on November 6 of 2012,

13  you testified that there was a new -- well, you testified that

14  Ms. Geiger, who worked in the accounting department, left

15  Harrison; correct?

16  A.  Yes.

17  Q.  And she was replaced by a person named Jakob Stickly;

18  isn't that true?

19  A.  Yes.

20  Q.  And that Mr. Stickly sometime in October of 2012 had

21  called you, or maybe emailed you, and asked if you could run

22  some reports for him; correct?

23  A.  Yes.  He came to see me.

24  Q.  And in retrospect now, you realize that those reports

25  related to the amount of revenue that was generated when you

1  ran the GenEnd program; correct?

2  A.  No.

3  Q.  Okay.  Well, but you did come to realize that Mr. Stickly

4  had developed some concerns about why certain totals that he

5  was looking at didn't match; correct?

6  A.  What totals are those?

7  Q.  Well, you would have to tell me, and I don't know that we

8  need to get into that level of detail.  But Mr. Stickly raised

9  some issues, correct, concerning the Medicare billing; isn't

10  that true?

11  A.  I don't know.

12  Q.  Okay.  Well, did you ever have any discussions with Mr.

13  Stickly about any concerns he ever had?

14  A.  No.

15  Q.  Okay.  When you went to meet with Ms. Wasson on

16  November 6, 2012, did she explain to you that Mr. Stickly

17  had raised some issues that she was looking into?

18  A.  She asked me one question.

19  Q.  And what was that question?

20  A.  Why did the total on the McKesson overpayment report not

21  match the credit column on the monthly -- month-end accounts

22  receivable reconciliation report.

23  Q.  And did you have any idea what caused her to come up with

24  that one question?

25  A.  She said finance asked.

1    Q.  Okay.  Is Mr. Stickly in finance?

2    A.  Yes.

3    Q.  Okay.  So you understand that Mr. Stickly asked a question

4    of Ms. Wasson that she passed on to you; correct?

5    A.  Yes.

6    Q.  Okay.  So Ms. Wasson and Ms. Holland met with you in that

7    meeting on November 6th, 2012; correct?

8    A.  No.

9    Q.  Okay.  Did you have more than one meeting with Ms. Wasson

10   on November 6th?

11   A.  Yes.

12   Q.  Okay.  Who was in the first meeting that you had with Ms.

13   Wasson on November 6, 2012?

14   A.  Diane and I.

15   Q.  Okay.  Diane Wasson.  Did you have another meeting later

16   in the day with Ms. Wasson?

17   A.  Yes.  I met.  We worked on this -- not this specific

18   thing, but two or three times in the afternoon.

19   Q.  Okay.  What time was the first meeting that you had with

20   Ms. Wasson on November 6, 2012?

21   A.  Two o'clock in the afternoon.

22   Q.  What time did you get off work during that period of time?

23   A.  Five o'clock.

24   Q.  So is it fair to say that all of the meetings you had with

25   Ms. Wasson that afternoon occurred between two o'clock and

1  five o'clock?

2  A.  Yes.

3  Q.  Did you have an understanding that Mr. Stickly was working

4  to investigate approximately $80,000 in overpayments which

5  appeared to him on the overpayment report that you had

6  calculated?

7  A.  Yes, that was the total of the overpayment report.

8  Q.  And this was an overpayment of -- well, this was an

9  overpayment of the interim moneys that Medicare would pay to

10  Harrison; correct?

11  A.  I don't know.

12  Q.  Okay.  Do you have an understanding as to whether -- well,

13  strike that.  This wasn't an overpayment for the final amount

14  that Medicare would pay to McKesson after the end of the

15  60-day period, was it?

16  A.  I don't know.

17  Q.  So you have no idea what the overpayment related to; is

18  that correct?

19  A.  I asked McKesson, and I learned from them near the end of

20  the day on -- no, it wasn't near the end of the day.  It was

21  probably my first call after Diane asked me the question, and

22  McKesson told me that their overpayment report does not

23  reflect overpayments or credits at all.  That it is an

24  accumulation or ongoing accounting of adjustment transactions

25  that happen in the system.

1  Q.  Okay.  So that means it's not an overpayment of the final

2  amount, it's an overpayment of the interim amount; correct?

3  A.  I don't know.  No one else has ever said that to me.

4  Q.  Okay.  Did you -- so in order to find out whether that's

5  true, you would have to call McKesson back; is that right?

6  A.  Yes.

7  Q.  So in the first meeting that you had with Ms. Wasson, she

8  told you that there was a problem; right?

9  A.  Yes.

10  Q.  And did she ask you to try to determine what was wrong

11  with the report?

12  A.  Yes.

13  Q.  And that's when you commenced your investigation; correct?

14  A.  Yes.

15  Q.  So your investigation consisted of going back to your

16  office and calling the help desk at McKesson; right?

17  A.  The first thing I did was I reran the report to make sure

18  there were not any typographical errors or errors in the dates

19  of the report, and I came up with the same result as the first

20  result.

21  Q.  So then you picked up the phone and you called the

22  McKesson help desk; right?

23  A.  No.

24  Q.  What did you do next?

25  A.  I told Diane Wasson where I was on the project, and she

1    asked me to keep researching.

2    Q.  So just so I'm clear.  The first thing you did as part of

3    your investigation was went back to your desk and reran the

4    report?

5    A.  Correct.

6    Q.  And then you took the report back to Ms. Wasson and said,

7    I reran the report and it looks the same?

8    A.  Yes.

9    Q.  Did she tell you to call McKesson then?

10   A.  No.

11   Q.  Okay.  So did you make the determination that the next

12   thing you should do in your investigation was call the

13   McKesson help desk?

14   A.  Right.  I had also asked Diane, can you tell me or did

15   finance tell you where this information is coming from, what

16   they describe it as, what they're trying to correlate

17   together?  And she could not give me any more information, so

18   then I determined to call McKesson.

19   Q.  What was Ms. Wasson's job title at that time?

20   A.  She was the director of home health.

21   Q.  What were her job responsibilities, as best you know?

22   A.  Oversee the entire department, the clinicians and the

23   business office.

24   Q.  So the billing function for home health was just a part of

25   her job responsibilities; correct?

1    A.  Yes.

2    Q.  Did you consider her to be an expert in Medicare billing?

3    A.  No.

4    Q.  Would you have expected her to know more than you about

5    Medicare billing?

6    A.  At least the same amount, and she also said she had

7    experience with McKesson.

8    Q.  But you considered yourself to be an expert in Medicare

9    billing, didn't you?

10   A.  Yes.

11   Q.  So after you went back the second time to Ms. Wasson, did

12   you then decide to call the McKesson help desk yourself?

13   A.  Yes.

14   Q.  So then you went back to your desk and you called the

15   McKesson help desk; correct?

16   A.  Yes.

17   Q.  And you explained the problem --

18   A.  Yes.

19   Q.  -- right?  And they gave you an answer; correct?

20   A.  Yes.

21   Q.  And among other things, they told you that there was no

22   overpayment or overbilling to Medicare; correct?

23   A.  They just said that the overpayment report does not

24   reflect credits in your system described as balances you need

25   to refund.  They're not true overpayments to you from another

1    party.

2    Q.   So you understood that the reports that you were

3    generating using this GenEnd program were not the final

4    reports that Medicare would use to determine how much was

5    ultimately to be paid to Harrison for any particular patient;

6    right?

