<pre>
 1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF WASHINGTON
 2                          AT TACOMA

 3

 4  LORI COOK individually,      )  Cause No. C13-5986BHS
                                 )  Court of Appeals No. 15-35613
 5         Plaintiff,            )
                                 )  Tacoma, Washington
 6      v.                       )  April 3, 2015
                                 )
 7  HARRISON MEDICAL CENTER, a   )
    Washington Non-Profit        )
 8  Corporation,                 )
                                 )  VOLUME 4
 9         Defendant.            )
    _____)

10

11                    TRANSCRIPT OF TRIAL (Day 4)
                  BEFORE THE HONORABLE BENJAMIN H. SETTLE
12              UNITED STATES DISTRICT JUDGE, and a jury

13  APPEARANCES:

14  For the Plaintiff:       ROBERT H. FULTON, II
                             Fulton Law PLLC
15                           601 Union Street, Suite 4200
                             Seattle, Washington  98101
16
    For the Defendant:       SEAN R. GALLAGHER
17                           MEGAN HARRY
                             Polsinelli PC
18                           1515 Wynkoop Street, Suite 600
                             Denver, Colorado 80202
19
                             JEFFREY A. JAMES
20                           Sebris Busto James
                             14205 Southeast 36th Street, Suite 325
21                           Bellevue, Washington  98006

22  Court Reporter:          Julaine V. Ryen
                             Union Station Courthouse, Rm 3131
23                           1717 Pacific Avenue
                             Tacoma, Washington  98402
24                           (253) 882-3832

25  Proceedings recorded by mechanical stenography, transcript
    produced by reporter on computer.
</pre>

1                      I N D E X

2

3   Jury Instructions.........................   500

4   CLOSING ARGUMENT

5        Plaintiff............................   512
         Defendant............................   529
6        Rebuttal.............................   557

7   Jury Excused to Begin Deliberations.......   562

8   Verdict...................................   563

9   Jury Polled...............................   564

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MORNING SESSION

(Jury not present; 8:35 a.m.)

THE COURT:  All right.  The Court has reviewed the *Hemmings* case, and I will hear from Mr. Fulton, but I will say, I believe that Harrison has the better of the argument here.  I cannot find a statute or contract that would warrant or justify the giving of the instruction.

MR. FULTON:  Your Honor, I concur with that.  I researched it as well.

THE COURT:  That would mean that what was previously marked as 19 and 20 would come out, and of course the jury verdict form would be modified to remove that question with regard to treble damages.

So with that, the Court will put together a final set here and should be able to get to you a final set here within five to ten minutes so you can review them and make your exceptions, if any, and then we can proceed.

So unless there's some other preliminary matter, we will be in recess for a short break.

MR. FULTON:  Your Honor, number one, how long do you allow for closing argument?

THE COURT:  How much time do you want?

MR. FULTON:  I think 30 minutes would probably be sufficient.

MR. GALLAGHER:  Your Honor, when I rehearsed mine

1  this morning, it came in like at 33 minutes.  So if we could

2  do around 30, that would be possible for us.

3         THE COURT:  We're fine with that.

4     (Recess.)

5     (Jury not present; 9:15 a.m.)

6         THE COURT:  The parties now have a full set of the

7  jury instructions with the verdict form.  The Court pulled out

8  a duplicate and, of course, I meant to inquire yesterday about

9  the interrogatory instruction.  I know that that was an

10  identified exhibit but never offered.  So we're good, are we?

11        MR. FULTON:  Yes, Your Honor.

12        MR. JAMES:  Yes, Your Honor.  No exceptions.

13        THE CLERK:  Please rise for the jury.

14     (Jury present; 9:16 a.m.)

15        THE COURT:  Everyone, please be seated.

16     We have come to the conclusion of the trial, and I'm now

17  going to give you the final jury instructions that will be

18  followed by you in deliberations.  Gretchen, of course, as you

19  can see, is handing out to you each a full set of the

20  instructions, as well as a verdict form which I will cover

21  with you also.

22     Now, I'm going to tell you that you must not infer from

23  these instructions or from anything I may say or do as

24  indicating that I have an opinion regarding the evidence of

25  what your verdict should be.  It is your duty to find the

facts from all the evidence in the case.  To those facts you will apply the law as I give it to you.  You must follow the law as I give it to you whether you agree with it or not.  And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy.  That means that you must decide the case solely on the evidence before you.  You will recall that you took an oath to do so.

In following these instructions, you must follow all of them and not single out some and ignore others because they are all important.

The law treats all parties equally whether they are incorporations or individuals.  This means that corporations and individuals are treated in the same fair and unprejudiced manner.

Under the law, a corporation is considered to be a person. It can only act through its employees, agents, directors, or officers.  Therefore, a corporation is responsible for the acts of its employees, agents, directors, and officers performed within the scope of authority.

When a party has the burden of proof on any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true.

You should base your decision on all of the evidence, regardless of which party presented it.

1     The evidence you are to consider in deciding what the

2  facts are consists of:

3     1.  the sworn testimony of any witness;

4     2.  the exhibits which are received into evidence; and

5     3.  any facts to which all the lawyers have agreed.

6     In reaching your verdict, you may consider only the

7  testimony and exhibits received into evidence.  Certain things

8  are not evidence, and you may not consider them in deciding

9  what the facts are.  I will list them for you:

10    1.  Arguments and statements by lawyers are not evidence.

11  The lawyers are not witnesses.  What they have said in their

12  opening statements, and will say in their closing arguments,

13  and at other times is intended to help you interpret the

14  evidence, but it is not evidence.  If the facts as you

15  remember them differ from the way the lawyers have stated

16  them, your memory of them controls.

17    2.  Questions and objections by lawyers are not evidence.

18  Attorneys have a duty to their clients to object when they

19  believe a question is improper under the rules of evidence.

20  You should not be influenced by the objection or by the

21  Court's ruling on it.

22    3.  Testimony that has been excluded or stricken, or that

23  you have been instructed to disregard, is not evidence and

24  must not be considered.  In addition, sometimes testimony and

25  exhibits are received only for a limited purpose; when I have

1  give a limiting instruction, you must follow it.

2      4.  Anything you may have seen or heard when the court was

3  not in session is not evidence.  You are to decide the case

4  solely on the evidence received at trial.

5      Evidence may be direct or circumstantial.  Direct evidence

6  is direct proof of a fact, such as testimony by a witness

7  about what that witness personally saw or heard or did.

8  Circumstantial evidence is proof of one or more facts from

9  which you could find another fact.  You should consider both

10  kinds of evidence.  The law makes no distinction between the

11  weight to be given to either direct or circumstantial

12  evidence.  It is for you to decide how much weight to give to

13  any evidence.

14      There are rules of evidence that control what can be

15  received into evidence.  When a lawyer asks a question or

16  offers an exhibit into evidence and a lawyer on the other side

17  thinks that it is not permitted by the rules of evidence, that

18  lawyer may object.  If I overruled the objection, the question

19  could not be answered or the exhibit received.  If I sustained

20  the objection, the question could not be answered, and the

21  exhibit could not be received.  Whenever I sustained an

22  objection to a question you must ignore the question and must

23  not guess what the answer might have been.

24      Sometimes I have ordered that evidence be stricken from

25  the record and that you disregard or ignore the evidence.

That means that when you are deciding the case, you must not consider the evidence that I told you to disregard.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it. Proof of a fact does not necessarily depend on the number of witnesses who testify about it.

In considering the testimony of any witness, you may take into account:

1. the opportunity and ability of the witness to see or hear or know the things testified to;

2. the witness's memory;

3. the witness's manner while testifying;

4. the witness's interest in the outcome of the case and any bias or prejudice;

5. whether other evidence contradicted the witness's testimony;

6. the reasonableness of the witness's testimony in light of all the evidence; and

7. any other factors that bear on believability.

Again, the weight of evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.

Some witnesses, because of education or experience, are permitted to state opinions and the reasons for those

opinions.

Opinion testimony should be judged like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

Some of you have taken notes during the trial. Whether or not you took notes, you should rely on your own memory of what was said. Notes are only to assist your memory, and you should not be overly influenced by the notes.

A deposition is the sworn testimony of a witness taken before trial. The witness is placed under oath to tell the truth, and lawyers for each party may ask questions. The questions and answers are recorded. When a person is unavailable to testify at trial, the deposition of that person may be used at trial.

You should consider deposition testimony, presented to you in court in lieu of live testimony, insofar as possible, in the same way as if the witness had been present to testify.

Do not place any significance on the behavior or tone of voice of any person reading the questions or answers.

Lori Cook claims that Harrison Medical Center retaliated against her for investigating and reporting Harrison Medical Center's wrongful conduct. Lori has the burden of proving each of the following elements by a preponderance of the

evidence:

1.   She engaged in activity protected under federal law;

2.   Harrison Medical Center knew that she engaged in this protected activity; and

3.   Harrison Medical Center discriminated against her because she engaged in protected activity.

If you find that Lori has proved all three of these elements, your verdict should be for her.  If, on the other hand, Lori Cook has failed to prove any of these elements, your verdict should be for Harrison Medical Center.

Lori Cook engaged in "protected activity" if:

1.   She had a good faith belief that Harrison Medical Center was possibly committing fraud against the government;

2.   She investigated the possible fraud; and

3.   A reasonable employee in the same or similar circumstances might believe that Harrison Medical Center was possibly committing fraud against the government.

An employer has knowledge that an employee is engaging in protected activity if the employer was aware that its employee was investigating possible fraud.

An employer discriminates against an employee if the employer discharges or suspends the employee because the employee engaged in protected activity.

It is the duty of the Court to instruct you about the measure of damages.  By instructing you on damages, the Court

does not mean to suggest for which party your verdict should be rendered.

If your verdict is for Lori Cook on her retaliation claim, you must determine the amount of her damages.  Lori Cook has the burden of proving damages by a preponderance of the evidence.  Damages means the amount of money that will reasonably and fairly compensate Lori Cook for any injury that you find was caused by Harrison Medical Center.