7    A.   The GenEnd is just an internal process.

8    Q.   Okay.  Let's set aside GenEnd.  You understood when you

9    had that first phone call as part of your investigation, the

10   first phone call with the help desk at McKesson --

11   A.   Yes.

12   Q.   -- that -- you understood from McKesson that the report

13   that you were talking about was not the final report that

14   Medicare would use to determine how much would ultimately be

15   paid to Harrison; correct?

16   A.   The overpayment report in McKesson is not sent to

17   Medicare.  It's -- the two don't tie together.

18   Q.   But you understood after that call that Harrison was not

19   overbilling Medicare, didn't you?  That's what they told you.

20   A.   No, they didn't tell me that.

21   Q.   So regardless of what they told you, you then went back to

22   Ms. Wasson a second time; right?

23   A.   Yes.

24   Q.   Or I guess it would be a third time that day.

25   A.   Uh-huh.

1  Q.  What did you tell her?

2  A.  I showed her in the billing manual, because by that time I

3  had talked with Tiffany at McKesson support and learned that,

4  oh, your GenEnd -- let's just start at the very beginning of

5  the whole process.  How do you do GenEnd.

6  Q.  Well, I actually -- okay.  I want to make sure you answer

7  my question.  What is it that you discussed with Ms. Wasson

8  when you went back to her office the third time that day?

9  A.  What I have found after talking to McKesson.

10 Q.  And then she asked you another follow-up question; right?

11 A.  No.  She said, "We'll work on it tomorrow."

12 Q.  Okay.  And then you went back and called McKesson another

13 time that afternoon; right?

14 A.  No.

15 Q.  Okay.  So you only had one call with McKesson that

16 afternoon?

17 A.  No, I had two or three.

18 Q.  Okay.  So we talked about first call you had with

19 McKesson.

20 A.  Yes.

21 Q.  What did you ask them the second time you called them?

22 A.  I just asked them if there was any more they could tell

23 me.  I verified again that the overpayment report of McKesson

24 and the MARR report, the month-end reconciliation of McKesson,

25 should not match.

1 Q. And did you then go back to Ms. Wasson and report that?

2 A. Yes.

3 Q. Did she ask you to do anything else as part of your

4 investigation?

5 A. No.  Just check on McKesson again and --

6 Q. She wanted you to call McKesson a fourth time?

7 A. No.  Just a third.

8 Q. Okay.  And after you called them the third time, did she

9 ask you to do anything else as part of your investigation?

10 A. No.  She said we would continue on it tomorrow.

11 Q. Okay.  So did you think that your investigation then was

12 complete?

13 A. Oh, no.  I thought we -- there was a big can of worms

14 opening up and we were going to have a lot of work to do.  And

15 hopefully then I would get more McKesson training for -- to

16 try to decipher what these people are asking me.  I don't want

17 to not be able to give the answer.

18 Q. And how would you get more McKesson training, would it

19 come from calling the McKesson help desk?

20 A. No.  I hoped Diane would sign me up for classes, even if

21 they were online classes.

22 Q. So you hoped that, among other things, maybe you could get

23 some more training on McKesson software so you could continue

24 this investigation that you were charged with; right?

25 A. Correct.  And put our system correct so everybody felt

1   good, it was correct and in compliance, and we could move on.

2       The other thing that's happening at the same time is

3   working on problems in the middle of 2012, McKesson -- I

4   learned from McKesson that our 11.2.9 Horizon Home Care

5   software version was not going to be supported after 2013.  I

6   immediately gave that information to Diane, and what we kept

7   hearing was to go to 12, and we had good reason to go to 12,

8   we had even checked with other agencies to see if it was much

9   improved.  We had learned of a lot of advantages for

10  clinicians and finance.

11  Q.  How much --

12  A.  But we were --

13  Q.  Oh, sorry.

14  A.  We were told that to go to that version, the software

15  would be free, but we would have to have a new server.

16  Q.  How much would the server cost, did you know?

17  A.  No.  I -- my guess is $60,000.

18  Q.  When you say $60,000, is that based on some sort of

19  expertise you have in procuring electronic -- or computer

20  service?

21  A.  No.

22  Q.  Did you just sort of add --

23  A.  I just kind of randomly looked them up to see about how

24  much they cost.  But I don't have all the IT experience and IT

25  specification.

1   Q.  You would have to talk to somebody in IT to find out how
2   much it would cost?
3   A.  Right.
4   Q.  So you didn't do anything else as part of your
5   investigation on November 6th beyond what we've talked about;
6   right?
7   A.  Correct.
8   Q.  Now, on November 7th, you had another meeting with Ms.
9   Wasson and Ms. Holland at this point; correct?
10  A.  Yes.
11  Q.  What time did that meeting occur?
12  A.  10:30.
13  Q.  And was it in Ms. Wasson's office?
14  A.  No.
15  Q.  Where was it?
16  A.  Human resource meeting room.
17  Q.  And at that meeting, Ms. Wasson explained to you that they
18  uncovered some problems, which she communicated to you were
19  serious problems; correct?
20  A.  Yes.
21  Q.  And she told you that you were being placed on suspension;
22  correct?
23  A.  Karen said that, yes.
24  Q.  At some point during that meeting, you became concerned
25  that the police may come and talk to you; right?

1  A.  Yes.

2  Q.  Is that because they told you that there was -- that there

3  was a possibility of fraud?

4  A.  Yes.

5  Q.  Did they suggest that they thought you might have engaged

6  in fraud?

7  A.  Yes.

8  Q.  Did they tell you that they suggested that you might have

9  actually personally profited from fraud that they had

10  uncovered?

11  A.  No.

12  Q.  Okay.  Did you ever have an understanding that one of the

13  concerns that the company had was that perhaps you had

14  personally taken money as part of this fraud?

15  A.  I would say not in so many words, but just when you use

16  the word "fraud," that's the meaning.

17  Q.  Okay.  So you thought -- when you walked out of that

18  meeting, you thought they may be pointing the finger at me;

19  right?

20  A.  Definitely.

21  Q.  And you testified yesterday that you thought it was

22  inappropriate, at least, that Ms. Holland took away your key

23  card that allowed you access to the building and took away

24  your notepad that had your passwords on it.  Do you recall

25  that testimony?

1  A.  Not as you describe it.

2  Q.  Well, did you think it was appropriate that they took your

3  card that allowed you access to the building away?

4  A.  I didn't have a question about that.  I wanted a receipt

5  for it.

6  Q.  So you don't have a problem with the fact that they took

7  that away?

8  A.  No.

9  Q.  And ultimately you did get a business card from Ms.

10  Holland that -- or Ms. Wasson that constituted such a receipt;

11  right?

12  A.  Right.  I just thought it looked -- I don't know --

13  unbusinesslike not to have specific forms for every action and

14  disciplinary action and receipts for things you might have to

15  receive from people.

16  Q.  Okay.  Ultimately, you learned that Harrison contacted

17  McKesson and asked McKesson to provide support with Harrison's

18  investigation; correct?

19  A.  State that again, please.

20  Q.  Yes.  You learned later on that Harrison had contacted

21  McKesson and asked McKesson to help with the investigation;

22  correct?

23  A.  Yes.  Long after when I asked who was doing the audit.

24  Q.  Did you think it was inappropriate for Harrison to contact

25  McKesson and ask them to help with the investigation?

1  A.  I would say I don't see McKesson as an independent

2  third-party auditing agent.