You should consider the following:

1.  The reasonable value of wages, benefits, and employment opportunities lost to the present time;

2.  The reasonable value of future wages, benefits, and employment opportunities which with reasonable probability will be lost in the future;

3.  The mental and emotional harm, pain and suffering, humiliation, personal indignity, embarrassment, anxiety, and loss of enjoyment of life experienced and which with reasonable probability will be experienced in the future.

It is for you to determine what damages, if any, have been proved.  Your award must be based on evidence and not upon speculation, guesswork, or conjecture.  The law does not require that economic damages be proved with mathematical certainty, but only that a reasonable basis for determining such damages be presented.

The law has not furnished us with any fixed standards by

which to measure emotional distress, pain and suffering, humiliation, personal indignity, embarrassment, anxiety, and loss of enjoyment of life. With reference to these matters, you must be governed by your own judgment, by the evidence in this case, and by these instructions.

Any award for future economic damages must be for present cash value of those damages.

Noneconomic damages such as pain and suffering are not reduced to present cash value.

Present cash value means the sum of money needed now, which, when invested at a reasonable rate of return, will pay future damages at the times and in the amounts that you find the damages will be incurred or would have been received.

The rate of return to be applied in determining present cash value should be the interest that can be reasonably expected from safe investments that can be made by a person of ordinary prudence, who has ordinary financial experience and skill. You should also consider decreases in the value of money which may be caused by future inflation.

Lori Cook has a duty to use reasonable efforts to mitigate damages. To mitigate means to avoid or reduce damages.

Harrison Medical Center has the burden of proving by a preponderance of the evidence:

1. That Lori Cook failed to use reasonable efforts to mitigate damages; and

2.   The amount by which damages would have been mitigated.

From time to time during the trial it became necessary for me to talk with the attorneys out of the hearing -- your hearing either by having a conference at the bench when the jury was present in the courtroom or by calling a recess. Please understand that while you were waiting, we were working.  The purpose of these conferences was not to keep relevant information from you, but to decide how certain evidence is to be treated under the rules of evidence and to avoid confusion and error.

Of course, we have done what we could to keep the number and the length of these conferences to a minimum.

When you begin your deliberations, you should elect one member of the jury as your presiding juror.  That person will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement, if you can do so.  Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not hesitate to change your opinion if the discussion persuades you that you should.  Do not come to a decision

1  simply because other jurors think it is right.

2      It is important that you attempt to reach a unanimous

3  verdict but, of course, only if each of you can do so after

4  having made your conscientious decision.  Do not change an

5  honest belief about the weight and the effect of the evidence

6  simply to reach a verdict.

7      If it becomes necessary during your deliberations to

8  communicate with me, you may send a note through the deputy

9  clerk, signed by your foreperson or by one or more members of

10  the jury.  No member of the jury should ever attempt to

11  communicate with me except by a signed writing; I will

12  communicate with any member of the jury on anything concerning

13  the case only in writing or here in open court.  If you send

14  out a question, I will consult with the parties before

15  answering it, which may take some time.  You may continue your

16  deliberations while waiting for the answer to any question.

17  Remember that you are not to tell anyone -- including me --

18  how the jury stands, numerically or otherwise, until after you

19  have reached a unanimous verdict or have been discharged.  Do

20  not disclose any vote count in any note to the court.

21      A verdict form has been prepared for you, and after you

22  have reached unanimous agreement on verdict, your presiding

23  juror will fill in the form that has been given to you, sign

24  and date it, and advise the court that you are ready to return

25  to the courtroom.

1    Again, you have a special verdict form, and I will just go

2  through it briefly with you.  There are four questions, and it

3  begins:

4    We, the jury, give the following answers to the questions

5  submitted by the Court:

6    1.  Did Lori Cook engage in protected activity?  Check

7  either yes or no.

8    If you checked yes to question number 1 above, then

9  proceed to question number 2.  If you checked no to question

10  number 1, then do not answer any more questions.  Sign this

11  verdict form and notify Gretchen.

12    Second question.  Did Harrison Medical Center know that

13  Lori Cook was engaged in protected activity?  Check either yes

14  or no.  If you checked yes to question number 2 above, then

15  proceed to question number 3.  If you checked no to question

16  number 2, then do not answer any more questions.  Sign this

17  verdict form and notify Gretchen.

18    The third question is:  Did Harrison Medical Center

19  suspend or terminate Lori Cook because she was engaged in

20  protected activity?  Check either yes or no.  If you checked

21  yes to question number 3 above, then answer question number 4.

22  If you checked no to question number 3, then do not answer any

23  more questions.  Sign this verdict form and notify Gretchen.

24    4.  What is the total amount of Lori Cook's damages caused

25  by Harrison Medical Center's unlawful conduct?  Fill in there

the amount for lost past wages and benefits, if any.  The next line, fill in the amount of lost future wages and benefits, if any.  And the last line, fill in the amount for emotional distress and damages.

Again, there's a place for the date, and for the foreperson, the presiding juror, to sign.

We are now prepared to proceed with closing arguments.  As you will recall, at the beginning of the trial, I indicated to you that the plaintiff, who has the burden of proof here, is entitled to go first, and then that will be followed by defendant Harrison, and then the last word is given to the plaintiff, if elected.

Mr. Fulton.

MR. FULTON:  Thank you, Your Honor.

May it please the Court, counsel, members of the jury:

It's been a long week.  I know you're tired, and you've finally come to the time where we get an opportunity to explain to you, show you again how all the evidence comes together to support the fact that Lori Cook was retaliated against by Harrison Medical Center.  So let me give you a brief overview of evidence and how it fits together.

You've heard testimony from John Miotke.  Mr. Miotke was the former director at Harrison Medical Center back in 2010. He was there before Lori Cook got there.  And you've heard the testimony of how John Miotke created both a daily manual and a

1   monthly manual.  While he was there, before he left, he had

2   two subordinates, Sam Hubbard and Stacy Geiger.  Now, both

3   were under the supervision of John Miotke.  Now, Sam and Stacy

4   stayed at Harrison.  John left.

5      Lori comes to Harrison in 2011.  Sam provides Lori with

6   the daily manual that has been created by John Miotke on his

7   way out the door.  Stacy Geiger is still at Harrison, has the

8   monthly manual.  She's in the finance department.

9      Now, Lori comes.  After 90 days things are great.  You

10   recall the evaluation by Diane Wasson after 90 days.  Lori's

11   experiential qualities are praised.  They are happy to have

12   Lori here.  Lori's gone through extensive interviews, they've

13   had opportunities to check with her references.  They want

14   Lori.  They acknowledge that Lori is doing a good job.

15      You heard testimony that, well, this really is a neutral

16   evaluation.  It wasn't neutral.  It was a glowing evaluation,

17   in just 90 days, where she had taken this department that had

18   been without ten months anyone there to work on these AR,

19   aging reports.  She got right to it and she started knocking

20   them out.  That's what she did.  That's why she was praised.

21   So everything is okay.

22      She continues her work.  She's been there for now over a

23   year.  And what's next?

24      Well, another evaluation.  June 2012, she gets another

25   evaluation.  Not only does she get an evaluation, what does

1  she get?  She gets a wage increase.

2      Now, I don't know how many of you have been in jobs where

3  they just handed you out wage increases just because it's a

4  nice thing to do.  It never happened to me.  I would love it

5  to happen, but that's not what companies do.  They make sure

6  that you deserve your raise.

7      Now, Diane Wasson has now been supervising Lori for almost

8  a year.  And again, there's no problem.

9      Now, Lori has testified that, yeah, there's -- if there's

10  issues with accounts, I would -- Diane Wasson and myself would

11  have communications, we would have to talk about what we need

12  to do because that's what you do.  Those weren't disciplinary

13  communications.  Those weren't communications that said, you

14  know, Lori, you have one more change, otherwise there's the

15  door.  No.  You see no evidence brought forth, no evidence of

16  any disciplinary action between the time that Lori started and

17  the time that she was ultimately terminated.  Zero.  Why?

18  Because there is none.

19      But like I said before in opening -- remember what I said

20  in opening?  I said, what happened?  What changed?  Do you

21  remember what changed?  Do you remember from the evidence?  If

22  you listened closely, you heard it.  What changed was Stacy

23  Geiger left in October.  That's the change.  You had a

24  seamless integration between the monthly book and the daily

25  book that was prepared by John Miotke because Stacy Geiger was

in the finance department. Lori, she's in the billing

department. So if there's issues and they're going to be

coinciding, they are running directly off of the daily manual

and the procedures that Miotke left behind. There's no

problem. And if there is, it's like, yeah, we understand that

because we've seen that before. That's why there's no

problem. There's no concern. But what happened? Jacob

Stickly comes, because now Stacy Geiger's gone. And Jacob

says, "I don't know if I quite understand this accounting."

Good question. What does he do?

Well, there's an allegation, or at least testimony that

said he actually went and talked to Lori. But that's not what

happened. He actually went and talked to Diane. Diane didn't

have an answer for him, so Diane calls in Lori, and they start

talking.

Lori said, "Well, everything matches up in the end. I

don't know what's going on in the finance department." That

starts this whole thing. So now Lori begins to understand,

wait a minute, there are some things I need to check. I need

to do some investigating.