3  Q.  Right.  But did you think it was inappropriate to ask

4  McKesson to assist with the investigation?  Because they

5  certainly understood their software; right?

6  A.  They could ask McKesson any question they want.

7  Q.  So at the time that you were placed on suspension, you

8  were concerned about whether in fact you might have

9  unknowingly committed Medicare fraud, weren't you?

10  A.  Correct.

11  Q.  But even as you sit here today, you can't identify anyone

12  at Harrison that you think intentionally committed Medicare

13  fraud; isn't that correct?

14  A.  Correct.

15  Q.  And the basis for your allegation that the GenEnd process

16  was not run correctly is based upon your suggestion that the

17  manual that you had told you to run it on a daily basis as

18  opposed to a monthly basis; right?

19  A.  No.  It's not a suggestion, it's a fact.

20  Q.  Okay.  And so you're saying the manual said I had to do

21  it, so you had to do it; right?

22  A.  Correct.

23  Q.  And you think the manual was written by John Miotke?

24  A.  Yes.

25  Q.  But do you think that John Miotke intentionally miswrote

1  that manual in such a way as to commit fraud?

2  A.  I don't know.

3  Q.  But as you sit here today, you don't have any reason to

4  believe that he did, do you?

5  A.  I don't have any reason to disbelieve it either.

6  Q.  So you just don't know, do you?

7  A.  No.

8  Q.  Let me have you turn to Exhibit 5.

9  A.  Which book?

10  Q.  It's going to be in the -- your exhibit book, the

11  plaintiff's trial exhibit book.

12  A.  Okay.

13  Q.  Exhibit 5.

14  A.  I have it.

15  Q.  Okay.

16       MR. GALLAGHER:  This has been admitted, Your Honor,

17  so I would like to publish it to the jury.

18       THE COURT:  You may.

19  BY MR. GALLAGHER:

20  Q.  Do you recognize Exhibit 5?

21  A.  Yes.

22  Q.  This is entitled "Initial Competency Record/Conditional

23  Period Evaluation," isn't it?

24  A.  Yes.

25  Q.  This was your first performance review?

1  A.  Yes.

2  Q.  It was performed by Ms. Wasson; correct?

3  A.  Yes.

4  Q.  Now, there are certain things in here that are

5  highlighted; isn't that true?

6  A.  Yes.

7  Q.  Okay.  And some of the highlights that I'm indicating here

8  with my finger are highlights that appear on the version that

9  you are looking at; right?

10  A.  Repeat that, please.

11  Q.  You've got an exhibit in front of you in the exhibit book,

12  don't you?

13  A.  Right, but I did not hear your question.

14  Q.  Okay.  There's certain highlighting in this exhibit; isn't

15  there?

16  A.  Yes.

17  Q.  And that highlighting is information that your counsel

18  highlighted in this particular exhibit; isn't it?

19  A.  I believe so, yes.

20  Q.  So when you got this exhibit, that stuff wasn't

21  highlighted in the performance review that you received?

22  A.  Right.

23  Q.  Okay.  Now, I have highlighted on my copy of the exhibit a

24  couple other items above the highlighting that your counsel

25  created.  So if you compare what's on the screen with what's

1  in your book -- and the screen in front of you is the same as

2  the screen there.

3  **A.**  I know, but it's not clear.

4  **Q.**  Okay.  Well, I can zoom in on it for you.  But what I'm

5  really trying to do -- maybe I can't zoom in on it.  See where

6  I'm referring to, there's some highlighting there?

7  **A.**  Okay.

8  **Q.**  Right here, I'm pointing to it.

9  **A.**  And then two or -- no, three lines underneath?

10  **Q.**  Yes.

11  **A.**  Okay.

12  **Q.**  I will represent to you that the highlighting on top is my

13  highlighting.

14  **A.**  All right.

15  **Q.**  I put that on my copy.

16  **A.**  Okay.

17  **Q.**  I wanted to do that so you could see what I'm talking

18  about.

19  So Ms. Wasson gave you this performance review in 2011;

20  correct?

21  **A.**  Yes.

22  **Q.**  So it was more than a year before you were ultimately

23  placed on suspension; right?

24  **A.**  Yes.

25  **Q.**  And you would agree with me that this is a pretty good

1  review; isn't it?

2  A.   After your 90-day probation period.

3  Q.   But it's a pretty good review; isn't it?

4  A.   It's the current review for that time.

5  Q.   Well, but I mean --

6  A.   I don't think it's really preliminary to anything.  I've

7  never heard anyone ask -- say that.

8  Q.   No, my question is, she gave you a pretty good review,

9  didn't she?

10  A.   Oh, yes.

11  Q.   She didn't give you a bad review, did she?

12  A.   No.

13  Q.   But as often happens in these reviews, she had some

14  constructive suggestions for you on things that you could

15  improve on, didn't she?

16  A.   Sure.

17  Q.   And the section that I'm pointing here to on the exhibit

18  that you can see on the screen in front of you, that's the

19  portion of the review where she actually made some

20  constructive suggestions to you, didn't she?

21  A.   Yes.

22  Q.   And those were suggestions that your counsel didn't

23  highlight and point out in your direct examination yesterday;

24  correct?

25  A.   Right.

1  Q.  I wanted to ask you about them.

2  A.  Okay.

3  Q.  So in this review, more than a year before you were placed

4  on suspension, Ms. Wasson told you, among other things, that

5  she would like you to design and implement effective and

6  efficient processes to address:  Month-end processing -- do

7  you see where I'm referring to?

8  A.  Right.

9  Q.  She told you that, didn't she?  Correct, did she tell you

10 that?

11 A.  Yes.

12 Q.  And she told you that she wanted you to develop and

13 implement effective and efficient processes for addressing the

14 RAP status; correct?

15 A.  Yes.

16 Q.  That's the anticipated payment we talked about; right?

17 A.  Yes.

18 Q.  And actually, the word "anticipated payment" occurs right

19 below that; correct?

20 A.  Right.

21 Q.  So you understood as early as 90 days after you started

22 with the company that Ms. Wasson had some concerns about the

23 way you processed these RAP payments, didn't she?

24 A.  No.  She didn't say she had a concern.  These are normal

25 things, just basic tasks of the person doing the billing.

1  Q.  But you --

2  A.  She didn't say anything was wrong with them.  But you

3  always have to have your plan in place and to make sure that

4  you keep it effective and efficient as new processes or

5  requirements come from Medicare.  It's always changing.  So

6  she's just asking me to keep all of this current.

7  Q.  Right.  And that's because she thought that there was room

8  for improvement in your performance in that regard, didn't

9  she?

10  A.  Well, everyone can have room for improvement.  She didn't

11  notify me of any concern.

12  Q.  Did you believe that you had room for improvement with

13  regard to your performance on these three items?

14  A.  You always can have room for improvement.

15  Q.  So the answer is yes?

16  A.  You would not want me to give you an evaluation because I

17  don't give top of the line.  Everyone has something new they

18  can learn.

19  Q.  And this wasn't a top-of-the line evaluation, at least

20  with regard to those items; correct?

21  A.  Say that again, please.

22  Q.  This was not a top-of-the-line evaluation, at least with

23  regard to those three items; correct?

24  A.  I disagree.

25  Q.  You thought it was -- you thought this was a top

1  evaluation?