Now, the investigation, it's not a long investigation;

right? Because she got terminated the next day. So

counsel -- or defendants are going to argue, she only

investigated for 45 minutes. That can't be protected

activity. It was just 45 minutes because she talked on the

1  phone, she did a few things herself.  That's not long enough
2  to be protected activity.  Hogwash.  It's not in the
3  instruction about the length of time that makes it protected
4  activity.  It could be five minutes and it's protected
5  activity.
6      What else was she going to do to discover the problem?
7  She's got to talk to someone, and those conversations, in her
8  estimations, were maybe 45 minutes.  They could have been
9  longer, but she said 45 minutes, along with this, beginning
10 her own checks and balances that she did starting in October.
11 And the key here is the issues that we've been talking about,
12 this GenEnd process.
13     Now, you've heard testimony by Diane Wasson -- and I will
14 talk about that a little later.  Diane said this GenEnd
15 process, it's no big deal.  You shouldn't -- who cares about
16 GenEnd?
17     Well, it is a big deal.  Without it, it generates the
18 final claim.  And when you have the final claim, that goes to
19 the government.  That's undisputed evidence in this case.  It
20 goes directly to the government.
21     So if the GenEnd process is off, everything is off.  And
22 that's what we've seen, haven't we?  We've seen that.  We've
23 seen that indeed, the fact that all of these systems were not
24 balancing because of the GenEnd process.  It's central to
25 what's going on.  And if that is not correct or if you don't

know it's correct, that's potential fraud.  If you don't know

what your billings are, and you are seeing them as correct,

that's potential fraud.

Now we can get into semantics, as Diane Wasson did, what

is fraud?  Fraud is fraud.  Well, if it's not intentional,

it's not fraud.  No, fraud is fraud.  Fraud is a

misrepresentation.  It can be by an accident or it can be

intentional.  But it's a misrepresentation of what you want to

present.  That's fraud, boom.  That's it.

So Lori is investigating potential fraudulent activity.

I'm not saying it was fraudulent because it doesn't matter.

That's not what this case is about.  It's not about proving

fraud.  It's not about proving fraud.  That's *qui tam*, not

retaliation.

So make sure you understand that now before defense

counsel gets up here.  It's not about proving fraud.  It has

nothing to do with it, zero.  Potential.

So Lori has performed the conducted activity, it's taken

place.  November 6th or 7th, it could have been 5th and 6th,

but right there.  And what does she do with it?  She goes

right to Diane Wasson.  And Diane says, "Thank you very much."

And she goes home.

Lori was saying, I'm going to come back in on the next

day, on the 7th, because I found the stuff I think is finally

going to allow us to take care of this.  I found it.  I found

it.  Not only did I find it, I'm showing you the book, the daily manual where I was told to do this.  Here it is.  Key point.

She goes home, not thinking anything about it, because she provided her with the book that absolves her from what's happened.  She's not thinking.  Okay, I'm going back to work the next day, not because I did anything wrong, but because I did something good, I found the book.  Now, what I was doing was not good.  As instructed, of course that was horrible.  But what I was doing was I was following the instructions.  I was following the manual.

She comes back on the 7th.  What does Diane Wasson say?  We're in big trouble.  Big problems.  Potential fraud.  Right there Harrison is aware of the protected activity.  Right there.  Right there.

We can go further because what happened with this knowledge that Lori gave?  It led to an audit of potential fraud.  So this notion that we didn't think it was fraudulent.  No, it's clear.  Lori left that day thinking that the police were going to come.  Why?  Because for over two years I have been doing a function that should not have been done, and I do not -- I do not know what the ramifications of this are.  I don't know.  You've got to find out.  I'm scared.

I think you would be scared.  It's on your shoulders.  When you came there in April, and from the time you were there

1   until November, you've been doing something wrong and it has

2   potential fraudulent possibilities?  Are you scared?  I'm

3   terrified.  Especially a billing manager in Medicare who

4   knows, you don't mess with the government.  You don't mess

5   with the government.  You need to make sure that this is

6   corrected, and I'm going to help you.  That's why she came in

7   the next day.  Let's get going on this, let's get to the

8   bottom of it, let's find out what's going on.

9       No, Lori, don't come back.  We will take care of it.  We

10  will call you when we need you.

11      Well, I just brought you the reason.  Now let's make sure

12  we can work together to find out what's going on.

13      No, Lori, no.  Don't come back.

14      Okay.  I kind of understand that, but I just gave you the

15  information as to why, and it was verified that it shouldn't

16  be done by McKesson.

17      So Lori, still she's trying to understand how can this --

18  I'm the one helping here, why am I on the chopping block?  Why

19  me?

20      Somebody's got to go, because this -- and if you listened

21  to Diane Wasson's testimony, what did she say about how far

22  the accounts were affected?  She said these accounts were

23  impacted, and we see accounts of unidentified cash that we can

24  contribute to who?  John Miotke.  That's what she said.  She

25  was saying it in a helping way, but it helps Lori, because it

1   shows you the connection between these manuals, the procedures

2   that John had instilled in Sam and in Stacy.  It all is a

3   system that has been going on until Jacob Stickly said, I

4   don't get it.  That's the connection.

5       And every time Lori wanted to say, can I help, what's the

6   information saying?  Even here, this was 11/27, she was

7   saying, hey, help me.  I need to know what's going on.  She's

8   sitting at home thinking there's still criminal acts that are

9   going to be taking place.  She thought she was involved in

10  fraud.  Just because it's -- well, I think it's fraud.  No,

11  she thought it was fraud because at the meeting Diane Wasson

12  said, this is fraudulent activity, potentially.  She is

13  scared.  She's still scared.  She hasn't heard anything.

14  She's calling, she's saying, look, tell me, show me so I can

15  rest at night.  But no, nothing.

16      1/29.  There she states it again.  I gave you this.  I

17  gave it back to you on November 6th.  I'm still waiting for an

18  answer from you.

19      Why the secrecy?  Why not just answer her?

20      Well, we know what's going on now.  We've seen the

21  evidence.  They're doing an audit.  McKesson is, at least.

22  Our independent third party is doing the audit.

23      I don't know about you.  I buy that McKesson has software

24  expertise, but if McKesson is the vendor who possibly is

25  implicated in the mis-processing of information to the federal

government, do you think they are happy that they get to be chosen to do their own audit?  I would be.  And yesterday when Diane Wasson was on the stand, and I asked her did the audit include anything about fraud?  Nope.  I asked her again, did it include anything about fraud?  Nope.  All right, I will give you one more chance.  Did it include anything about fraud?  No.

It's an exhibit.  It wasn't my exhibit, but I had to put it in.  What did it say?

Directly to Diane Wasson.  The communication between McKesson auditor Maria Franca and Diane Wasson, and the summary of what you told me to do, Diane, here it is.  Including checking for fraud.  Fraud.  Oh.  Diane just told me that it didn't have anything to do with fraud.  That this whole investigation had nothing to do with fraud.

Did Diane tell someone else that there's no fraudulent -- or any investigations about fraud?  Remember Judy Swem?  Remember Judy Swem, the investigator that came in here and said I contacted Harrison.  I talked to Diane Wasson.  I asked her a blanket question covering the whole time period she had been there, which hadn't been long.  Did you ever conduct an investigation of potential fraud or have someone else do it?

What was Diane Wasson's answer?  No.  She lied again.

What else did Diane Wasson do?  Harrison's chief spokesperson for this entire case.  Diane Wasson on the stand,

again, yesterday.  Diane, those notes, those aren't your

original notes, are they?

No.

Those are notes prepared for litigation, aren't they?

Yeah.

They are just notes.  Take a copy of your notes, your

handwritten notes.  You showed the ability that you can read

your handwritten notes on Exhibit 19.  You can read your

writing.  It looked pretty legible.  Take a copy of your

notes.  Bring your notes.

Nope.  I'm taking the time to type up exactly what I

wanted to say.  Include all the entries that I want to

include.  Now it looks right.  Let's present that as my

evidence.  Well, she still read it to you.

Disregard everything she said.  Everything.  Diane Wasson

should not be believed one iota.  Not at all.  She's the

reason why we are here.

Lori's life has been horrible.  Horrible.  She's lived

this.  She's had nightmares.  Can't sleep.  Why?  How could

this happen to her?  Lori; meek, mild Lori.  Doing her job.

That's why.

You're going to be asked to go through -- and you were

just given those instructions.  And it's going to talk about

what you need to understand and what you need to decide.  And

when we're talking about the preponderance of the evidence,

1   that's 51 percent.  But I submit to you, it's far greater.

2   You will easily see it more than 51 percent.  Far greater.

3   But you have to show that Lori engaged in protected activity.

4       Now, protected activity, that's not a special word.  It's

5   a simple word, protected activity.  Duration is not involved.

6   Length of time is not involved.  The key component is, is the

7   information potentially fraudulent?  That's the key.  Not

8   length of time.  Not the length of time.

9       Lori engaged in protected activity.  Did she work -- was

10  Harrison aware of it?  Yeah, they were, when she went

11  immediately, immediately.  Why?  Because she was scared.

12  That's why.  Immediately she ran to Diane and gave it to her.

13  No question.

14      It's the third prong that we've got to walk through a

15  little bit, because it's this discrimination issue.  Lori, up

16  to that point, as we have said, but for what happened on

17  November 6th that led to her immediate suspension, there is no

18  evidence that has been presented to say that Lori would have

19  been suspended or terminated.  It's not there.  Oh, well, it

20  is there if you look at the doctored documents prepared in

21  anticipation by Diane Wasson.  Yes, it's there, but it's not

22  here in this courtroom, evidence that you should consider,

23  credible evidence.  That's not here.

24      And you've got only two other witnesses.  None of them

25  supervised Lori.  They took all their input, and they

testified, they took all of their information from whom?
Diane Wasson.  Why?  Well, they work in the HR department.
They're not experts in medical billing or Medicare billing, so
they've got to rely on Diane Wasson.

So Diane Wasson is the key here.  If you believe Diane
Wasson, if you believe she is trustworthy, believe Diane
Wasson, not Lori Cook.  She's kept the same consistent story
because it's true.  She uncovered what she thought was fraud,
she was scared out of her whits, went to her employer, told
them immediately.  Continued to call, what's going on?  I gave
you the evidence.  Could you give me an answer?  No.

We talked a little bit in opening about integrity.
Integrity.  Lori has integrity.  She trusted.  She trusted
Diane Wasson when she gave her the materials that she wouldn't
do anything with them.

Well, that's what you get for integrity sometimes, because
we don't have that document.  Either Diane Wasson is telling
the truth or Lori is telling the truth.  You decide if you are
going to believe Diane Wasson, who sat on the stand and did
what she did yesterday, or are you going to believe Lori Cook?
You decide.  But I can give you help.