2  A.  It may not be 100, but it's not derogatory.

3  Q.  When you --

4  A.  It's not saying -- it's not a red flag that you are doing

5  these things inappropriately.  You have to revamp everything.

6  You have to go back to the drawing board and relearn

7  everything.

8  Q.  Let me have you now turn to Exhibit 17.

9  A.  Same book?

10  Q.  Same book.

11  A.  Okay.

12  Q.  Now, Exhibit 17, if you recall, is a document that was

13  marked as an exhibit, it's included in your book, but the

14  judge has not allowed either side to actually show this

15  document to the jury.  Correct?

16  A.  Correct.

17  Q.  This is a document that was marked so that you could refer

18  to it from time to time if you had to refresh your

19  recollection about things that happened.

20  A.  Yes.

21  Q.  Right?  And so the jury isn't able to see Exhibit 11, but

22  I want to describe -- I would like you to describe for them

23  sort of what it looks like.  Not necessarily the content, but

24  how many pages is Exhibit 11?

25  A.  It's 11 pages, and it has highlighted points in

1  chronological order.

2  Q.  Now, with the highlighted points, is there actual

3  highlighting, like colored highlighting in your copy?

4  A.  No.

5  Q.  So by highlighting, you mean points you thought were

6  important that you included in this document?

7  A.  Right.  I would say they are differentiated by numerals,

8  numbers, and a date.

9  Q.  You've got paragraph numbers; right?

10  A.  Yes.

11  Q.  This is a document you prepared; right?

12  A.  Yes.

13  Q.  Did you prepare it like on your home computer?

14  A.  Yes.

15  Q.  You typed it yourself?

16  A.  Yes.

17  Q.  It's in -- it's single spaced, isn't it?

18  A.  Yes.  It's doubled between the paragraphs.

19  Q.  Okay.

20  A.  The topics.

21  Q.  And it's in probably ten point fount, do you think?

22  A.  No, 12.

23  Q.  Twelve.  But there's a lot of text in this; correct?

24  A.  Yes.

25  Q.  And when you put it together, did you do this in one

1  sitting, or did you -- was it sort of a work in progress that

2  you would work on from time to time?

3  A.  No.  November 7th I did everything that went to November

4  7th, and then I did it each day as a new event occurred.

5  Q.  And you intended that this document would serve as a

6  comprehensive summary of everything that happened to you at

7  Harrison that led up to your suspension; right?

8  A.  Right.  In case I was ever questioned about it.  As I

9  said, I may be called in for meetings.

10  Q.  Well, at some point you decided to file a lawsuit; right?

11  A.  I did decide that.

12  Q.  So one of the reasons you prepared it was so that you

13  would have a complete set of notes that you could use in case

14  you were on the witness stand in a lawsuit; right?

15  A.  No.  Actually the main reason I started it was in case I

16  ever had a -- if my unemployment had been questioned and I had

17  to go in for appeal.  I think it's called an appeal for that.

18  Q.  We will talk about that later, but you didn't -- your

19  unemployment application wasn't questioned, was it?

20  A.  Pardon?

21  Q.  Your unemployment application was not questioned; right?

22  A.  I don't think so.  I don't think Harrison ever responded

23  to it.

24  Q.  Did you get your unemployment?

25  A.  Yes.

1  Q.  So you never had to go in for an unemployment appeal?

2  A.  No.

3  Q.  Now I want to ask you about the two manuals that are on

4  the little chart that you prepared.

5      The manual on the left is the manual that you say

6  contained the instructions that required you to run GenEnd on

7  a daily basis; right?

8  A.  Yes.

9  Q.  And your belief was you didn't really have any choice

10 about that, the manual said you had to do it; right?

11 A.  Yes.

12 Q.  And at no point before November 6, 2012, did you believe

13 that maybe that manual was wrong; isn't that correct?

14 A.  That's correct.

15 Q.  You never had any reason to be suspicious about the

16 accuracy of the manual?

17 A.  Correct.

18 Q.  So in the meeting on November 6 of 2012, that's the first

19 time that you heard that there was an issue regarding these

20 reports that were generated when the GenEnd process was run;

21 correct?

22 A.  I can't say.

23 Q.  That was a bad question.  The first time that you heard

24 there was an issue with the running of a GenEnd was on

25 November 6th of 2012; right?

1  A.  Right.  When McKesson told me.

2  Q.  And at some point that day, you went back and gave a copy

3  of this manual to Ms. Wasson; correct?

4  A.  Yes.

5  Q.  And you believed at the time that you gave this manual to

6  Ms. Wasson that you were following the appropriate procedure

7  that Harrison had told you to follow; right?

8  A.  Yes.

9  Q.  So you recognize that this manual you gave to Ms. Wasson

10  was a pretty important document; right?

11  A.  Yes.

12  Q.  Were there other copies of this manual out there?

13  A.  Yes.

14  Q.  Who else had other copies of this manual?

15  A.  Sam.

16  Q.  So at the time you gave this report to Ms. Wasson, you

17  knew that there was another copy of the manual out there?

18  A.  Repeat the question, please.

19  Q.  You gave one copy of the manual to Ms. Wasson; correct?

20  A.  Yes.

21  Q.  But you knew that there was another copy of this manual

22  out there?

23  A.  I'm sorry, I'm missing the words in the middle of your

24  sentence.

25  Q.  Okay.

1  A.  I did what?  Yes, I thought so or no?

2  Q.  That's what I'm trying to figure out.  Let me make sure

3  I --

4  A.  I can't hear all your words.

5  Q.  Okay.  I will slow down.  Maybe that will help.

6     You gave Ms. Wasson a copy of the manual; correct?

7  A.  Yes, the daily manual.

8  Q.  And you believed that Sam had a copy of the daily manual

9  also?

10  A.  Yes.

11  Q.  And your testimony is that you did not make a copy for

12  yourself of the daily manual because you gave it to Ms.

13  Wasson, because you did not think that it was appropriate for

14  you to make a copy of a Harrison document; right?

15  A.  Correct.  For -- as a copy for myself.  To have one at my

16  desk would be okay, but she and I were going to be working on

17  it, we were going to be working on it the next day.  I have no

18  reason to hurry over and make another copy.

19  Q.  Well, ma'am, that seems to me to be a different issue than

20  what you testified to before.

21  A.  When?

22  Q.  I believe earlier today you said you did not make a copy

23  of that manual because you did not think that it was

24  appropriate for you to make a copy of company property.  Did I

25  misunderstand your testimony?

**A.**   Oh.  That is exactly what I'm saying.  Just now I thought

you were kind of wondering like, well, if you needed it

tomorrow, why didn't you make a third copy of it.

**Q.**   Well, that's actually what I was wondering.  Why didn't

you make a third copy of it?

**A.**   Because I trusted Diane.  We were working on the project

together.

**Q.**   Well, but you understood at some point that there were

concerns about your performance; right?

**A.**   Yes.

**Q.**   And this manual was the manual that described what you

should do; correct?

**A.**   Yes.

**Q.**   So you thought that this manual justified any -- or strike

that.  You believed that this manual explained away any issues

that Ms. Wasson had with your performance, didn't you?

**A.**   In regarding to why I affected the revenue of GenEnd every

day, yes.

**Q.**   So if anybody ever questioned you about why you did that,

this manual was the document that proved why you did it;

correct?

**A.**   Yes.

**Q.**   And you didn't think to make a copy of it to protect

yourself?

**A.**   I didn't think the book was going anywhere.  I thought she

1   would still have it.