Mr. Miotke can help, because Mr. Miotke testified that he
left behind procedural information for Sam and for Stacy.
That supports Lori.  He testified that he wouldn't have left
Exhibit 19, the Home Health Student Guide, as the procedural

1  information.  But what are we seeing?  What do you see as

2  Exhibit 19?  It is the home student guide.  You don't see the

3  other half of Mr. Miotke's procedural manual that he made

4  screen shots of for Sam and Stacy.

5  Well, then she brought in the monthly one, and that wasn't

6  the one that Lori gave her.  What did it say in her notes?  It

7  said this is the one that Stacy Geiger trained Lori on.  What

8  about the daily one?  Just bring it in.  No, I can't.  Not

9  now.  We're in litigation.  That wouldn't be prudent.  But I

10  can bring in something else.  So she did.  Because even that

11  document itself, she should have checked it clearer -- or

12  closer, was an outdated document.  Screen shots on there 2005

13  to 2006.  SCIC, which was that sudden change in a patient's

14  condition.  She tried to explain it as well.  It really didn't

15  go out in 2007.  An outdated -- at least bring in one that's

16  updated.  That would at least be believable, somewhat.  Still

17  John Miotke said that's not what I prepared, that's not what I

18  created.  Lori brought it, the daily manual.  She brought it.

19  It just wasn't brought in here.

20  Now, counsel is going to talk about the report -- or I

21  should say the audit and how that supports their position that

22  Lori should be terminated.  It really doesn't support their

23  position.  What it says is that they're basing the reason for

24  her termination on an audit that was done by a senior

25  financial analyst.  What are her credentials?  They didn't

bring her in here to talk about her ability to make that type
of assessment on a billing manager.  But it's conveniently in
there.  It sure helps Diane if I can give you some information
to make sure you keep us on as your software vendor.  It makes
perfect sense.  The problem is you should have thought that
one through a little more.  The senior financial analyst of a
software company making an assessment on Lori Cook, a billing
manager, in her ability to do Medicare billing.  It makes no
sense.  But even in their letter to Lori that's telling her
why we're terminating you, in quotes, "it's based on the audit
and their conclusion," from a senior financial analyst for the
software company.

What did John Miotke say about software companies being
experts in billing managing?  "The software vendor would be
expected to be the expert at knowing how to use their software
but they would not be an expert at the proper billing
procedure for Medicare."

You don't rely on a software company to tell you whether
or not your employee has the ability to manage a billing
department.  You don't.  But that's what they relied on in
order to terminate Lori.

So but for Lori's presenting the information of potential
fraud and the fallout from that, she wouldn't have been
terminated.  Really, Lori did this to herself, if you want to
look at it that way, because she brought in the manual and she

said, this is what I discovered in my protected activity and I

have given it to you.  I'm trusting that I'm protected, which

she wasn't, and now she's living this life right now.

So I'm going to ask you to do what you've been called in

here to do, which is to give justice.  Give justice to Lori

Cook.  Because she -- when you get done looking through the

evidence, you will see by a preponderance of the evidence,

Lori Cook should not have been terminated for her protected

activity.  She should not have been terminated.

Now we're going to go through some damages, and we had the

expert come in here, and all of the jury instructions that

relate to future pay, front pay, he went through all of that

with you when he calculated these figures.  He went through

all of it.

Now, granted, defendant said, look, this 3.9 percent

inflation could be 2.5, couldn't it?  Sure it could.  It could

be 1 percent.  That's for you to decide.  But I think what you

should also look at is during the cross of the expert, did

they talk about, other than his web page that should be

redesigned, did they talk about his inability to do the

calculations?  No.  Why?  Because he's more than qualified.

Came out of Harvard.  I think he's more than qualified to do

the calculations and provide the information.  More than

qualified.  Not that Harvard is the best school.  University

of Washington would be all right too.

**1**    But everything he said, every analysis he made was not

**2**  refuted.  It wasn't refuted.  Nor was there any argument in

**3**  terms of mitigation of damages.  None.  Did you hear any from

**4**  defense witnesses?  You shouldn't have because there wasn't

**5**  any.  That's a trick question.  There wasn't any.

**6**    But you have to decide whether or not in her stage of her

**7**  life, based on where she's at, age 59, when do you think she's

**8**  going to get -- receive gainful employment again, if any?

**9**  That's what you have to decide.  And if you don't think she

**10**  will, well, then it's when do you think she would have

**11**  retired.  Age 68 is what she provided the information to the

**12**  expert.  It could be age 66.  She wanted to go to 68.  She's

**13**  healthy.  So that's for you to decide.

**14**    But I will remind you of the numbers that the expert gave.

**15**  For backpay -- and backpay wouldn't change regarding how long

**16**  she lives.  But for backpay, two thousand two hundred and

**17**  fifty -- and five hundred and forty-seven.  That's the back

**18**  pay.  The front pay, $906,290.  That's the front pay, if she

**19**  were to work until she was 66.

**20**    Now, that number I just gave you, the 906,290, needs to be

**21**  recalculated to include present-day value.  So actually that

**22**  should be 820,999.  820,999.  These are the numbers that the

**23**  expert gave.  You don't have to take these numbers, but the

**24**  expert gave you those numbers.  Defendant didn't offer any

**25**  expert to refute those numbers.  So I give you those numbers.

1     Now for emotional damages, this one is easy.  Put yourself

2 in the shoes of Lori Cook and what she's endured when she

3 didn't do anything wrong.  And repeatedly she said, "I have

4 not done anything wrong."

5     Now, if you had -- just common sense.  If you had given

6 your employer a document, would you give your employer a

7 document that incriminated you, that said -- that didn't

8 support what you wanted it to say?  I mean, would you run to

9 your employer to do that?  It doesn't make any sense.  It

10 doesn't make any sense to continue to ask to look at this

11 document that supports what I've been saying to you, that I

12 was trained on this procedure with this manual.

13     One step further.  If you were given maybe your last

14 opportunity to get any compensation because you're 57 at this

15 time, your last opportunity thinking, this is it, and they

16 offer you a severance package, of course you have to sign away

17 something saying you aren't going to do some things, and you

18 say no, I haven't done anything wrong.  Why am I signing --

19 I'm not going to sign anything.  It makes no sense.  It makes

20 no sense.

21     So this is Lori's only day in court, and this is your

22 opportunity to make it right.  This is her last chance, and

23 we're confident that you will make it right.

24     Thank you.

25         MR. GALLAGHER:  Ladies and gentlemen, may it please

1    the Court:

2        Bullfight critics ranked in rows

3        Crowd the enormous Plaza full;

4        But there's only one there who really knows --

5        And he's the one who fights the bull.

6        You've spent three days now listening to evidence in this

7    case.  You've heard from eight witnesses.  You've had an

8    opportunity to review documents, to observe witnesses up

9    close, and within about 45 minutes, this case is going to be

10   in your hands.  You are going to be in the ring.  It's going

11   to be your responsibility, whether you like it or not, to make

12   a determination about whether Diane Wasson in fact did destroy

13   documents and in fact is retaliating against Ms. Cook.

14       I would suggest that after all of the evidence has been

15   entered and you've had a chance to review it, that you will

16   agree with us that Ms. Cook was fired for legitimate

17   nondiscriminatory reasons.

18       I want to take a few minutes now and go through the

19   testimony of each witness and highlight for you what I think

20   are the key takeaways in this case.

21       The first witness that you heard from was Lori Cook.  You

22   heard Ms. Cook testify to the following key points:

23       First, Ms. Cook testified that Harrison Medical Center is

24   a not-for-profit entity.  Thus, unlike for-profit entities

25   that are in it to make money for their shareholders, Ms. Cook

said that Harrison is about providing good health care to
citizens.  Ms. Cook testified that health care companies are
not required to take Medicare patients, but when they do, the
government attaches some strings.  One string is that they
have to follow Medicare billing rules.  Another string is that
providers that take Medicare have to provide Medicare services
to everyone, including free services to the poor.

But in return for that, Medicare has set up a system that
provides for regular payment for those services by Medicare,
and the unit of payment that is used is this 60-day episode of
care.  And Medicare doesn't require that the providers wait
until the end of this 60-day period in order to get paid.  In
order to help with their cash flow, in order to help those
providers stay in business, Medicare allows those providers to
request and receive an interim payment before the expiration
of that 60-day period.  That's what we've talked about as the
RAP, the request for anticipated payment.

And once the request for anticipated payment is received,
Ms. Cook testified that the provider receives an interim
payment.  They receive usually 50 to 60 percent of the total
amount they are to get.  They get that as an interim pay.  And
then at the end of that 60-day period, they submit a final
claim.  Medicare then retracts the interim payment and it
makes a full and final payment, and that full and final
payment is the result of a trueing up between the provider and

Medicare.  In other words, they compare notes, they compare
the balances that they believe are owed, and once they are
agreed on a balance, Medicare pays the full balance.  That
way, the provider and Medicare are assured that there is no
overpayment.  There can be no fraud.

At the time that she interviewed with Harrison, Ms. Cook
testified that she represented she had more than 37 years of
experience with the Medicare system and with Medicare billing.
She acknowledged that she understood that Harrison was looking
for somebody who knew about Medicare billing and that they
were not looking to hire somebody that they had to train on
the job.

At the time that she applied for her job at Harrison, Ms.
Cook represented to Harrison that she had experience with
Medicare billing software, including the McKesson software,
and that she had served as an application trainer.  She
specifically testified that when she was at Swedish Home Care
she used McKesson software.

Now, when Ms. Cook joined Harrison, her early efforts were
focused on reducing the backlog of the accounts receivable.
Ms. Cook received a performance review about three months
after she joined Harrison and the second review in the summer
of 2012.  Both reviews noted areas for improvement.