2   Q.  Well --

3   A.  I trusted her.

4   Q.  But you didn't at any time make a copy of the document

5   that basically would get you off the hook for any misconduct,

6   did you?

7   A.  No, I did not.

8   Q.  And as you sit here today, you don't have a copy of it;

9   correct?

10  A.  No.

11  Q.  Did you ever call up Sam and ask Sam to make you a copy of

12  it?

13  A.  After I left?

14  Q.  At any time.

15  A.  No.

16  Q.  Did you ever call anyone and ask anyone to get you a copy

17  of that manual?

18  A.  No.

19  Q.  And you understand that Harrison has taken the position

20  that we don't have the manual that you are talking about;

21  right?

22  A.  And I don't believe you.

23  Q.  What do you think happened to it?

24  A.  I don't know.

25  Q.  Well, do you think Ms. Wasson destroyed it?

1    A.   Anything could have happened to it.  On TV you see people

2    taking their classified documents and throwing it into their

3    own fireplace.

4    Q.   But, ma'am, you have filed a lawsuit in federal court

5    asking this jury to award money against Harrison Medical

6    Center, haven't you?

7    A.   And we asked the defendants to bring in all appropriate

8    documents.

9    Q.   And --

10   A.   And you send bits and pieces.

11   Q.   Ma'am, but you are in this court suggesting that the jury

12   should award damages against Harrison Medical Center, aren't

13   you?

14   A.   I made a claim, and I am asking for the claim to be

15   followed through.

16   Q.   And part of the claim is you're saying that Harrison

17   Medical Center destroyed this key document, aren't you?

18   A.   I don't know that I can say that I'm saying.  You did not

19   bring it forth as evidence.

20   Q.   So as you sit here today, is it fair to say you don't have

21   any reason to believe that Harrison destroyed this document?

22   A.   Say that again, please.

23   Q.   What I'm trying to figure out, ma'am, is whether you think

24   we destroyed a critical document in this case?

25   A.   You did something you shouldn't have done with it.

1  Q.  Yeah, my question for you is do you think we destroyed it?

2  A.  You either destroyed it or you just didn't bring it.

3  Q.  So we just hid it somewhere or didn't produce it to you?

4  A.  Pardon?

5  Q.  So we hid it somewhere or didn't produce it to you;

6  correct?

7  A.  Correct.

8  Q.  But either way, you're alleging that we are not producing

9  it to you and not allowing the jury to see it; correct?

10 A.  Correct.

11 Q.  What evidence do you have that we did that?

12 A.  My knowledge of what was in the two manuals that I

13 followed.

14 Q.  Ma'am, do you own a cell phone?

15 A.  Yes.

16 Q.  Did it ever occur to you to take out your cell phone and

17 just take a quick picture of the one page that proves

18 everything that you're trying to prove in this case?

19 A.  No.  If I had done that, that -- that paper, that

20 information on them did not belong to me and then I would have

21 charges against me for stealing.

22 Q.  So your testimony is that if you made a photocopy or took

23 a picture of the page that you're talking about now, you think

24 that we would have charges brought against you for stealing;

25 is that your testimony?

1    A.   Correct.  Yes.

2    Q.   Now, at some point after your termination, you filed

3    what's been discussed as a -- or called a *qui tam* lawsuit,

4    correct?

5    A.   Yes.

6    Q.   And do you have an understanding as to what a *qui tam*

7    lawsuit is?

8    A.   Yes.

9    Q.   Now, the *qui tam* lawsuit is a lawsuit that you filed in

10   United States District Court here; correct?

11   A.   Yes.

12   Q.   And you filed a *qui tam* lawsuit even before you filed this

13   case, which is -- we can consider, I guess, a retaliation of

14   wrongful termination case; correct?

15   A.   Yes.

16   Q.   So the *qui tam* lawsuit is separate from the lawsuit we are

17   here today on; correct?

18   A.   Yes.

19   Q.   But you filed that against my client, against Harrison

20   Medical Center; right?

21   A.   Yes.

22   Q.   And the lawsuit is brought -- was brought not only on

23   behalf of you, but also on behalf of your husband; right?

24   A.   Repeat that, please.

25   Q.   Your husband was one of the plaintiffs in the *qui tam*

1  case, wasn't he?

2  A.  Yes.

3  Q.  But you would agree with me that your husband doesn't have

4  any individual knowledge about Harrison's billing practices;

5  correct?

6  A.  No.

7  Q.  Now, with regard to the *qui tam* case, you know, don't you,

8  that the *qui tam* case is brought under a federal statute

9  called the False Claims Act; right?

10  A.  Yes.

11  Q.  And the False Claims Act is a Civil War era statute that

12  gives individuals the right to sue if they believe the

13  government has been defrauded, doesn't it?

14  A.  Yes.

15  Q.  And one of the things that this False Claims Act, or the

16  *qui tam* claim, allows you to do is bring a claim against a

17  defendant and if you prevail, you get to keep a percentage of

18  the money that the government was defrauded; correct?

19  A.  Yes.

20  Q.  A minimum of 15 percent of anything that you can prove was

21  defrauded; correct?

22  A.  Yes.

23  Q.  Now, at the time that you -- well, strike that.

24      This morning you testified that one of the reasons that

25  you filed the False Claims Act claim was because you wanted

1  somebody to get to the bottom of this issue of whether you

2  engaged in fraud; isn't that true?

3  A.  Yes.

4  Q.  You wanted somebody to clear your name?

5  A.  Yes.

6  Q.  So after you believed that you had been accused of fraud,

7  were there any other things that you tried to do -- well,

8  strike that.

9      After you were accused of fraud, you formed an opinion

10  that perhaps there was fraud here; right?

11  A.  I did not know.  That's why I asked the question of the

12  *qui tam*.

13  Q.  Okay.  Now, and so that was one way that you were going to

14  get that question answered; right?

15  A.  Yes.

16  Q.  You had been employed at health care facilities for 37

17  years; right?

18  A.  Yes.

19  Q.  And as you know, health care facilities almost always have

20  whistleblower hotlines, phone numbers that you can call if you

21  believe there's some fraud that needs to be reported; correct?

22  A.  Yes.

23  Q.  And so you know from looking through the employment

24  manuals that you were given at Harrison that they had a

25  whistleblower or employee tip hotline; correct?

1  A.  Yes.

2  Q.  But you chose not to call that number to report fraud;

3  correct?

4  A.  Right.

5  Q.  Okay.  Another thing you could have done -- you've worked

6  your entire career dealing with Medicare billing; correct?

7  A.  Yes.

8  Q.  So you're familiar with the Office of Inspector General;

9  right?

10  A.  Yes.

11  Q.  And the Office of Inspector General is a federal agency, a

12  division of -- well, why don't you explain what the Office of

13  Inspector General is.

14  A.  They're just -- they just administer all the rules and

15  policies and they have specific, I guess would you call them,

16  initiatives that they want people to work on every year like

17  goals and things.  And I don't know the extent of all the

18  audits, and so forth, that they go into and sanctions.

19  Q.  But you do know that the Office of Inspector General is

20  the government group that comes in and investigates problems

21  with Medicare complaints; right?

22  A.  Yes.

23  Q.  The last thing you want if you are a Medicare billing

24  person is having the Office of Inspector General look into a

25  Medicare issue; correct?

**A.**  I don't want that, but that's what I needed to do.

**Q.**  Okay.  But you didn't file a complaint with the Office of Inspector General, you filed a lawsuit, didn't you?

**A.**  I think that kind of detail is above me.  I -- I followed the -- when I went to ask for legal advice, I followed the advice.