Ms. Cook testified in October 2012 that Stacy Geiger, a
member of the accounting department, left Harrison and was

replaced by Jacob Stickly. You heard Mr. Fulton talk about Mr. Stickly. Mr. Stickly contacted Ms. Cook and requested that Ms. Cook provide him with an accounting report. After reviewing that accounting report, Diane Wasson became concerned about whether Ms. Cook was properly preparing those reports.

And you heard Mrs. Cook talk about how Ms. Wasson called her into a meeting on November 6th to discuss problems that were raised by Mr. Stickly. According to Ms. Cook, Ms. Wasson directed her to find out whether she was running the GenEnd report correctly. So what happened? Ms. Cook told us the first thing she did was she went back to her desk and she reran the report again to make sure that it was prepared properly. And it turned out exactly the same. So what did she do? She went back to Ms. Wasson and told her, "I reran the report and it looks exactly the same," and asked, "What do I do next?" And Ms. Wasson said contact McKesson Customer Service. So that's what Ms. Cook did. She went back and picked up the phone and she called McKesson Customer Service.

And her testimony was that she had called McKesson Customer Service twice a week since she started working for Harrison. So she certainly knew the number and they knew her. She spoke to Tiffany. And she testified that that call took about 15 minutes. And Tiffany told her that she was not running the GenEnd report correctly, that she was running it

1  on a daily basis and that's not how it should be run.

2  So Ms. Cook went back to Ms. Wasson again and told her

3  what she had learned from the help desk at McKesson, and Ms.

4  Wasson told her to go back and call them again, so she did.

5  She went back and placed the second call that day to Tiffany.

6  And when I asked her in her examination what she asked

7  differently in the second call, she wasn't able to articulate

8  what the purpose of the second call was.  She said Ms. Wasson

9  just told me to go back and call them again, so that's what

10  she did.

11  And then she went back to Ms. Wasson again, told her what

12  they told her the second time.  Ms. Wasson, according to Ms.

13  Cook's testimony, asked her to go back and make a third call,

14  so that's what she did.  She went back and she called the

15  McKesson help desk, someone named Tiffany, a third time, and

16  then came back and reported again to Ms. Wasson.

17  By that point in time, it was the end of the day.  It was

18  5:00, and she had spent 45 minutes on the phone with McKesson

19  on three different calls.  And that is the sum total of the

20  investigation that she claims she made into fraud.

21  But the calls that Ms. Cook made to customer service were

22  not an investigation into fraud.  Rather, they were simply an

23  attempt by an employee who had no clue what she was doing to

24  get some clarification of how she was supposed to perform her

25  job.  Ms. Cook didn't report the results of this investigation

to the authorities.  All she was doing was responding to a
request by her boss to find out why the reports were
inaccurate.  There was no testimony to suggest that she
reported results of these investigations to anybody else.  In
fact, if anybody was performing an investigation, it was Ms.
Wasson.  She was the one who was directing Ms. Cook to go make
these calls and report back.  Everything Ms. Cook was doing
was at the direction of Ms. Wasson that day.  There's no
variation in the testimony on that particular issue.  And the
following day, Ms. Cook was placed on administrative leave.

Now, ladies and gentlemen, it's difficult to be told that
you don't know what you're doing at work.  I understand that.
And Ms. Cook tries to rationalize what she was told now by
claiming that there was a manual that told her what she needed
to do, in fact required her to do what she was doing.

Now, there are a couple of things that are important here.
The first one is, she's never produced a copy of that manual,
even though she believes it would have saved her job.  It
would have been her get-out-of-jail-free card.  She didn't
save a copy, she didn't make a copy, she didn't even take a
copy of it -- or make a photo of it with her phone.  But more
importantly, ladies and gentlemen, she was the manager of the
billing department.  She didn't even realize -- if you believe
that the manual said what it said, she didn't even realize
that it was wrong, and she had been running this procedure for

almost two years on a daily basis.  She was the one who was
responsible for running the medical billing department.  It
was her responsibility to know if the billing was done
appropriately.  She should have realized that there was a
problem with the manual.

Now, ultimately you are going to have to decide whether
such a manual ever existed.  But the fact that Ms. Cook
blindly followed the wrong procedure every day for more than a
year conclusively demonstrates that she was not performing
effectively in her job.

And what did she then do?  She sued Harrison for fraud
under the False Claims Act.  And when I questioned her about
why she did that, remember what her answer was?  She said she
filed the False Claims Act claim -- not this lawsuit, but the
prior false claims lawsuit -- in an attempt to clear her name
and to find someone that would tell her whether or not she
committed fraud.  An attempt to clear her name and find
someone who would tell her whether she committed fraud.

Ladies and gentlemen, that explanation is simply
preposterous.  She and her husband were looking for money.  If
Ms. Cook really wanted to find out whether she had committed
fraud, she could have submitted a claim to the anonymous tip
line at Harrison or she could have contacted the Office of
Inspector General at the Department of Health and Human
Services.  Instead, she filed a federal tort law suit against

Harrison, alleging that Harrison had defrauded the United States Government, and she asked that a judgment be entered against Harrison that would allow her and her husband, who was also a party to that case, to keep at least 15 percent of any money they could prove was fraudulently obtained.

And it's undisputed that after she filed that lawsuit, the United States Department of Justice conducted an investigation into her allegations and concluded that her lawsuit lacked merit. They declined to intervene in the lawsuit, and Ms. Cook testified that the lawsuit has since been dismissed.

Now, Ms. Cook testified that she's been unable to find any employment since leaving Harrison. There are two points I want to focus on about that.

First, Ms. Cook candidly admitted that she was only looking for jobs, as she put it, quote, at her level. Those were the words she used, looking for jobs at her level. And she explained what she meant. She was looking for management or administrative jobs. So she has essentially taken herself out of a large segment of the job market. She's not looking for any job whatsoever, she's looking for senior management jobs.

And second, she testified she's only looking in Washington, despite the fact that she has been employed in Illinois before. And when you look at her resumé, her resumé really shows a very substantial ability to find employment.

1  She has a long history of stable employment with other

2  employers, and very short gaps in her resumé.  Indicative of

3  the fact that when she wants to find employment, she's

4  actually pretty good at it.

5      So that's what we heard from Ms. Cook.

6      The next witness you heard from was Judy Swem.  She was

7  the investigator with the Department of Justice.  Now, Ms.

8  Swem testified that after the lawsuit was filed, the False

9  Claims Act lawsuit, she was required to conduct an

10 investigation on behalf of the United States.  And as part of

11 that, she called Diane Wasson.  She admitted she called her

12 out of the blue.  She didn't tell Diane Wasson that she was

13 calling in connection with Lori Cook or that Lori Cook had

14 filed a lawsuit.  She simply asked Ms. Wasson if Ms. Wasson

15 had been investigating -- or had ever investigated Medicare

16 fraud at Harrison.  Ms. Wasson told her no, she had not

17 conducted an investigation into Medicare fraud.

18     We know from Ms. Wasson's testimony later that day that

19 that statement is true.  Ms. Wasson said she never did conduct

20 an investigation into Medicare fraud.  She explained to you

21 why fraud could not occur with this interim payment process

22 because of the trueing up at the end of the accounting where

23 both parties compared notes.  There's no potential, no

24 capability to defraud the government.  She said she was

25 conducting an investigation into employee incompetence.

1    Ms. Swem told you the U.S. Government concluded there was

2   no merit to the False Claims Act claim and fraud did not enter

3   in.  And Ms. Cook admitted that the case has been dismissed.

4    Next you heard from Paul Torelli.  Mr. Torelli made some

5   damages calculations.  First, Mr. Torelli was not offered or

6   received by the Court as an expert in any discipline, so you

7   can give his testimony whatever weight you think is

8   appropriate.

9    Now, Mr. Torelli prepared an estimate of Ms. Cook's

10  possible damages.  And I've got a slide to show you on that.

11   This was a slide -- can we go to computer 2?

12   Your Honor, do you mind if I approach and pull the easel

13  out of the way?

14       THE COURT:  You may.

15       MR. GALLAGHER:  You remember Mr. Fulton had this

16  Exhibit 1 up, and I suspect you will probably see it in a few

17  minutes when he comes to do his final closing.

18   And Mr. James conducted the examination of Mr. Torelli.

19  And you will remember Mr. Torelli told us that he owns a

20  company called Quantitative Social Science.  When Mr. James

21  pressed him on language on his website and the fact that he is

22  the chief economist at Quantitative Social Science, you will

23  recall that Mr. Torelli conceded that he's the only person

24  that works for Quantitative Social Science.  Now, I think that

25  calls into question his willingness to push the facts a little

bit.

But let's talk about his calculation, because that's the critical thing here. And there were a couple of admissions that he made during the course of his cross-examination that I believe are critically important.

Now, Mr. Torelli indicated that the calculations that he made were based on a number of assumptions: That Harrison would have kept Ms. Cook in the same position through the age of 68. It was based on the assumption that she was competent at her job. It was based on an assumption that she would have received a 3.9 percent salary increase even though the only evidence in front of you is a 2.5 increase. And it's based on the critical assumption that she was unable to find any new employment even in a lower paying job.

Now, ladies and gentlemen, if she was able to find comparable employment, Mr. Torelli testified that all of the front pay calculations would be irrelevant. So you can mark that off of his chart. Even if she got a lower paying job, it would completely undermine the estimates that he put together.

Mr. Torelli also indicated -- well, and she found full employment today, she would be entitled to zero in terms of front pay.

Now, Mr. Torelli also admitted that he only works for plaintiffs' lawyers. He's only taken work from lawyers who represent employees in civil employment cases. He doesn't

represent the other side. And he didn't even meet with Ms.

Cook in person when he prepared his report. And you also

heard him candidly admit that even if one of his assumptions

is incorrect, all of his calculations would be wrong.

Next you heard from John Miotke. He was presented by

deposition. There were some key points in John Miotke's

testimony. The first one was that the online billing

manual -- the online billing manual is the most reliable

source for billing procedures. It's available on McKesson's

website, so it would be available to Ms. Cook at any time.