As far as calling the hotline or talking to human resource, it was just Karen Holland and Diane taking me right out of my job.  I had no reason to trust them.

**Q.**  Well, but when you filed the lawsuit under the False Claims Act, you understood that if you prevailed in that case you would get to keep a percentage of any money that you could prove was inappropriately taken from the federal government; right?

**A.**  Yes.

**Q.**  So if you prevailed on that False Claims Act claim, you stood to make a substantial amount of money; isn't that right?

**A.**  I would, but that was not the reason why I requested it. I requested it to clear my name and prove that I did not commit Medicare fraud.  I want people to know that I have never been taken out of my right to bill Medicare.

**Q.**  But at no point did anybody from Harrison tell you that they were going to somehow deprive you of your ability to ever work for a health care company again; correct?

**A.**  They didn't do me anything in writing, so I had

1    nothing that I could trust them about anymore.

2    Q.  But how could Harrison somehow stop you from serving in

3    the medical billing position going forward?

4    A.  I don't know.

5    Q.  But nevertheless, you felt that you had to file this False

6    Claims Act case and go into court and win a lawsuit in order

7    to clear your name?

8    A.  I didn't have to win the lawsuit.  The research and

9    investigation that they did, did clear my name.

10   Q.  So ultimately the conclusion that Ms. Swem and the

11   Department of Justice reached was enough for you to believe

12   that your name had been cleared?

13   A.  Yes.

14   Q.  So in some ways, mission accomplished; right?

15   A.  Somewhat.

16   Q.  And as Ms. Swem testified this morning, the government did

17   conclude that there was no fraud on the part of --

18   A.  Right.

19   Q.  -- my client; correct?

20   A.  Right.

21   Q.  And as you know, the lawsuit was dismissed; right?

22   A.  I'm at a loss on that.  I don't -- I think you say that,

23   but I don't know the correct term.

24   Q.  Okay.  But you -- so you brought the False Claims Act

25   case; right?  You understand that you were the plaintiff, the

1  person pointing the finger in that case; right?

2  A.  Yes.

3  Q.  And you understand that the case is no longer going on;

4  right?

5  A.  Right.

6  Q.  So something happened to it; right?

7  A.  Right.

8  Q.  Do you believe that -- well, strike that.

9      You understand that the United States decided not to

10  participate in that lawsuit; correct?

11  A.  Yes.

12  Q.  They had the opportunity if they believed that there

13  really was fraud, they could -- they could intervene in the

14  case and bring it on behalf of the United States of America;

15  correct?

16  A.  Yes.

17  Q.  And they decided not to do that?

18  A.  Right.

19  Q.  And so as you sit here today, you think that that False

20  Claims Act case is over with; right?

21  A.  Yes.

22  Q.  Nothing more for you to do or for my client to do;

23  correct?

24  A.  Say that again.

25  Q.  There's nothing more for either you to do in that case or

1    for Harrison Medical Center to do; correct?

2    A.   Not as far as *qui tam*.

3    Q.   Okay.  So with regard to the phone calls that you had with

4    McKesson on November 6th of 2012, did you make notes of those

5    telephone conversations?

6    A.   Yes.

7    Q.   Who did you speak with at McKesson?

8    A.   Pardon?

9    Q.   Who did you speak with at McKesson?

10   A.   Tiffany.

11   Q.   Do you know Tiffany's last name?

12   A.   No.

13   Q.   Anybody else that you spoke with?

14   A.   On the 5th or the 6th I think I spoke to a Jason once.

15   Q.   Do you know Jason's last name?

16   A.   No.

17   Q.   How long did the first call that you had with McKesson

18   last, the first call you had on November 6th, 2012?

19   A.   Oh, I don't know.  Ten minutes.

20   Q.   Who did you speak with on that call?

21   A.   Tiffany.

22   Q.   And how long did the second call last?

23   A.   Twenty minutes.

24   Q.   Who did you speak with on that call?

25   A.   Tiffany again.

1  Q.  Did you speak with Jason on the third call?

2  A.  No.  I spoke with Tiffany.  I must have spoken with Jason

3  on the topic on the 5th.

4  Q.  So you spoke with Jason about something other than this

5  issue that you were investigating; right?

6  A.  Right.

7  Q.  So the only person -- the only person at McKesson that you

8  spoke with as part of your investigation was Tiffany?

9  A.  Yes.

10 Q.  And you spoke with Tiffany twice for a total of 30

11 minutes; correct?

12 A.  Three times for 30, 35 minutes.

13 Q.  So the third call was maybe another five minutes; is that

14 right?

15 A.  Oh, no.  Then I must have talked to her a total of about

16 45 minutes.

17 Q.  Okay.  So you spoke with her maybe another 15 minutes?

18 A.  Uh-huh.

19 Q.  So the totality of your investigation into these

20 allegations was 45 minutes on three calls with the McKesson

21 help desk?

22 A.  At that point.  If I was there after November 7th, I'm

23 sure it would have extended.

24 Q.  But as far as the investigation that you did conduct, that

25 was it; right?

1  A.  Correct.

2  Q.  Following the -- you had a meeting on November 7th, right,

3  with Ms. Wasson and Ms. Holland?

4  A.  Yes.

5  Q.  And that was the meeting where you were suspended?

6  A.  Yes.

7  Q.  And it was after that meeting that you thought the police

8  might come for you; correct?

9  A.  Yes.

10  Q.  Why did you think the police might come for you?

11  A.  Because they accused me of fraud.

12  Q.  Now, I believe you testified on direct examination that

13  when you mentioned in the meeting that you were concerned the

14  police might come for you, they snickered.  I think that was

15  your term, they snickered.

16  A.  Yes.

17  Q.  Did they say anything to you when you made that comment?

18  A.  They just said, "No, they won't be coming."  And I go,

19  "Well, as you start your investigation, should I be expecting

20  them later?  Will they be arriving at my home to pick me up?"

21  Because it seemed very odd if they were accusing me of

22  something so serious, I hadn't seen investigators, I hadn't

23  seen any auditor.  But still, it's a legal matter, so as soon

24  as, you know -- you know, you accuse a person of it, you

25  should be -- they should be read their rights and they should

1  be incarcerated.

2  Q.  Do you think that Ms. Holland or Ms. Wasson should have

3  read you your rights after the meeting on November 7th?

4  A.  I'm not sure if they are the appropriate people, but they

5  could have had law enforcement do it.

6  Q.  Would that have been a better result, in your view, to

7  have had some law enforcement officers come and read you your

8  rights?

9  A.  I don't think -- I don't think I'm trying to say what

10  better result of the meeting there should have been.  That's

11  just a matter of what the law is and what you do with the

12  person breaking the law.

13  Q.  Well, do you think that they should have had the police

14  come and investigate you?

15  A.  If their allegation was real, they should have.  I don't

16  know.  Maybe they would have called the police and the police

17  would say, oh, she's left out on her own recognizance until we

18  find out two or three more facts.  I don't know.

19  Q.  But you do understand that Harrison conducted an

20  investigation and called you back -- it was in March of 2013,

21  but they called you back and gave you the results of that

22  investigation, didn't they?