He also testified that McKesson's customer services is

very available, but we know that because she called them

multiple times a week.

He testified as to the difference on the GenEnd page in

the manual. He testified that adjustments, the adjustments

tab should only be clicked and the adjustments run daily, but

when you click the adjustments and revenue distribution tab,

that's only to be run at month's end. That's page -- or

that's -- that's page 19 of the exhibit with the GenEnd tab,

or the GenEnd page.

It's important because that's the only evidence that's in

front of you. There's no suggestion that there was another

separate GenEnd page. The testimony that Mr. Miotke gave was

that the document marked as the exhibit was the page that he

had put in his manual. And he said when he left Harrison, he

left a collection of screen shots for future reference.

They also admitted that even if Ms. Cook did not follow the appropriate GenEnd procedure, which she said was the monthly run, there was no duplicate revenue billed to Medicare, or there was no inappropriate request to Medicare, and thus there could be no fraud.

Finally, he testified that when he was the supervisor at Harrison and when he was having problems with an employee, he would essentially do what Ms. Wasson did. He would meet with the employee, he would coordinate with HR, he would document his conversation, he would try to counsel the employee, and if there was no resolution, he would work with HR to follow the appropriate steps to discipline that employee or to terminate.

Now, the final witness in the plaintiff's case was Mr. Cook. He told you that he did not have any firsthand information about fraud, but he did -- he did confirm that he loves his wife very much.

And that was the end of Ms. Cook's case.

Now, Harrison's first witness was Diane Wasson. Ms. Wasson testified that she had been in management in home health for over 28 years. That when she was hired as the director of Harrison Home Health, she became Ms. Cook's supervisor. She testified that she began having concerns about Ms. Cook's performance within several months of taking over supervising Ms. Cook. But she didn't fire her

1  immediately. She identified those problems and addressed them

2  in two performance reviews -- you will be able to see those

3  exhibits -- and she tried to work with Ms. Cook to address the

4  problems.

5      She testified to a series of 20 meetings with Ms. Cook

6  that started in January 2012 to help Ms. Cook work through

7  problems with accounts receivable, to advise her on seeking

8  help from McKesson when necessary, to help her perform a

9  credit balance, Excel spreadsheet report. She said she met

10  three times with her on that. And then in a very significant

11  situation that Ms. Cook never addressed in this trial, Ms.

12  Wasson identified that Ms. Cook actually suspended the care of

13  a patient at Harrison because she couldn't get Medicare

14  approval because she hadn't submitted the paperwork in a

15  timely fashion. So because of Ms. Cook's inability to do her

16  job, a patient at Harrison Medical Center almost had her --

17  his or her care affected, but luckily the team of physicians

18  stepped in and said we can't do this. We have to -- we have

19  an obligation to treat this patient.

20      So Ms. Cook' performance problems extended beyond the

21  financial. This was an example of how a patient's care was

22  affected by her inability to do her job in a timely fashion.

23      Ms. Wasson also said she worked with Ms. Cook to

24  understand the appropriate procedure to prepare quarterly

25  Medicare reports, and she attempted to help her understand on

multiple occasions why the home health accounts receivable

that she was preparing did not match the numbers coming from

the finance department.

And you heard Ms. Wasson testify that the straw that broke

the camel's back was when she asked Ms. Cook to explain to her

why those reports weren't matching, and Ms. Cook could not

explain them.  Instead, Ms. Cook had to go back to her desk,

and she returned with a manual that she said explained why she

was doing what she did.  It was at that point that Ms. Wasson

learned that Ms. Cook had been running the GenEnd process

wrong.

And at that point Ms. Wasson decided that she needed to

take appropriate action.  So she met with Ms. Holland and Ms.

LaMarche, and they determined that it was going to be

necessary to conduct an investigation into Ms. Cook's errors,

and they placed her the following day on investigatory leave.

Ms. Wasson looked into Ms. Cook's errors, and in fact

herself performed Ms. Cook's billing functions while Ms. Cook

was on leave.  She hired McKesson, as we now know, to help

conduct that audit into Ms. Cook's performance, and McKesson

did in fact conduct an audit, and what did McKesson conclude?

This is from the McKesson report that you will get to see as

Exhibit A.  They concluded in the summary:

In summation:  It is my opinion that the billing manager

lacked the analytical and cross functional expertise needed by

1    a skilled and experienced billing manager.

2         They concluded that when billing manager tried to make

3    correction independent of instruction or direction for each

4    account, those are the accounts we find out of sync.

5         And finally they concluded:  This is all a result of not

6    understanding how a home care billing system handles

7    adjustments, payments, contractual allowances, and all the

8    workings behind the scene.

9         Mr. Fulton suggested that McKesson was in cahoots with

10   Harrison, and I will talk about that in a minute.  But the

11   reality is McKesson validated Ms. Wasson's concerns that Ms.

12   Cook was simply not competent to do her job.  Ms. Wasson

13   testified that these -- this report confirmed her suspicions.

14        And next you heard from Karen Holland.  She was the human

15   resources business partner who worked with Diane Wasson and

16   helped her determine the appropriate process to follow with

17   Ms. Cook.  Ms. Holland testified she doesn't work at Harrison

18   anymore, but she first learned of Ms. Wasson's problems with

19   Ms. Cook's performance in the fall of 2012, and she counseled

20   Ms. Wasson on how to proceed, how to reach out to Ms. Cook and

21   help her work through these issues.

22        Ms. Holland testified she was in that meeting on

23   November 7th, 2012, when Ms. Cook was placed on investigatory

24   leave.  She testified that she was aware that McKesson had

25   been hired to audit Ms. Cook's performance, and she thought

1   that was a good idea and it was reasonable because McKesson

2   knows their own software.  She was aware of the results of the

3   audit and recalled that Ms. Cook did not have the

4   qualifications to be the billing manager, and she was in the

5   meeting when Ms. Cook was terminated, and she thought that

6   decision to terminate Ms. Cook's employment was a reasonable

7   and responsible thing to do.

8       Harrison's final witness was Marie LaMarche.  She's the

9   executive director of human resources at Harrison.  She

10  testified that she approved the decision to terminate Ms.

11  Cook's employment.  She did so because she and Ms. Holland and

12  Ms. Wasson recognized that Ms. Cook had made errors and that

13  the investigation had borne that out.

14      She was part of the decision as well to hire McKesson and

15  thought that it was appropriate because they knew their own

16  software and because Harrison had an agreement in place in

17  which McKesson had agreed to protect the patient's protected

18  health information.  She received the results of the McKesson

19  report and she approved the decision to terminate Ms. Cook's

20  employment.

21      At the beginning of the case on Tuesday, Ms. Harry stood

22  before you and told you that this was going to be a case about

23  responsibility.  What have you heard about responsibility over

24  the last four days?

25      First you heard from Diane Wasson that Harrison Home

1  Health believes it has a responsibility to its patients to

2  provide them with first rate care and to bill them accurately.

3      You heard from Karen Holland who said that she believes

4  she had a responsibility to ensure that the investigative

5  process was fair, and that's what she did.

6      You heard from Ms. LaMarche, who testified that she had a

7  responsibility, she felt, to ensure that Ms. Cook was treated

8  fairly.

9      But what did you hear about responsibility from Ms. Cook?

10 Ms. Cook testified that she was not responsible for the

11 problems with the GenEnd program.  Despite the fact that she

12 was the billing manager in the department, Ms. Cook testified

13 it wasn't her responsibility that this manual, if it even

14 existed, was wrong.  She took no responsibility whatsoever for

15 the problems with the Medicare billing, yet she was their

16 medical billing manager.

17     Instead, she blamed John Miotke, who she claims made an

18 error in drafting the original supposed manual.  She blamed

19 the poor quality of the McKesson software.  She blamed the

20 Harrison IT department, remember, because she said they

21 wouldn't buy a new computer server to update the McKesson

22 software to a newer version.  She said it would only cost, I

23 think, $80,000.  She blamed Harrison for never integrating

24 more than 70 percent of the functionality of the McKesson

25 software.  And, of course, she blamed Diane Wasson, her

1   vengeful boss, who she claims wanted to make her a scapegoat.

2   And she blamed Karen Holland, who she called a parrot -- I

3   assume for rubber stamping the actions of her boss.  And she

4   also referred to Marie LaMarche also as a parrot.

5       Ladies and gentlemen, it now falls to you, as jurors, to

6   determine who in this case is telling the truth and who is

7   not.  I submit that there are only two plausible scenarios

8   from which you can choose.  First, you can believe Ms. Cook's

9   theory of the case, her reality.

10      In Ms. Cook's reality, she was the expert -- those were

11  her words.  She was the expert in Medicare billing, who was

12  fully qualified to serve as Harrison's medical billing

13  manager.

14      In her reality, Harrison had a daily manual that had been

15  used for more than nine years for running the McKesson

16  software GenEnd program on a daily basis, and that manual

17  required her to do that.

18      In her reality, Harrison had been running this GenEnd

19  process incorrectly for six years, and that error was so

20  subtle that even a qualified Medicare billing expert like Ms.

21  Cook could not have discovered it.

22      In her reality, the only way that Harrison was able to

23  identify the root cause of this billing problem was for her to

24  conduct an investigation -- those were her words -- in which

25  she candidly admits consisted only of three telephone calls to

1    somebody named Tiffany at the McKesson help desk.  And after

2    she concluded her investigation, she would have you believe

3    that for some sinister reason Diane Wasson decided to pin all

4    the blame on her.  But to cover her tracks, Ms. Wasson

5    enlisted Karen Holland and Marie LaMarche, her parents -- or

6    her peers to conduct their own sham investigation.

7        Now, there are clearly problems with Ms. Cook's reality.

8    However, the death note of this theory, I would suggest, and

9    the most important point in the case, I would suggest, was

10   when Ms. Harry asked the judge to admit Exhibit 8, the

11   McKesson investigative report, into evidence and Mr. Fulton

12   said he wanted to get it into evidence.  But you will recall

13   he objected to the admission of that into evidence, but it was

14   brought in nonetheless.  And that exhibit showed that Harrison

15   brought in McKesson Health to determine whether Ms. Cook was

16   properly running the software.