23  A.  They -- they did briefly tell me a few things about it.

24  Q.  Okay.

25  A.  But they also, about November 26th or 27th, asked me to

1    resign or they would terminate me.  So they should have --

2    that makes me think they should have concluded their

3    investigation to come to that decision.

4    Q.   Did you ever think they were just trying to find a way for

5    you to elegantly leave and to give you some severance?

6    A.   Say that a little bit louder, please.

7    Q.   Did you ever think that they were just trying to find a

8    way for you to elegantly leave the company and they could give

9    you some severance?

10   A.   I think they were making me a scapegoat and, you know,

11   just trying to shove me away, get me off the computers, and as

12   I asked them several times, I can come back to work, I can

13   help you.  I mean, why should I not be included in the

14   meetings, anything about an investigation and so forth?  If

15   they thought I needed more training, give me more training.

16   Q.   But you understood they were investigating more than just

17   your lack of training; right?

18   A.   I did not know.

19   Q.   Okay.  Well, regardless of what you knew, they brought you

20   back to a meeting at Harrison in March of 2013; right?

21   A.   Yes.

22   Q.   And that was the meeting where they terminated your

23   employment; right?

24   A.   Yes.

25   Q.   And at that meeting, you said they gave you, I believe you

1  said, a couple of sentence report on what McKesson had

2  concluded; right?

3  A.  Yes.

4  Q.  And as best as you can recall, what is it that they told

5  you that McKesson had concluded?

6  A.  They said that I called McKesson too much.  When I would

7  work through an account to update it with McKesson, the

8  account was moot.  When I did not, there were problems with

9  the account, but they didn't go into any detail.  And

10 apparently the person doing the report said I was not

11 analytical or cost functional.

12 Q.  So you understood that McKesson had concluded that you

13 were not competently performing your job; correct?

14 A.  Yes.  I believe that's how Karen Holland phrased it.  She

15 was reading off a piece of paper, and I -- I asked her if she

16 wanted to share that with me, and she said, "Oh, no, this is

17 Harrison business.  I can't."  And she read it, and then she

18 just sat there.

19 Q.  Okay.  When you were at that meeting, though, you

20 understood that Ms. Holland and Ms. Wasson were telling you

21 that they did not think that you were competently performing

22 your job; correct?

23 A.  That's what they said.

24 Q.  They thought you were incompetent.

25 A.  Yes.

1  Q.  Did you believe that you were competent?

2  A.  I believed I was competent.

3  Q.  But that's why they terminated your employment; correct?

4  A.  That's what they said.

5  Q.  Do you disagree with that?

6  A.  I disagree.

7  Q.  Why do you think they terminated your employment?

8  A.  I don't know exactly.  I find it very strange that since I

9  have left, they never posted a request for anyone to apply to

10  the same position at the home health office.

11  Q.  Do you think that they did that in some reason -- or in

12  some way to retaliate against you?

13  A.  Yes.

14  Q.  So who do you think -- well, let me ask you kind of a

15  question that I think is sort of necessarily antecedent to

16  that, a predecessor question.  Why do you think Diane Wasson

17  would treat you as a scapegoat?

18  A.  Now that the book is gone, I believe that she's taking her

19  own ideas and -- you know, whatever level she knew about

20  McKesson, which at times, as I worked with her more, it didn't

21  seem like very much.  She always said, "You can come and

22  always ask me questions," but she didn't have the answers to

23  the question.  So I'm thinking because the merger was coming,

24  and so forth, and they are very much, again, sounding like

25  they wanted some downsizing, downsizing, possibly they

1  outsourced my job.

2  Q.  But you don't know that, though, do you?

3  A.  No.  Those things I don't.

4  Q.  Do you think Diane Wasson terminated your employment

5  because you were making her look bad because you knew what you

6  were doing?

7  A.  Say that again.

8  Q.  Do you think Diane Wasson terminated your employment

9  because you were making her look bad because you knew what you

10 were doing?

11 A.  I would not phrase it that way.

12 Q.  Well, regardless --

13 A.  I would say, if anything, she wanted to say I have

14 discovered the problem.  Like first they asked me about the

15 overpayment report from McKesson and the credit column on the

16 month-end reconciliation.  They couldn't even pose a question.

17 They couldn't tell me what it tied to.  They couldn't show me

18 examples of what it used to be.  They had no instructions,

19 nothing.

20     But then I, from McKesson, learned about the GenEnd.

21 Well, that's the first step to let us all get the corrections

22 done, and I'm not there, she has the book in her hand, she

23 could carry that forward to everyone else and say, I found

24 this, and we're getting rid of Lori so you don't have to worry

25 about her being here anymore.

1   Q.  But, ma'am, you were the medical billing director.  How

2   come you didn't know what was wrong immediately?  Isn't

3   that --

4   A.  It was not evident.  All the amounts on the claims looked

5   correct.  There were not -- as far as that overpayment and the

6   MARR, the deposit and the payment amount that we received in

7   our department matched to our monthly cash posting.  If --

8   when they talk about overpayment, then they talk about

9   unapplied cash, I don't know.  If we had any extra moneys or

10  less moneys come in any month, that would be reported to me

11  from McKesson when I asked for the payment report.  And the

12  two -- the deposits and the postings would not have matched.

13  So then I had a place to start to resolve the problem.

14  Q.  But, ma'am, if you weren't able to discover the problem

15  with the Medicare billing issues as the Medicare billing

16  director, who did you expect at the company was supposed to

17  figure this out?

18  A.  I don't know, but they did not really even ask me.

19  Q.  So we talked about Ms. Wasson.  Did you also believe that

20  Ms. Holland was out to get you?

21  A.  She's just -- she's just like a parrot.  She's just -- I

22  don't know if she does it with every department that she's a

23  business partner to, but she's just in there to be Diane's

24  witness to the meeting.

25  Q.  So she didn't -- she didn't real do anything; she just did

1  whatever Diane told her, is that what --

2  A.  Right.

3  Q.  How about Marie LaMarche, do you think Marie's a parrot?

4  A.  I don't know.  She may just be taking Diane's information,

5  too.

6  Q.  Okay.  But --

7  A.  Because when she like wrote back to me why I was

8  discharged, it's just the information out of what I finally

9  saw on the McKesson report.

10  Q.  But in any event, you believe that Ms. Holland and Ms.

11  LaMarche were complicit in what Ms. Wasson was trying to do to

12  you; correct?

13  A.  I don't have a dictionary here.  Will you please tell me

14  complicit --

15  Q.  Sure.  They didn't try and stop her; right?

16  A.  Right.

17  Q.  So in that sense, they were also facilitating her attempt

18  to make you a scapegoat; correct?

19  A.  Yes.

20  Q.  Is there anybody else at Harrison that you believe also

21  helped facilitate Ms. Wasson's attempt to make you a

22  scapegoat?

23  A.  No.

24  Q.  So those are the only three?

25  A.  Yes.

1          MR. GALLAGHER:  Your Honor, if I may have a minute?

2     I would like to run through my notes here and see if I have

3     any additional questions.  May we take maybe a five-minute

4     break?  Would that be appropriate?

5          THE COURT:  I don't know if you need five minutes.

6     It's a little early for our afternoon break.

7          MR. GALLAGHER:  Okay.  If you would just give me a

8     minute to run through my notes and talk to co-counsel and

9     resolve it?