17       Now, despite the fact -- and they did this.  This is Ms.

18   Cook's theory despite the fact she would apparently have you

19   believe that Tiffany is an expert on one hand, but the woman

20   who came in and did the audit for McKesson should not be

21   trusted.

22       So ultimately in Ms. Cook's view of the world, Diane

23   Wasson, Karen Holland, Marie LaMarche, and the support team

24   and the McKesson audit team all conspired to concoct a false

25   explanation for why month-end reports were incorrect.  And

when I asked her why Ms. Wasson would possibly do such a thing, do you remember what she said?  She said that people on TV shred documents like that all the time.  People on TV shred documents like that all the time.

So in Ms. Cook's theory of the case, Diane Wasson, Karen Holland, and Marie LaMarche all sat in that chair right there, they looked you in the eye, and they lied to you.  They committed perjury in federal court all to frame Ms. Cook.

Well, ladies and gentlemen, I would suggest that there's another explanation for what happened with Ms. Cook's employment.  I would suggest that Ms. Cook was a hard working person who was simply in over her head.  When Ms. Cook applied at Harrison for the billing manager position, she stretched her qualifications.  She made herself seem more qualified than she actually was, and the extent of her fitting didn't become immediately obvious.  While Harrison did take away some of her management responsibilities almost immediately -- you will remember Mr. Fulton asked her about that -- they transferred a couple of employees out from under her to somebody else.  But really, for the first few months that she was working at Harrison, she was involved in trying to dig into this pile of accounts receivable that needed to be dealt with before the receivables became so old they couldn't get payment from Medicare.

But as time went on and as she made progress addressing

those receivable problems, the deficiencies in her skill set became apparent.  When her 90-day evaluation rolled around, the problems were starting to surface.  Ms. Wasson testified about how the review that she prepared listed some areas where improvement was needed, where she expected Ms. Cook to focus and make improvements, and one of those areas was cleaning up the month-end reports.  And in her first annual review, Ms. Wasson again pointed out areas where improvement was needed.

We heard from Karen Holland that Ms. Wasson first approached her only four months after Ms. Wasson had started and asked her to help her devise some ways to help address problems with Ms. Cook's performance.

Let me stop there for a moment.  Ms. Cook was hired as a billing manager.  She was supposed to be the expert in billing matters.  Ms. Wasson, on the other hand, was the director of home health.  She was responsible for running all of the operations at home health.  She was not necessarily an expert at billing, but she was certainly experienced enough to recognize problems when they arose.  And unfortunately what she was dealing with was a billing manager who was not able to effectively do her job, at least with a modest degree of supervision.  She testified Ms. Cook, though she was salaried, wanted to come in at 8:00 and leave at 5:00, and was willing to leave these problems for someone else to fix.

I would suggest, ladies and gentlemen, that Ms. Wasson is

a patient person.  She did not rush to judgment.  She did not dismiss Ms. Cook when it became apparent that she was in over her head.  Instead, working with the HR department, she regularly met with Ms. Cook to counsel her and to coach her about areas that she needed to focus on.  You heard Ms. Wasson testify that she counseled Ms. Cook on multiple occasions. You heard her describe the magnitude of the problems that were being brought to her attention.  This was not just one performance issue related to GenEnd, it was a series of issues across the board.

Should Ms. Wasson have terminated Ms. Cook earlier? Perhaps.  But as noted, she was patient and compassionate in her dealing with Ms. Cook, as was the HR department.  But every person, every organization has its limits.  Harrison's mission is to provide top quality care to its patients.  Part of that mission requires them to send accurate bills.

Ms. Wasson described it as a fiduciary responsibility, and because she believed she had this fiduciary responsibility to Harrison and to its patients, she said they couldn't accept these performance issues indefinitely.  Things reached a head in November 2012 when she inquired as to how Ms. Cook was running the GenEnd program.

Here we face the biggest red herring in the plaintiff's case.  The biggest red herring in the plaintiff's case.  She claims she gave Ms. Wasson a book.  In fact, she drew a

picture of a book which really didn't accurately represent the actual sheet pad, notepad of 30 pages that she gave her. And she wants you to believe that Ms. Wasson destroyed this book and then substituted it with different documents and then lied to you under penalty of perjury, and then got all these other witnesses to support her position in this grand conspiracy to get money.

But we submit that didn't happen. Rather, Ms. Cook never engaged in protected activity. What is protected activity? Well, you heard when Judge Settle read the jury instructions to you, and you will see when you get the jury instructions, protected activity requires Ms. Cook to have been investigating fraud against the government or to reasonably believe she was investigating fraud against the government.

What did Ms. Cook do here? She did her job. Not very well, but she did her job. She followed her supervisor's directions to determine the cause of the multiple billing errors. Unable to solve the problems herself, Ms. Cook did what she had always done, she called the McKesson help desk and asked Tiffany. And when she found out that information, she reported it to Ms. Wasson.

Was she investigating fraud against the government at that point? Hardly. Ms. Wasson was directing her to get to the bottom of the billing errors. There was no suggestion by Ms. Wasson or anybody that those errors might possibly result in

billing fraud.  No reasonable person could conclude that.

     In fact, Ms. Cook herself did not think that, at least not until after she had been terminated, not until she -- after she had decided to sue Harrison Medical Center.  How do we know that?  Well, think back to her testimony about the meeting that she had with Ms. Wasson and Ms. Holland on November 7, the day she was placed on leave.  What did Ms. Cook say she did?  She jumped to the conclusion that the police might show up at her home.  Why would she do that?  Because she thought her mistakes might have resulted in fraud, not that someone else at Harrison had engaged in fraud.  That never happened.

     So when you get the jury instructions, one of the most important instructions that we want you to focus on is instruction number 13, and instruction number 13 requires that the employee had knowledge that the -- requires the employer have knowledge that the employee was engaged in protected activity.  We suggest that at no point in time was Ms. Cook engaged in protected activity.

     Then there's instruction 15.  Instruction 15 describes that the employer knows that an employee is engaged in protected activity if that employer was aware at time that the employee was investigating potential fraud.  Again, we suggest that is not the case.  You heard Ms. Wasson's testimony.  She never considered this to be fraud.  Even John Miotke said that

1   in his deposition.

2      The next instruction that I would like you to focus

3   particularly on is instruction 18.  It requires that for you

4   to find for Ms. Cook you must conclude that Ms. Wasson, Ms.

5   Holland, and Ms. LaMarche, and the McKesson investigator all

6   concluded that Ms. Cook -- I think I have the wrong

7   instruction.

8      Actually -- let me go back.  We renumbered these.  Oh,

9   instruction 16.  Why don't you take a look at 16.

10     16 says an employer discriminates against an employee if

11  the employer discharges or suspends the employee because the

12  employee engaged in protected activity.  The important word

13  there is because.

14     There's no evidence in this case that Ms. Cook was

15  terminated because she engaged in protected activity.

16  Instead, the evidence is overwhelming that she simply wasn't

17  doing her job and that was the reason that she was terminated.

18  It was because she was not competent.  She was in over her

19  head.  There was testimony that almost a million dollars had

20  been lost to collections and was associated with the cost of

21  unwinding her mistakes.  Somebody finally had to say enough is

22  enough.

23     Lastly, I would like to direct your attention to the

24  verdict form.  This is the last two pages of the jury

25  instructions.  There's really only one question you need to

1  answer, and it is question number 1:  Did Lori Cook engage in

2  protected activity?  We believe that the answer clearly is no.

3      But if for some reason you believe that it is yes, you

4  must answer the second question:  Did Harrison Medical Center

5  know that Lori Cook was engaged in protected activity?  Again,

6  all Lori Cook was doing was acting at the direction of Ms.

7  Wasson, which was not protected activity.

8      And finally, question number 3:  Did Harrison Medical

9  Center suspend or terminate Lori Cook because she was engaged

10  in protected activity?  Again, I would suggest that the

11  evidence is overwhelming that Ms. Cook was terminated because

12  of performance issues.

13      Ladies and gentlemen, Ms. Cook is not a bad person, but

14  enough is enough.  Ms. Cook testified that she wanted someone

15  to investigate and tell her whether she had engaged in fraud.

16  You have now given her four days of your time.  It's now time

17  to close the book on this case so that she and her husband can

18  move on.

19      On behalf of Harrison Medical Center, I want to thank you

20  for your patience and your attention during this trial.  I

21  would ask you to find in favor of Harrison Medical Center and

22  tell Lori Cook that she has pointed her finger at everyone,

23  except for one person who is truly responsible for the

24  termination of her employment, Lori Cook herself.

25      Thank you.

1      THE COURT:  We're going to take a ten-minute break

2  here -- we will try to keep it at ten minutes -- and then we

3  will be giving the case to you.

4      THE CLERK:  All rise.

5   (Recessed at 11:00 a.m.)

6   (Jury not present.)

7      THE COURT:  I'm reluctant to ask, Mr. Fulton, how

8  much time?

9      MR. FULTON:  Five minutes.

10     THE CLERK:  All rise for the jury.

11     THE COURT:  But Mr. Gallagher managed to find more

12  time available to himself as well.

13     MR. GALLAGHER:  I apologize, Your Honor.

14     THE COURT:  No, you did fine.  It all worked out.

15     THE CLERK:  Please rise for the jury.

16   (Jury present; 11:15 a.m.)

17     THE COURT:  Everyone please be seated.

18   All right, Mr. Fulton.

19     MR. FULTON:  Ladies and gentlemen of the jury, I will

20  be brief so you guys can get back.

21   Just a few points regarding what defendant said.

22   He made a point about the sinister destroying of

23  documents.  It's not sinister.  It's not any sinister reason,

24  but I think we all can understand that when you are in a

25  position where you are ahead of a department and something has

1   been going on for a year and a half, someone is going to look

2   to you and say, how did this happen?  And when you are in a

3   position that is a comfortable position, where she testified

4   she's making over 145,000 a year, she wants to stay.  It's not

5   sinister, it's I'm protecting myself.