10          THE COURT:  You can talk to counsel.

11          MR. GALLAGHER:  Ms. Cook, I don't have any more

12     questions for you now.  We may recall you as a witness when we

13     get to our case and present our evidence, but for now, I have

14     no further questions.  Thank you.

15          THE WITNESS:  Thank you.  Oh, do you need this

16     deposition back?

17          MR. GALLAGHER:  You can just leave it up there and we

18     will deal with it at one of the breaks.  Thank you.

19          THE WITNESS:  Thank you.

20                    REDIRECT EXAMINATION

21     BY MR. FULTON:

22     Q.  Lori, I'm going to ask you some follow-up questions.

23     A.  Okay.

24     Q.  Counsel just asked you about Diane Wasson and what she had

25     to either gain or why she would retaliate against you.  Was

1  Diane Wasson your supervisor?

2  A.  Yes.

3  Q.  Was she in charge of you?

4  A.  Yes.

5  Q.  Did she oversee you during -- a year and a half during

6  your tenure at Harrison?  Or how long --

7  A.  About 16 month's worth, yes.

8  Q.  Sixteen months, nearly --

9  A.  Yes.

10  Q.  Nearly a year and a half.  Did she review every single

11  financial report that you prepared?

12  A.  Yes.

13  Q.  Did she ever question you on any of those reports that you

14  prepared before?

15  A.  I think once she had a question.  Two lines got transposed

16  as to -- I'm trying to think how to -- two insurance lines

17  that were on one, and they were transposed.  So then I

18  corrected that and we went on.

19  Q.  Okay.  And when you were concerned with fraud possibly

20  being committed, did that reflect on the whole department and

21  not just you personally?

22  A.  It would reflect on the whole department.

23  Q.  Counsel talked about your 37 years of experience.  And

24  could you explain to the jury how many years of experience you

25  actually had in Medicare billing home health?

1  A.  Okay.  For Medicare billing home health I started in 2005.

2  So it would have been about seven years.

3  Q.  About 37.

4  A.  You said Medicare home health?

5  Q.  Uh-huh.

6  A.  Since 2005.

7  Q.  Okay.  So was it -- you didn't have 37 years of Medicare

8  home health?

9  A.  No.  But ever since I began working in hospitals, I had 37

10  years doing Medicare claims, but all the claims were different

11  types of services:  inpatient, outpatient, home health,

12  physician, and nursing home.  They all have different forms

13  and they have different requirements.

14  Q.  And you said that you had worked with McKesson software

15  before at Swedish; is that correct?

16  A.  Yes.

17  Q.  But what was your role when you worked with the McKesson

18  software?

19  A.  I was a supervisor of the billing section.  We had three

20  lines of business, and also we had -- there was a Medicare

21  biller for home health and hospice and there was a Medicare

22  care biller for infusion, and I would oversee their roles.

23      Then before I did month-end reporting, I had to do the

24  month-end GenEnd, and the biller did GenEnd every day.

25  Q.  Okay.  So you weren't performing the GenEnd daily

1   function?

2   A.   No.

3   Q.   Counsel also talked about your managerial duties at

4   Harrison.

5   A.   Yes.

6   Q.   When you started, did you believe you were going to be

7   having managerial duties?

8   A.   Yes.

9   Q.   How long did those managerial duties last?

10  A.   Well, at first I thought I had about four or five people

11  on my team as they were introduced to me.  And then when I

12  started approving payroll, I did it for the whole group of

13  five people.  And a couple -- after a couple pay periods,

14  other managers came to me and they said, "Well, thank you for

15  checking so and so's payroll.  They're my employee, but you

16  checked it out and nothing changed."  And I said okay.  So I

17  went over to Pat Dodge, who was my supervisor then, and I

18  asked her about it, and she goes, "Well, I will have to check

19  on it," and then it ended up that I really just had two

20  subordinates.

21       And then after Diane Wasson came, it was -- it was like my

22  autonomy was much less because she would oversee so many

23  duties that I did.

24  Q.   Okay.

25  A.   I'm saying close scrutiny of them.

1  Q.  Okay.  Counsel also talked a lot about the GenEnd process

2  and actually what it did.  When you pressed the GenEnd

3  function key or radio button, did it affect revenue?  At least

4  is that what it appeared to say when you pressed the button,

5  affect revenue, is that what the verbiage was?

6  A.  Yes.

7  Q.  So in your mind -- and no one told you any differently?

8  A.  Right.

9  Q.  When you pressed that button, you believed you were

10  affecting revenue?

11  A.  Yes.

12  Q.  And when you talked to McKesson, they agreed that when you

13  pressed that button you were affecting revenue?

14  A.  Well, I talked with Tiffany, like I said, at the end of

15  the 6th, and she told me you are only supposed to do it at the

16  end of the month not throughout the month.  And I said, what

17  effect could it have on the accounts or the -- is it each

18  account or the system as a whole?  And she said she did not

19  know and so she would check on it, but I was not there long

20  enough to get her call back.

21  Q.  So if the software company that prepared the function

22  tells you they don't even know what it's supposed to do, how

23  are you supposed to find out what it's supposed to do?

24  A.  I don't know.  I was not -- I would keep researching with

25  them, and -- I guess I would ask for those claim support

1  people's supervisors and managers, that you have to give me an

2  answer of this right now.  I've got people waiting for the

3  answer.

4  Q.  In your meeting with Diane and Karen, you said that they

5  were making their determination to terminate you based upon

6  the McKesson audit.  Is that correct?

7  A.  Yes, in March of 2013.

8  Q.  Okay.  And yet they wouldn't provide you with a copy of

9  that on it; is that correct?

10  A.  Correct.

11  Q.  And it was when they wouldn't provide you with a copy of

12  that, that's when you decided that you needed to continue to

13  find out to make sure that -- to clear your name of any

14  potential fraud; is that correct?

15  A.  Right.  And I think I actually made the decision after the

16  April meeting when they gave me a document to review and agree

17  or disagree to, that they again brought no more descriptive

18  description or copy of the audit.  So I had nothing in writing

19  that I could base to believe them or not believe them.

20  Q.  And was it your belief that when they presented you that

21  document in April to allow you to no longer talk about this

22  matter to anyone else, did you believe that there was

23  information that they were trying to hide?

24  A.  Yes.

25          MR. FULTON:  I have no further questions.

1      MR. GALLAGHER:  Your Honor, may I just ask a very

2   brief recross?  A couple of questions.

3                      RECROSS-EXAMINATION

4   BY MR. GALLAGHER:

5   Q.  Ms. Cook, Mr. Fulton asked you some questions about what

6   happened to your supervisory responsibilities after you joined

7   Harrison.

8   A.  Yes.

9   Q.  And I believe you testified that they took away some of

10   your supervisor responsibilities.  Is that correct?

11   A.  In the number of staff I would have, yes.

12   Q.  Do you think that one explanation for them taking away

13   your responsibilities is that they felt that you were in over

14   your head?

15   A.  No.  I think they hadn't decided who was really going to

16   be on the billing team.

17      MR. GALLAGHER:  Nothing further, Your Honor.  Thank

18   you.

19      MR. FULTON:  Nothing further, Your Honor.

20      THE COURT:  You may step down.

21      THE WITNESS:  Thank you.

22              *      *      *      *      *

23              C E R T I F I C A T E
       I certify that the foregoing is a correct transcript from
24   the record of proceedings in the above-entitled matter.

25   /s/  Julaine V. Ryen            April 14, 2015
        JULAINE V. RYEN                  Date