6       And when something goes on long enough to where you think

7   you are okay, and then you get the call that blew that,

8   there's been a lawsuit filed, get ready for litigation.  Two

9   years approximately from the time when Lori was in her office.

10  A lot of things happen in two years.  Where do you find the

11  documents again?  Well, who knows.  The point is, it's not the

12  document.

13      Counsel also talked about, again, the 20 meetings.  I

14  shouldn't have to spend much time on the 20 meetings that were

15  read into evidence that were from an untrustworthy source, a

16  document prepared -- typed up and prepared in preparation for

17  litigation.

18      But let's look at the last three jury instructions that

19  were mentioned.

20      Jury instruction number 14.  Lori Cook engaged in

21  protected activity if she had a good faith belief that

22  Harrison Medical Center was possibly committing fraud against

23  the government.

24      Now, you've heard the testimony, and I will remind you

25  again, that what she was investigating involved two things.

1  One was a quarterly credit balance report, and her testimony

2  over the course of four days, you heard that, that quarterly

3  credit report, where does it go?  It goes to the government.

4  If that report is wrong, what do you have?  Fraud.  She was

5  investigating that.  Essentially fraud would have occurred.

6  If something is wrong and we are doing something wrong, that's

7  fraud.

8       What else was she investigating?

9       Counsel said that she was told to go find out about

10  GenEnd.  That's not the testimony.  In the process of working

11  to find out the problem between, what was it?  The McKesson

12  operation report -- or overpayment report was supposed to

13  match up to what?  The credit column in the MARR report.  When

14  she said, I need to find out, go find what this is, in that

15  process, in investigating that, that's when she discovered the

16  GenEnd.

17       So she wasn't following the direction of her employer.

18  Even if she was following the direction, it doesn't matter.

19  It's not a prerequisite -- or a non-requisite, I should say --

20  of the statute.  Investigation is investigation.  If you are

21  doing investigation, it's not -- you're in your workplace when

22  these things occur.  You're not outside your workplace.

23  You're in your workplace, and you find something, that's

24  what's investigation.  When you find something and it has

25  potential fraudulent ramifications, you have a duty to report

it.  If you don't, you're in trouble.  That's investigation.
That's what was testified to.  That's what is before you, and
I'm sure in your notes, and you will see again, that's what
she was doing.

Did she have a good faith belief?  Yes, she had a good
faith believe.  That good faith belief was ratified the day
she took that book into her supervisor.  It was ratified.
That good faith belief was immediately justified.  Not only
did she understand the GenEnd process leads to a final
payment, and that final payment goes to the government, bells
and whistles went off.  You're immediately suspended, stop
everything.  Why? Potential fraud.  That's why.  Potential
fraud.  It was immediate because it was the biggest discovery
in probably Harrison's history.  It was huge.  And yes, she
was responsible, she was the one doing it at the instruction
of her employer.

So any reasonable person in that position, any billing
manager who came across GenEnd as the intricate process for
final payment of claims would do the exact same thing that
Lori did.  Exact same thing.  Potential fraud, I'm giving it
to my supervisor right now.

Instruction number 15.  Employer has knowledge that an
employee is engaging in protected activity if the employer was
aware that the employee was investigating possible fraud.

She took it to her that day.  They became aware of her

1    investigation right there.  They can't cut the camp.  They can

2    say, that, oh, Lori didn't know what she was doing or we told

3    Lori to do it.  It doesn't make sense.  As soon as she brought

4    it, what did they do?  Immediate suspension, because the

5    implication was huge.  That's why it stopped right there.

6    They knew about fraud, potential fraud.  They were scared of

7    fraud.

8        Last instruction.  An employer discriminates against an

9    employee if the employer discharges or suspends the employee

10   because the employee engaged in protected activity.

11       What started all this?  Her investigation into potential

12   fraud.  That's the protected activity.  That's what started

13   all of this.

14       The instructions are clear, the evidence is clear.

15       Now, it's not a conspiracy.  I told you about LaMarche and

16   Holland.  All they can say -- it's not a conspiracy, but all

17   that they can say is what they were told by Diane.  It doesn't

18   mean it's a conspiracy.  They only can repeat.  Both of them

19   testified to, yeah, all the information I got was because of

20   what Diane told me.  That's not a conspiracy.  But it's all I

21   can say is whatever I was told.  Diane Wasson is the key.

22       I know you will do the right thing.  Thank you for your

23   time.

24           THE COURT:  All right, then.  As you know, I've been

25   telling you not to discuss the case even among yourselves, and

1  of course now it's your responsibility to do just that.  You

2  still can't discuss it with anyone else, but now you may

3  proceed to deliberate the case.

4        THE CLERK:  All rise.

5     (Jury excused to begin deliberations at 11:24 a.m.)

6        THE COURT:  My requirement is that you be within 15

7  minutes in case we get a question.  Of course, if we get a

8  question, I want to consult with you before we formulate an

9  answer.  And be available, of course, also for the verdict.

10    (Recessed at 11:25 a.m.)

11    (Jury not present; 3:15 p.m.)

12        THE COURT:  All right, we've been informed that the

13 jury has a verdict.

14    I will tell the jurors that by court policy the attorneys

15 are not to contact the jurors afterwards, but I also tell them

16 that if they wish, they can stay after and talk with the

17 attorneys.  I tell them not to discuss any of the specifics on

18 deliberations, but just more about style and that sort of

19 thing.

20    Are either attorneys interested in that process?

21        MR. FULTON:  Yes, Your Honor.

22        MR. GALLAGHER:  Yes, Your Honor.

23        THE COURT:  I also routinely poll each juror for

24 unanimous.

25        THE CLERK:  Please rise for the jury.

1     (Jury present; 3:18 p.m.)

2         THE COURT:  Please be seated.

3     Has the jury reached a unanimous verdict?

4         JUROR NO. 8:  Yes, Your Honor.

5         THE COURT:  Would you hand the verdict to Gretchen?

6     Thank you.

7     All right, Gretchen, would you read the verdict?  And I'm

8     going to, after she reads the verdict, ask each of you if this

9     is your verdict and the verdict of the jury.

10        THE CLERK:  We, the jury, give the following answers

11    to the questions submitted by the Court:

12    Did Lori Cook engage in protected activity?

13    Yes.

14    Did Harrison Medical Center know that Lori Cook was

15    engaged in protected activity?

16    Yes.

17    Did Harrison Medical Center suspend or terminate Lori Cook

18    because she was engaged in protected active?

19    Yes.

20    Number 4.  What is the total amount of Lori Cook's damages

21    caused by Harrison Medical Center's unlawful conduct?

22    Her lost past wages and benefits:  $222,547.

23    Her lost future wages and benefits:  $939,192.

24    For emotional distress damages:  $222.547.

25    Signed by the presiding juror.

1      THE COURT:  Would you read the emotional damages one
2  more time.

3      THE CLERK:  $222,547.

4      THE COURT:  All right.  Thank you.

5  Juror number 1, is this your verdict and the verdict of
6  the jury.

7      JUROR NO. 1:  Yes, sir.

8      THE COURT:  Juror number 2, is this your verdict and
9  the verdict of the jury?

10      JUROR NO. 2:  Yes.

11      THE COURT:  Juror number 3, is this your verdict and
12  the verdict of the jury?

13      JUROR NO. 3:  Yes.

14      THE COURT:  Juror number 4, is this your verdict and
15  the verdict of the jury?

16      JUROR NO. 4:  Yes.

17      THE COURT:  Juror number 5, is this your verdict and
18  the verdict of the jury?

19      JUROR NO. 5:  Yes.

20      THE COURT:  Juror number 6, is this your verdict and
21  the verdict of the jury?

22      JUROR NO. 6:  Yes, sir.

23      THE COURT:  Juror number 7, is this your verdict and
24  the verdict of the jury?

25      JUROR NO. 7:  Yes, Your Honor.

1    THE COURT:  And juror number 8, is this your verdict
2  and the verdict of the jury?

3    JUROR NO. 8:  Yes, Your Honor.

4    THE COURT:  All right.  Thank you for your service.
5  I said at the beginning of the trial how important I believe
6  it is that a citizen respond to summons and perform the work
7  of a juror.  Our system depends upon it.  So on behalf of the
8  parties, I thank you, and I will dismiss you.

9    Now, the rule in our district here is that attorneys are
10  instructed that they may not contact jurors after the case.
11  However, if you are willing, you may remain after and come
12  back in the courtroom in the back to the benches, and the
13  attorneys may have questions that they would like to ask of
14  you, but they cannot explore into matters of deliberation.
15  It's really just a matter of asking you about how you thought
16  they performed as attorneys and general questions like that.
17  But your deliberations are done in the deliberations room and
18  you need to protect the sanctity of that jury room as to how
19  you explicitly deliberated this case.

20    So thank you again for your service.

21    THE CLERK:  All rise.

22  (Jury excused; 3:23 p.m.)

23    THE COURT:  If there are jurors -- you may be seated.
24  If there are jurors who wish to take up that invitation, I
25  will also be in the courtroom.  What I usual do is just have

1  you sit at your tables, turn your chairs around and face them.

2  I will sit between the two tables and supervise.

3      No, you're fine, you can sit there.

4      Are there any questions here?

5          MR. FULTON:  No, Your Honor.

6          MR. GALLAGHER:  Nothing from the defense, Your Honor.

7          THE COURT:  All right.  I will direct Gretchen to

8  record the verdict.  We will be in recess.

9      (Recessed at 3:24 p.m.)

10

11

12                  C E R T I F I C A T E
        I certify that the foregoing is a correct transcript from
13  the record of proceedings in the above-entitled matter.

14  /s/  Julaine V. Ryen              September 4, 2015
        JULAINE V. RYEN                      Date
15

16

17

18

19

20

21

22

23

24

25